# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

June 28, 2005

The Honorable Sue L. Robinson         **REDACTED**
United States District Court
844 North Kind Street
Wilmington, DE 19801

      RE:   *BTG International Inc. v. Amazon.com, Inc.*
             C.A. No. 04-1264-SLR

Dear Chief Judge Robinson:

      This is BTG's reply letter regarding BTG's assertion of the common interest doctrine. In their opposition letter of June 24, 2005 (D.I. 147), defendants failed to explain why the clear and identical legal interest BTG and Tucows share in the validity, enforceability and infringement of the patents-in-suit under their joint Patent Assignment and Commercialization Agreement (PACA) doesn't apply.

-               That omission is glaring.

                    That creates for Tucows the same legal interest as BTG in having the patents-in-suit found not invalid, enforceable and infringed. *See* Exhibit A to BTG's opening letter, §§ 8.1 to 8.3
      Defendants' opposition letter does not even address those provisions of the PACA. That glaring omission speaks volumes as to the strength of defendants' arguments. Moreover, it is surprising because defendants have stated several times that Tucows should be a party to this suit as a result of those very same provisions of the PACA. For example, during the April 20 hearing, Counsel for defendants explained:

The Honorable Sue L. Robinson
June 28, 2005
Page 2

*See* Exhibit D, p. 37:23- 38:5.

That statement just cannot be reconciled with defendants' current position that Tucows has absolutely no legal interest in the patents-in-suit or this patent infringement litigation. Sections 8.1 – 8.3 of the PACA clearly create for Tucows the identical legal interest that BTG has—that the patents be found valid and enforceable.

- The common interest exception applies to all documents that were created before but not exchanged until after the PACA was signed.

Defendants argue that the common interest doctrine cannot apply to documents created before the execution date of the PACA, <u>even</u> if those documents were transmitted from Tucows to BTG after the October 10, 2002 execution date of the PACA. Not only would such a rule make no sense, but defendants completely mischaracterize the facts and law of the *Baxter* case to claim such a rule exists. In *Baxter*, the documents at issue were exchanged at a time when the parties had <u>no</u> common interest at all. *See Baxter Travenol Labs., Inc. v. Abbott Labs.*, 1987 U.S. Dist. LEXIS 10300 at * 6-7 (N.D. Ill. June 17, 1987) (Exhibit C to BTG's opening letter). While the *Baxter* court did say that the communications at issue were not privileged because they were made before the common legal interest arose, the court was referring to when the communications were actually exchanged—all the communications were exchanged before the common interest was established. *Id.* That is much different than the case at hand where, while the documents were created before October 10, 2002, they were not transferred between BTG and Tucows until after that date—*i.e.*, after the common interest arose.

- 

That financial interest, however, does not and can not destroy the legal interest Tucows shares with BTG. The Federal Circuit could not have been clearer on this: "The fact that there may be an overlap of a commercial and a legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest." *See In re The Regents of the Univ. of Cal.*, 101 F.3d 1386, 1390 (Fed. Cir. 1996).

In *Regents*, the Federal Circuit held that the patentee and the exclusive licensee had the "same interest in obtaining strong and enforceable patents," that the patentee sought "valid and enforceable patents to support royalty income," and that the licensee sought "valid and enforceable patents to support commercial activity." 101 F.3d at 1390. Their commercial interests did not negate the effect of their legal interests in establishing applicability of the

The Honorable Sue L. Robinson
June 28, 2005
Page 3

common interest doctrine. *See id.* (citing *Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146, 1172 (D.S.C. 1974)).

Defendants try to distinguish BTG's cited cases on the claim that they merely involve a common interest in obtaining patents. However, courts have made clear that irrespective of whether the communications were "focused on pending litigation or on developing a patent program that would afford maximum protection, the privilege should not be denied when the common interest is clear." *See SCM Corp. v. Xerox Corp.*, 70 FRD 508, 514 (D. Conn. 1976) (explaining that the parties may have shared a sufficiently common interest in the exploitation of certain patents); *Stanley Works v. Haeger Potteries, Inc.*, 35 FRD 551 (N.D. Ill. 1964) (court considered parties' interests in joint licensing programs sufficiently in common to justify protecting communication between the interested parties in preparation for trials in which common business interests were involved). The common interest in this case is clear—the validity, enforceability and infringement of the patents-in-suit through the rights and obligations created under the PACA.

- Cases cited by defendants do not support their argument.

Defendants cite only two patent cases—*Corning* and *Duplan*—in support of their argument that Tucows' interest is solely commercial. Both of these cases, however, are easily distinguishable from the facts here.

The *Corning* case simply dealt with a situation where privileged information was disclosed before any type of shared legal interest had been created. In that case, the disclosing party provided an opinion of counsel to a past potential third-party acquirer of the patents. The sole purpose of the disclosure was to persuade the acquirer to invest in the party. Those *Corning* facts are much different than the facts at hand. Here, the parties entered into the PACA—which created their identical legal interests in the patents—*before any privileged information was exchanged*. The purpose of the exchange here was not to persuade BTG to invest in Tucows; rather, it was to assist the parties in having the patents found to be not invalid, enforceable and infringed.

In their continued attempt to develop their "purely commercial interest" theme, defendants compare either BTG or Tucows to something less than an exclusive licensee.[1] In doing so, they cite the *Duplan* case for the proposition that "disclosure to [even] an exclusive licensee constitutes wavier because such a licensee holds purely a commercial interest in the patent." Defendants' opposition letter, p. 4. Irrespective of the lack of merit to defendants' analogy, this was not the holding in *Duplan*. Rather, the *Duplan* court found that an exclusive licensee under the patents, who was not a party to the litigation, did not have a community of

---

[1] It is completely unclear whether defendants are claiming that it is BTG or Tucows who holds only a commercial interest because defendants state: "Plaintiff holds even less interest than exclusive licensee holds ..." and "Plaintiff only holds a commercial interest...". *See* Defendants' opposition letter, p.4. BTG assumes defendants meant to refer only to Tucows and have erroneously called Tucows the Plaintiff in this lawsuit.

The Honorable Sue L. Robinson
June 28, 2005
Page 4

interest with the patentee because the patentee had no duty to defend the licensee in the pending litigation. *See Duplan,* 397 F. Supp. at 1172. The court then found, however, that the work product privilege may attach for communications made to or received from that licensee for the purpose of gathering evidence for the litigation. *Id.*

Neither of these cases show, as defendants suggest, that Tucows' interest in the patents was solely commercial. Instead, they provide further support that Tucows and BTG had a common legal interest in the patents.

Additionally, under *Duplan,* any communications between BTG and Tucows for the purposes of gathering information in anticipation of litigation is privileged.

### Other issues raised in Defendants' opposition letter

The Court did not order briefing on any issues other than the ones discussed immediately above. The defendants, however, in their June 24, 2005 opposition letter, have attempted to seek *in camera* review for privileged documents involving communications between non-attorneys at the direction of an attorney (i.e., communications where it may be unclear who the attorney involved in the communication is), and for certain privileged communications with third parties. Those two categories of documents have been referred to as "categories (3) and (4)" in defendants' June 14, 2005 letter to the Court (D.I. 143) and at the June 14, 2005 hearing. BTG submits that the defendants have jumped the gun on these issues, and that they are, as discussed at the June 14, 2005 hearing and in subsequent correspondence with the defendants, in the process of being resolved.

With respect to category (3)—privileged communications at the direction of an attorney—at the June 14, 2005 hearing, BTG's counsel noted that the defendants' privilege logs had the same exact "deficiencies" that defendants were complaining about.[2] *See* Exhibit C to Defendants' opposition letter, 14:5-17. BTG's counsel suggested that the privilege logs be amended to indicate the name of the attorney that directed the privileged communications. *Id.* The defendants raised no objection to proceeding that way and made no other proposal.

The "problem" of which defendants now complain began when BTG's counsel called Overstock's counsel—who stated on the record at the June 14th hearing that he was speaking for

---

[2] For example, the majority of the entries on Barnes and Noble's log list the author/addressee as "Legal Dept.," "Marketing Dept." or even "n/a" without identifying the particular individuals the document was actually provided to or received from or the attorney directing the communication. *See e.g.,* Exhibit E, Privilege Doc. No. PD0004; PD0019; PD0022. Similarly, Amazon's log has numerous entries where the author/recipient column is completely blank and there is no mention of the attorney directing the action. *See e.g.,* Exhibit F, p.3, P-AMZ-B 00000315-00000320 to P-AMZ-B 00000602-615. And every one of Overstock's five entries on its privilege log fails to identify a recipient. *See e.g.,* Exhibit G.

The Honorable Sue L. Robinson
June 28, 2005
Page 5

all of the defendants on these privilege issues—to discuss the proposal to amend the privilege logs. Overstock's counsel refused to discuss whether defendants agreed to the proposal. BTG's counsel soon afterward sent Overstock's counsel a letter—which was copied to counsel for all defendants—indicating that, if the defendants agree to the procedure proposed by BTG, the parties "can work out a format and schedule for providing the information." *See* Exhibit F to Defendants' opposition letter. BTG is still waiting to hear whether the defendants agree to the procedure, and any assertion by the defendants in their opposition letter to the contrary is completely erroneous. If defendants agree to the proposal, BTG will soon thereafter exchange amended privilege logs with defendants. If defendants have another proposal, they should make that proposal to BTG.

With respect to category (4), privileged communications with third parties, BTG's counsel has explained to Overstock's counsel precisely who the third parties are that appear on BTG's log. Additionally, for any of the third parties for which Overstock identified a concern, BTG agreed to revisit those documents to determine if they can be produced on a non-waiver basis.[3] It is more than surprising that defendants told the Court in their opposition letter that "BTG has provided no explanation for the asserted privilege with respect to these documents and communications with third parties" after BTG's detailed conversation with Overstock's counsel. As BTG's counsel explained in the June 17 letter that defendants filed with the court, BTG is currently reviewing these documents and others to determine if any can be produced on a non-waiver basis.[4]

### Conclusion

For the reasons set forth above, BTG submits that the common interest doctrine applies to privileged communications between Tucows and BTG.

Respectfully,

/s/ *John G. Day*

John G. Day

JGD/nml
Attachments

---

[3] All of the entries for Forbes Magazine are really entries for BTG employee David Armstrong. This was merely an oversight in drafting the log and all of those entries will be amended to include Mr. Armstrong's correct title.

[4] Defendants' logs similarly identify communications with third parties. For example, Amazon's log list individuals from Stanford and Cornell as being recipients of documents. *See, e.g.*, Exhibit F, P-AMZ-B 00000033-00000072. For Netflix's log, it is impossible to determine who the authors or recipients are because they provide no titles whatsoever for the individuals listed other than a very short list of attorneys. *See, e.g.*, Exhibit H, Netflix's first entry NF 00094131 to NF 00094134.

The Honorable Sue L. Robinson
June 28, 2005
Page 6

159006.1

c:  Clerk of the Court (by hand; w/attachments)
    Josy W. Ingersoll, Esquire (by hand; w/attachments)
    Rodger D. Smith, Esquire (by hand; w/attachments)
    William J. Wade, Esquire (by hand; w/attachments)
    David J. Margules, Esquire (by hand; w/attachments)
    Ronald J. Schutz, Esquire (via Federal Express; w/attachments)
    Jeffrey S. Love, Esquire (via Federal Express; w/attachments)
    Jeffrey R. Chanin, Esquire (via Federal Express; w/attachments)
    William W. Flachsbart, Esquire (via Federal Express; w/attachments)
    Lawrence G. Kurland, Esquire (via Federal Express; w/attachments)