# EXHIBIT A



711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
Phone 713.223.2300
Fax 713.221.1212
www.bracewellgiuliani.com

June 2, 2005

By Facsimile

Mr. Michael A. Collyard
Robins, Kaplan, Miller & Ciresi, L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota 55402-2015

Re: C.A. No. 04-1264-SLR; *BTG International Inc. v. Amazon.com, et al.;* In the United States District Court for the District of Delaware

Dear Michael:

After a review of BTG's privilege log, I believe that you have listed many documents in error. There are several categories of documents listed on the privilege log that are not privileged and must be produced.

**Infonautics/Tucows**

You have listed many documents that are communications by and between Infonautics, Tucows, BTG, and other parties. Any communications by and between BTG and Infonautics or Tucows is obviously not privileged. Moreover, any documents in your possession that were formerly in the possession of Infonautics or Tucows are no longer privileged, even if they were privileged when possessed by Infonautics or Tucows. Where one company assigns assets (such as patents) to another company, the attorney client privilege related to those assets is not transferred. The"authority to assert and waive the corporation's attorney-client privilege follows the passage of control of the corporation." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985). Thus, the privilege is only transferred to the second corporation where change in control of the entire company, not just specific assets, is transferred. Many courts have confirmed that the mere transfer of assets without a change in control of the entire company does not transfer the privilege. *See Telectronics Proprietary Ltd. v. Medtronic, Inc.* 836 F.2d 1332, 1336 (Fed. Cir. 1988) (affirming district court holding that assignment of a patent does not transfer attorney-client relationship); *Pilates, Inc. v. Georgetown Bodyworks Deep Muscle Massage Centers, Inc.*, 2012 F.R.D. 261, 264 (D.C. 2000) (holding that party who was merely assigned trademarks cannot assert attorney-client privilege on behalf of former owners of trademarks); *Yosemite Investment, Inc. v. Floyd Bell, Inc.*, 943 F. Supp. 882, 883 (S.D. Ohio 1996) ("The general rule that the right to assert the attorney-client privilege does not change hands with bare assignment of

 

BRACEWELL & GIULIANI LLP

assets is based upon the notion that the right to assert the attorney-client privilege is an incident of control of the corporation...."); *In re In-Store Advertising Securities Litig.*, 163 F.R.D. 452 (S.D.N.Y. 1995) (holding that where confidential attorney-client communications are transferred from a corporation selling assets to the corporation buying the assets, the privilege is waived as to those communications).

Further, any communications by and between you and Tucows/Infonautics after the transaction closed cannot possibly be privileged under any theory.

Accordingly, at least the following documents (referenced by their number on BTG's privilege log) are not privileged and must be produced:

| | | |
|---|---|---|
| 0001-0264 | 1393-1406 | 1623-1624 |
| 0321-0323 | 1435 | 1629-1631 |
| 0678-0687 | 1439 | 1637-1639 |
| 0946 | 1458 | 1650 |
| 0948-0949 | 1464 | 1669 |
| 0951-0952 | 1487-1491 | 1677 |
| 0972 | 1500-1501 | 1840 |
| 1043 | 1504-1507 | 1866 |
| 1228 | 1515 | 1998-1999 |
| 1257-1260 | 1519-1520 | 2008 |
| 1277-1282 | 1524 | 2144 |
| 1305-1306 | 1602-1604 | 2146 |
| 1321 | 1614 | |
| 1360-1361 | 1616-1619 | |

**BTG Internal Communications and Documents**

There are many emails and other documents listed on BTG's privilege log that do not appear to have been sent by or to an attorney. I noticed that you were very careful in labeling attorneys as "Esq." in the privilege log, so I assume that the following communications (and possibly others) were not made or sent by attorneys. These communications are not privileged and must be produced. In the alternative, the documents should be inspected *in camera* by the Court to determine if they should be produced.

| | | |
|---|---|---|
| 0304 | 0830 | 1480-1484 |
| 0541-0549 | 0833-0837 | 1486 |
| 0551-0563 | 1210 | 1492 |
| 0566-0572 | 1371 | 1565-1575 |
| 0574 | 1459-1460 | 1587-1589 |

| | | |
|---|---|---|
| 1598 | 1776-1779 | 1932-1933 |
| 1620-1622 | 1781-1783 | 1948-1949 |
| 1633-1636 | 1785-1786 | 1952-1953 |
| 1642-1643 | 1789-1795 | 1956-1957 |
| 1654 | 1802 | 2029-2030 |
| 1657 | 1832-1834 | 2032 |
| 1670-1674 | 1847-1849 | 2077-2080 |
| 1680-1682 | 1854-1859 | 2150-2153 |
| 1693-1694 | 1864 | 2231-2235 |
| 1729-1732 | 1867 | 2239 |
| 1755-1759 | 1882 | |

**Documents and Communications with Third Parties**

There are a number of documents that appear to be communications between BTG and some third party as well as documents created by a third party. For example, there are several entries related to Patent Logistics, Firefly Communications, and Taylor Rafferty. There is no basis for your assertion of privilege for communications with any of these or other third parties who are not BTG's clients or consulting-only experts. Please produce the documents corresponding to the following numbers in BTG's privilege log, as well as any other communications with third parties:

| | | |
|---|---|---|
| 0646 | 1421 | 1661-1668 |
| 0649 | 1425 | 1709-1711 |
| 0653 | 1438 | 1801 |
| 0738-0744 | 1444 | 1807 |
| 0791 | 1446-1447 | 1812 |
| 1034 | 1462-1463 | 1814 |
| 1046 | 1470 | 1817 |
| 1096-1098 | 1485 | 1819 |
| 1114-1115 | 1493 | 1821 |
| 1125-1171 | 1495-1496 | 1824 |
| 1175-1182 | 1498-1499 | 1830 |
| 1275-1276 | 1531-1534 | 1877 |
| 1304 | 1576-1578 | 1951 |
| 1307 | 1581-1583 | 1954 |
| 1320 | 1595-1596 | 2053-2063 |
| 1323 | 1609 | 2085-2086 |
| 1362-1363 | 1612 | 2149 |
| 1410-1411 | 1659 | 2229 |




BRACEWELL & GIULIANI LLP

Finally, BTG has redacted portions of several emails that it produced. If these redacted emails are on your privilege log, please let me know which privilege log number corresponds to the following Bates labeled pages:

| | | |
|---|---|---|
| BTG021916 | BTG022137 | BTG022191 |
| BTG022056 | BTG022140 | BTG022309 |
| BTG022065 | BTG022161 | BTG022330 |
| BTG022068 | BTG022186 | BTG022351 |
| BTG022076 | BTG022187 | BTG022370 |
| BTG022135 | BTG022189 | BTG022425 |
| BTG022136 | BTG022190 | |

If these redacted documents are not on BTG's privilege log, please provide the basis for redaction.

I trust that you will produce the above documents, as none of them are privileged. I also look forward to resolving the issue of the redacted emails. Please call me if you have any questions.

Very truly yours,

Bracewell & Giuliani LLP

John F. Luman III

JFL/da

cc: Karen L. Pascale.
David J. Margules
BOUCHARD, MARGULES & FRIEDLANDER
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
*(Via Facsimile)*

Glenn A. Ballard, Jr.
BRACEWELL & GIULIANI LLP

# EXHIBIT B

BOUCHARD MARGULES & FRIEDLANDER
A PROFESSIONAL CORPORATION
SUITE 1400
222 DELAWARE AVENUE
WILMINGTON, DELAWARE 19801
(302) 573-3500
FAX (302) 573-3501

ANDRE G. BOUCHARD
JOEL FRIEDLANDER
DAVID J. MARGULES

JOANNE P. PINCKNEY
COUNSEL
KAREN L. PASCALE
JOHN M. SEAMAN
DOMINICK T. GATTUSO

June 14, 2005

***Via Electronic Filing***

The Honorable Sue L. Robinson
United States District Court
844 North King Street
Wilmington, DE 19801

RE: *BTG International, Inc. v. Amazon.com, Inc.*,
D. Del., C.A. No. 04-1264-SLR

Dear Chief Judge Robinson:

I am writing today on behalf of Defendants Amazon.com, Inc., Amazon Services, Inc., Netflix, Inc., Barnesandnoble.com Inc. and Overstock.com, Inc., in connection with the discovery conference at 4:30 p.m. today. There are several issues Defendants wish to raise. Defendants' counsel has raised each of these issues with Plaintiff's counsel.

**1. BTG's Assertions of Privilege**

As the Court may recall, in a letter to the Court on April 20, 2005 and at the discovery conference of the same date, Defendants raised a concern over Plaintiff's failure to produce documents related to the alleged invention of the technology of the patents-in-suit, the acquisition of the patents, and valuation of the patents. Plaintiff had asserted such documents were privileged. Under the Court's scheduling order, the parties were not obligated to exchange privilege logs until July 14, 2005. Defendants anticipated deposing the four named inventors, the subsequent owner of the patents (Tucows) and Plaintiff before mid-July, and were concerned about the potential impact mistaken claims of privilege could have on such depositions. Therefore, Defendants requested that the Parties exchange privilege logs on May 13, 2005, and have today's discovery conference to discuss Plaintiff's privilege claims.

On May 16, 2005, Plaintiff provided Defendants with a 474-page privilege log, alleging 2246 documents (not merely pages) are covered by one or more privileges. Many of Plaintiff's withheld documents, however, do not appear to fall under a proper claim of privilege. For example, Plaintiff has asserted privilege for the following classes of documents: (1) communications by and between Infonautics, Tucows, BTG, and other parties; (2) documents belonging to Infonautics/Tucows that have been disclosed to BTG prior to this litigation; (3) emails and other documents that do not appear to have been sent by or to an attorney; and (4) communications between BTG and some third party as well as documents created by third

parties. The total number of documents withheld that fall under these categories is in the neighborhood of 450 documents. Defendants maintain that these documents should be produced.

2. **Netflix Interrogatories Nos. 9 and 10**

Early in the case, BTG posed several interrogatories to Netflix, seeking facts in support of Netflix's laches and waiver defense. Netflix responded to BTG's interrogatories, laying out facts sufficient to sustain these defenses, most notably that BTG's predecessors-in-interest (Infonautics and Tucows) knew or reasonably should have known of Netflix's alleged infringement no later than May, 1999, when Netflix placed its first online advertisement. Netflix then posed Interrogatories No. 9 and 10 to BTG, asking BTG to state all facts it intends to rely on to defeat Netflix's laches and waiver defenses. On March 30, 2005, BTG responded, stating, in part, "Upon information and belief BTG's predecessors in interest never knew of Netflix's infringement." On April 11, 2005, Netflix amended its interrogatory responses, and provided additional facts in support of the laches and waiver defenses. For example, Netflix stated that Infonautics participated in Netflix's Affiliates Program, at least as early as 2001. BTG contends that Netflix infringes the '860 patent through its Affiliates Program. Netflix requested that BTG amend its responses to Interrogatories No. 9 and 10 in light of the additional information in Netflix's amended interrogatory responses. BTG refused.

Respectfully submitted,

Karen L. Pascale

Karen L. Pascale (#2903)
kpascale@bmf-law.com

cc: All Counsel

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

BTG INTERNATIONAL, INC., : CRIMINAL ACTION
Plaintiff :
vs. :
AMAZON.COM, INC., AMAZON SERVICES, INC., NETFLIX, INC., BARNESANDNOBLE.COM INC. and OVERSTOCK.COM, INC., :
Defendants : NO. 04-1264 (SLR)

- - -

Wilmington, Delaware
Tuesday, June 14, 2005
4:47 o'clock, p.m.

- - -

BEFORE: HONORABLE SUE L. ROBINSON, Chief Judge

- - -

APPEARANCES:

ASHBY & GEDDES
BY: JOHN G. DAY, ESQ.

-and-

ROBINS, KAPLAN, MILLER & CIRESI LLP
BY: NIALL A. MacLEOD, ESQ.
(Minneapolis, Minnesota)

Counsel for Plaintiff

Valerie J. Gunning
Official Court Reporter

APPEARANCES (Continued):

YOUNG, CONAWAY, STARGATT & TAYLOR LLP
BY: JOHN W. SHAW, ESQ.

-and-

KLARQUIST SPARKMAN
BY: KRISTIN CLEVELAND, ESQ.
(New York, New York)

Counsel for Defendant Amazon.com, Inc. and Amazon Services, Inc.

MORRIS, NICHOLS, ARSHT & TUNNELL
BY: RODGER D. SMITH, ESQ.

Counsel for Defendant Netflix, Inc.

RICHARDS, LAYTON & FINGER
BY: STEVEN J. FINEMAN, ESQ.

-and-

NIRO, SCAVONE, HELLER & NIRO
BY: WILLIAM W. FLACHSBART, ESQ.

-and-

BRYAN CAVE
BY: JOSEPH J. RICHETTI, ESQ.
(New York, New York)

Counsel for Defendant BarnesandNoble.com

APPEARANCES (continued):

BOUCHARD, MARUGLES & FRIEDLANDER P.A.
BY: KAREN L. PASCALE, ESQ.

-and-

BRACEWELL & GIULIANI LLP
BY: JOHN LUMAN, ESQ.

Counsel for Defendant Overstock.com

- - -

P R O C E E D I N G S

(Proceedings commenced in the courtroom, beginning at 4:47 p.m.)

THE COURT: Good afternoon, counsel.

I know I've received e-mails and letters about a few issues, so I will let plaintiff's counsel start with their issues and get to defendants.

MR. MacLEOD: Good afternoon, your Honor. Niall MacLeod, for plaintiff, BTG.

The good news, I think for the Court is that we right now we don't have any issues that we think we need to ask the Court to get involved in. We do have some issues with the defendants' document production, but they're all in the process, with one exception being worked out at this moment.

If I could just briefly update the Court on those, because they were issues that we discussed the last time we were before your Honor on April 20th, I believe.

The Court may remember that we had requested from Amazon that they produce documents related to, quote unquote, foreign websites. Amazon, for example,

Amazon.U.K. and Amazon.FR, which are French and British websites.

They've agreed to give us technical and financial information related to those websites and they are preserving their objections in that regard.

We also had some issues with regard to server and database logs with defendant Amazon. They've agreed to give us those as well and we're waiting to receive those from them and when we receive them, we can determine if the production is adequate at that time.

Finally, with respect to Amazon, we had requested documents related to third parties, third-party licenses, for example, and I believe they've agreed to give us those as well.

And we're just waiting for the production.

The one exception that I mentioned is with respect to BarnesandNoble.com, we think we have quite a few issues with their production. So far, though, we have not been able to meet and confer with Barnes and Noble. They've refused to meet and confer with us, their position being that, after the mediation we had in May, where the parties agreed to exchange some kind of settlement proposals, the discovery is on hold.

More correctly, the discovery is on hold with anything BTG wants. So we're waiting for that

meet and confer with Barnes and Noble and I assume that is partly based on what I'm saying right now, that will be upcoming soon. And at that time we can determine whether -- if the Court so chooses, that we could get before the Court again and discuss some of the Barnes and Noble discovery issues we have.

But that's all I have on behalf of plaintiff, your Honor.

THE COURT: All right. Thank you.

MR. LUMAN: Your Honor, John Luman, for Overstock.com, the defendants.

We sent you a letter. I'm not sure if you received it. You have been in trial, so it's probably not a high-PRIORITY thing for you to have looked at today. It's very short and talks about two issues that the defendants need to address.

One of them is actually a pretty big issue. We talked about it a little bit last time with respect to privileged documents.

The plaintiffs have not given us a lot of documents we think that are related to conception, reduction to practice, valuation, claiming they were all privileged. And so, on April 20th, we all agreed to give our privilege logs up by May 16th, to see exactly what they were claiming as privileged.

In fact, on May 16th, they gave defendants a roughly 500-PAGE privilege log claiming privilege on, I think, 2200 -- over 2200 documents.

We go through the privilege log, and there are -- I've outlined sort of four categories of documents that we don't believe the privilege applies to.

One of the biggest categories of documents relates to the patents in suit and sort of the original owner of these patents was Infonautix. Inventors were at Infonautix. They assigned their patent rights to Infonautix. This company, TUCOWS, came in and bought Infonautix, bought the patents. So the privileges that were associated with those patents passed from Infonautix to TUCOWS.

But now BTG came in and just bought the patents and they didn't buy anything else. They just bought the patents. The patents were assigned to BTG in this matter. And they are claiming privilege on all of the Infonautix and TUCOWS documents.

The case law is pretty clear that you can't buy a privilege and in this case they just bought the patents. They have not bought anything other than that. And so that's one big category of documents. I think it's on the order of 300 documents that fall into

this category that defendants are claiming attorney/client on.

So that's the -- that probably covers number two on this list and part of number one.

A couple other categories of documents. One is there are some documents that have sender receivers that aren't attorneys. There aren't titles associated with some of these people. We don't know why the privilege applies to those people as a category.

Also, there's communications with third parties, third-party marketing firms. There are some communications that went to Formes magazine that they're claiming privilege on and so those are the broad categories of documents that we've had trouble understanding why they claim privilege to.

I know this is all coming in a sort -- sort of out of the blue here without any briefing or anything like that.

We would be glad to offer the Court, you know, a five-page letter, something on that order, to supply case law and support for our arguments, if the Court is so inclined.

THE COURT: All right. Let's hear from BTG.

MR. MacLEOD: I can just briefly run down the arguments for the Court of the categories of

Page 9

documents that Mr. Luman just talked about. One category is what I think they're describing is communications between BTG, who's now the patent owner, and the previous patent owner, which was TUCOWS, TUCOWS/Infonautix.

We're claiming that the privilege did pass. We think there's a case and it's a better-reasoned case that says you look at these transfer of attorney/client on a case-by-case basis, but even if the Court were to disagree with us there, we think there's a common interest between BTG and TUCOWS that acts as an exception to any kind of waiver that may have gone on when BTG -- excuse me -- TUCOWS transferred any documents to BTG.

Our common interest is based on a patent assignment and commercialization agreement between BTG and TUCOWS, where TUCOWS assigns the patents to BTG and TUCOWS, in exchange for that, or in consideration for that, receives some of the net revenues of -- based on the commercialization of the patents.

So they have a common legal interest.

The other category that Mr. Luman discussed were some, I think some e-mails that he said did not have the -- in the to and for columns of our privilege log, did not have an attorney listed.

Page 10

First of all, all of the defendants' logs, with the exception of Overstock, which only has five entries on it, all of the defendants' logs have the same thing on it. But anyway, certainly, the law is that people acting at the direction of an attorney, including consultants or other employees of the attorneys, can communicate amongst themselves if it's at the direction of an attorney and can communicate privileged information between them without acting as a waiver of the attorney/client.

That's our position on that one, your Honor.

And I have agreed with Mr. Luman with respect to that particular category. To go back and look at those documents in any case and determine if there are some of them or perhaps we should have produced them and perhaps they're not attorney/client. And we will do that.

The last category Mr. Luman mentioned, I don't know about the Forbes Magazine document that he mentioned, but I will go back and look at that one.

All the other ones I think he's describing were communications, privileged communications between an attorney for BTG and a higher consultant, whether it was a technical consultant or a public relations consultant that was hired in connection with this

Page 11

litigation.

THE COURT: All right. Well, over 2,000 documents is a lot of documents to be on the privilege log, I have to say, and I've seen a few.

So with respect to the first issue, that sounds like something that I need some briefing on, and perhaps -- I don't know how best it is. It sounds like BTG is asserting a couple of arguments, so maybe BTG should go -- I don't know that simultaneous briefing is going to be helpful if the defendants aren't aware of all the arguments you are using for the assertion on privilege. I don't know whether even though typically, it would be motion to compel, maybe you shouldn't go first, so that there can be an appropriate response to all your arguments.

MR. MacLEOD: Okay. Can I have two comments on that?

THE COURT: Yes.

MR. MacLEOD: Our privilege log is large because we actually went back and got all the e-mails that existed at BTG and it just so happens that they happened to save a lot of them. I don't think the defendants have done quite the extensive searching we did.

There are literally thousands of e-mails on

Page 12

there because there were thousands of e-mails at BTG.

THE COURT: All right. Well, I'm not going to punish you for it. I'm just saying that I've not seen that many documents on a privilege log before.

With respect to this -- that kind of coverage, perhaps the first and second categories. With respect to the third and fourth, I don't know how, if there's no attorney listed, I don't know how opposing counsel can test whether the privilege has been asserted appropriately. At least with an attorney listed, there's a good chance that there's some privileged information.

So short of supplying the documents to me, it seems to me that what needs to happen is that there needs to be an attorney -- if these non-attorneys are talking at the direction of an attorney, that attorney has to be somehow enumerated or perhaps you can tell me how it is that we're supposed to be able to test whether, in fact, these are really privileged documents. I don't know, because even if I looked at them, it wouldn't necessarily be apparent to me that these communications were at the direction of some attorney.

MR. MacLEOD: The only way I can think, your Honor, is we were very careful in our description to indicate that this -- these were people working at

the direction of an attorney. That is really all I can offer. I mean, we believe they are privileged communications. E-mails between people working for Brad Dee, working at his direction, discussing legal communications. And, again, the same issues apply with respect to all of the defendants as well.

THE COURT: And you're saying that, with respect to Categories 3 and 4, most of these documents have to do with this litigation or is that just Category 4, the third party?

MR. MacLEOD: Most of the -- I think all the privileged documents would have to do with the patents in suit or this litigation.

THE COURT: Right. The patents in suit or this litigation.

Well, I don't exactly know how to -- I don't think it is necessarily unusual for there to be some review to make sure that the protection of the attorney/client is being appropriately asserted. So if there's not a better way of more clearly identifying that a lawyer is involved some way other than your just asserting that a lawyer is involved, then I'm going to have to take a look at these. And you will have to give me some explanation of the lawyer involved and how this got to be asserted.

So if you can't work something else out, then you'll have to -- perhaps defendants can identify a certain number in each category for my in-camera review.

MR. MacLEOD: May I make just one suggestion on that, your Honor? Since the problem, quote unquote, problem, exists with respected to their privilege logs as well, maybe we could discuss this with defendants and come up with a way where we can perhaps indicate on the log which attorney these communications were at the direction of.

THE COURT: Well, that would be a step forward. I suppose if there's the same kind of problem on both sides. I mean, I don't want to look at documents, to tell you the truth, but I think it is only fair for there to be some way to test the assertion if it's not clear from the log itself.

MR. MacLEOD: One more point, your Honor. I did indicate to Mr. Luman, I think it was yesterday, that we will look at some of the ones he identified in a previous letter to us to determine whether the assertion was correct.

THE COURT: All right. All right.

MR. LUMAN: Your Honor, Mr. MacLeod and I did speak on Friday I think it was. We did identify

some documents and there was another category here that we -- passed out. He's going to produce some documents.

The long and short of this is with respect to these documents, we did provide them a very detailed list of the documents we were concerned over, so it's not like he has to go back to everything and take a look at it. And so we have moved that ball forward.

THE COURT: All right. I'm not sure, have we decided that BTG was going to submit a short explanation as to Category 1 and 2 and that the defendants would respond according to some schedule with respect to Categories 1 and 2?

MR. MacLEOD: That would be fine with us, your Honor. I think you suggested that we would do an opening brief.

Since we don't really know what issues they specifically have, I was wondering if we could have a reply brief to any opposition that they had.

THE COURT: Sure. Absolutely.

All right. Let's move on to the other issue.

MR. LUMAN: Your Honor, just to follow up with the briefing, we have got inventor depositions and things of that nature coming up in late June and early July. Is there some type of schedule that we should have in order to get that done?

THE COURT: It's your issue.

MR. LUMAN: Well, he's got the opening brief.

THE COURT: Right. Well, I don't know how -- if you need it decided more sooner rather than later, then -- my problem is I probably won't be here much of July. I hope not to be here at least -- well, I hope not to be here much of July, so it either has to be done really quickly or you might as well not get anything done until August.

MR. LUMAN: Okay. Can I move that along somehow, even though I'm not the opening brief?

THE COURT: Well, I don't know how difficult this is to set down the argument.

Mr. MacLeod, can you get something to me in a week?

MR. MacLEOD: That would be very difficult. It really would.

THE COURT: Well, we are talking about a short brief that sets down, you said you've got two -- you've got the common interest argument and it does not sound like it should be much.

I would bet if we compared our burdens here, that mine is probably heavier than yours, and if I had to sit down and write a five-page brief on this, I could do it. I'm confident that you could do it as

well. So let's do five and five and two. All right? In terms of briefing. Five days, five days, two days.

MR. SMITH: Good afternoon, your Honor. Rodger Smith, on behalf of Netflix.com.

I will be brief on the second issue in the defendants' letter.

All of the defendants viewed the laches case here as a significant issue.

Very briefly, as your Honor may recall, BTG has sued us, all of us, based on our affiliates program and the way in which we administer those programs. And, in fact, the predecessor to BTG, prior to the owner of the patent, was an affiliate of many of ours, so was participating in many of these same programs. We think certainly put them on notice of our activities. If they didn't, in fact, know about it, they should have known. We all intend to vigorously pursue laches here.

The parties have exchanged contention interrogatories on the subject. BTG has said definitively that their predecessor Infonautix never knew about this. We've amended our response to say, Well, in fact, you did, and here's some evidence of your participation in our affiliates program.

And we've asked them to supplement their response to address the evidence we've put forward to

how they're going to defend against that and also not just on the knowledge, but also what contentions they have in terms of the reasonableness of their delay and the reasons for any delay.

My understanding, I have not had these conversations personally, but my understanding is they've so far taken the position that they are not required to supplement because it's not their burden. In fact, at some point it would become their burden, of course, if the burden shifted under laches case law. But even if this wasn't a burden-shifting legal issue, we don't understand any sort of reason for not supplementing and giving us these contentions.

As Mr. Luman said, we're getting ready to do depositions in this case and we'd like to have in hand what their contentions are on this subject so we can test it and determine for themselves whether their positions are supportable.

THE COURT: All right. Thank you.

MR. MacLEOD: Here's what's really going on with these Interrogatories 9 and 10. They're kind of strange to begin with because it is a burden, the laches defense is a burden that defendants have the -- Netflix, in particular, has the burden of proving. What they've done is given us an Interrogatory

basically saying tell us all the reasons that our laches defense might fail.

We have answered their laches Interrogatory in that regard to the extent we understood it. We can't read their minds, so we needed some facts from them showing what their laches case was.

Now, the Interrogatory we gave to them was very conclusory. It just said we have a laches defense and we think we're going to win and it laid out the elements in very legally conclusory form. Said there's a delay and we were prejudiced by it.

We just basically said, Well, we disagree with you, which is all we could do at that point.

What they've done is, about a month ago, added an additional fact in support of their laches defense, and now they want us to just come back and rebut it or refute it in some way, if we can.

I just don't understand why we -- why they are saying we have to proceed in this manner. Every time they add a fact to an Interrogatory answer, we have to come back and refute it or rebut it with whatever we have.

We have four supplementation dates in this case that the Court ordered at the beginning of the case. The next one is right around the corner. It's

on September 6th.

I think that's the appropriate time for us to supplement our Interrogatory Answers.

With respect to the particular fact that I mentioned that they added to their laches case, I don't know how I can rebut it, refute it or respond to it in the manner they want right now. I need to find whatever documents they've cited in support. Well, they have not cited any in support. I need to find whatever documents they're using to support it, take some depositions and see what it's all about. And I really don't think I can do that. I don't see why we have to until September 6th, which is the first supplementation date.

THE COURT: All right. I agree with you on that.

With respect to Barnes and Noble, I am --

MR. FLACHSBART: Your Honor, can I respond briefly?

THE COURT: To what?

MR. FLACHSBART: With respect to the stay of discovery.

THE COURT: Yes. I mean, there's never a stay of discovery until I say there's a stay of discovery, so I can't believe that instead of meeting and conferring and using this time to work out additional problems, that

we are now pushing whatever problems there are out and I suspect requesting more of my time.

MR. FLACHSBART: We'd be glad to meet and confer, your Honor. The only issue that they identified was a CD that was incorrectly burned. If they identify some issues to us, we'll be glad to meet and confer.

THE COURT: All right. All right. Is there anything else that we need to address this afternoon?

MR. LUMAN: No, your Honor.

THE COURT: All right. Thank you very much, counsel.

(Court recessed at 5:10 p.m.)

\- - -

-and [5] 1:19 2:4 2:15 2:18 3:4
04-1264 [1] 1:9
1 [2] 15:10 15:12
10 [2] 18:21 21:13
14 [1] 1:12
16th [2] 6:24 7:1
2 [2] 15:10 15:12
2,000 [1] 11:2
2005 [1] 1:12
20th [2] 4:21 6:23
2200 [2] 7:3 7:3
3 [1] 13:8
300 [1] 7:25
4 [4] 1:12 4:5 13:8 13:10
47 [2] 1:12 4:5
5 [1] 21:13
500-PAGE [1] 7:2
6th [2] 20:1 20:12
9 [1] 18:21
able [2] 5:19 12:18
Absolutely [1] 15:19
according [1] 15:11
acting [2] 10:5 10:9
ACTION [1] 1:4
activities [1] 17:15
acts [1] 9:12
add [1] 19:20
added [2] 19:15 20:5
additional [2] 19:15 20:25
address [3] 6:16 17:25 21:8
adequate [1] 5:10
administer [1] 17:11
affiliate [1] 17:13
affiliates [2] 17:10 17:23
afternoon [4] 4:7 4:11 17:3 21:9
again [2] 6:5 13:5
against [1] 18:1
ago [1] 19:14
agree [1] 20:14
agreed [6] 5:3 5:7 5:13 5:22 6:23 10:12
agreement [1] 9:16
along [1] 16:10
Amazon [6] 1:7 2:8 4:24 4:25 5:7 5:11
Amazon.com [2] 1:7 2:8
Amazon.FR [1] 5:1
Amazon.U.K [1] 5:1
amended [1] 17:21
amongst [1] 10:7
answer [1] 19:20
answered [1] 19:3
Answers [1] 20:3
anyway [1] 10:4
apparent [1] 12:21
APPEARANCES [3] 1:16 2:1 3:1
applies [2] 7:6 8:9
apply [1] 13:5
appropriate [2] 11:14 20:2
appropriately [2] 12:10 13:19
April [2] 4:21 6:23
argument [2] 16:13 16:20
arguments [5] 8:21 8:25 11:8 11:11 11:15
ARSHT [1] 2:10
ASHBY [1] 1:17
asserted [3] 12:10 13:19 13:25
asserting [2] 11:8 13:22
assertion [3] 11:11 14:16 14:22
assigned [2] 7:11 7:18
assignment [1] 9:16
assigns [1] 9:17
associated [2] 7:14 8:7
assume [1] 6:1
attorney [12] 9:25 10:5 10:8 10:23 12:8 12:10 12:15 12:16 12:16 12:22 13:1 14:10
attorney/client [5] 8:2 9:9 10:10 10:16 13:19
attorneys [2] 8:7 10:7
August [1] 16:9
aware [1] 11:10
ball [1] 15:7
Barnes [4] 5:19 6:1 6:5 20:16
BarnesandNoble.com [3] 1:8 2:22 5:17
based [4] 6:2 9:15 9:20 17:10
basis [1] 9:9
become [1] 18:9
begin [1] 18:22
beginning [2] 4:5 19:24
behalf [2] 6:7 17:4
best [1] 11:7
bet [1] 16:22
better [1] 13:20
better-reasoned [1] 9:7
between [6] 9:3 9:11 9:16 10:9 10:22 13:3
big [2] 6:17 7:24
biggest [1] 7:8
bit [1] 6:18
blue [1] 8:17
BOUCHARD [1] 3:2
bought [6] 7:12 7:13 7:16 7:18 7:22 7:23
BRACEWELL [1] 3:6
Brad [1] 13:4
brief [7] 15:15 15:18 16:2 16:11 16:19 16:24 17:5
briefing [5] 8:17 11:6 11:9 15:22 17:2
briefly [4] 4:19 8:24 17:9 20:18
British [1] 5:1
broad [1] 8:14
BRYAN [1] 2:20
BTG [21] 1:4 4:12 5:25 7:16 7:18 8:23 9:3 9:11 9:13 9:14 9:16 9:17 10:23 11:8 11:8 11:21 12:1 15:9 17:9 17:12 17:19
burden [6] 18:8 18:9 18:10 18:22 18:23 18:24
burden-shifting [1] 18:11
burdens [1] 16:22
burned [1] 21:5
buy [2] 7:17 7:22
C [1] 4:2
careful [1] 12:24
case [13] 7:21 7:22 8:21 9:7 9:8 10:14 17:7 18:10 18:15 19:6 19:24 19:25 20:5
case-by-case [1] 9:9
categories [8] 7:5 7:8 8:5 8:14 8:25 12:6 13:8 15:12
category [11] 7:24 8:1 8:9 9:2 9:22 10:13 10:18 13:9 14:3 15:1 15:10
CAVE [1] 2:20
CD [1] 21:5
certain [1] 14:3
certainly [2] 10:4 17:15
chance [1] 12:11
Chief [1] 1:14
chooses [1] 6:4
CIRESI [1] 1:20
cited [2] 20:8 20:9
claim [1] 8:15
claiming [7] 6:22 6:25 7:2 7:19 8:1 8:13 9:6
clear [2] 7:21 14:17
clearly [1] 13:20
CLEVELAND [1] 2:6
columns [1] 9:24
coming [2] 8:16 15:23
commenced [1] 4:4
comments [1] 11:16
commercialization [2] 9:16 9:20
common [4] 9:11 9:15 9:21 16:20
communicate [2] 10:7 10:8
communications [9] 8:10 8:12 9:3 10:22 10:22 12:22 13:3 13:5 14:10
company [1] 7:12
compared [1] 16:22
compel [1] 11:13
CONAWAY [1] 2:2
conception [1] 6:21
concerned [1] 15:5
conclusory [2] 19:8 19:10
confer [5] 5:19 5:20 6:1 21:4 21:6
conferring [1] 20:24
confident [1] 16:25
connection [1] 10:25
consideration [1] 9:18
consultant [3] 10:23 10:24 10:25
consultants [1] 10:6
contention [1] 17:18
contentions [3] 18:2 18:13 18:16
Continued [2] 2:1 3:1
conversations [1] 18:6
corner [1] 19:25
correct [1] 14:22
correctly [1] 5:24
counsel [9] 1:22 2:8 2:11 2:22 3:7 4:7 4:9 12:9 21:12
couple [2] 8:5 11:8
course [1] 18:10
Court [36] 1:1 1:23 4:7 4:13 4:15 4:19 4:23 6:4 6:5 6:9 8:19 8:22 8:23 8:25 9:10 11:2 11:18 12:2 13:7 13:14 14:12 14:23 15:8 15:19 16:1 16:3 16:12 16:18 18:19 19:24 20:14 20:19 20:22 21:7 21:11 21:13
courtroom [1] 4:4
coverage [1] 12:6
covers [1] 8:3
CRIMINAL [1] 1:4
D [2] 2:10 4:2
database [1] 5:7
date [1] 20:13
dates [1] 19:23
days [3] 17:2 17:2 17:2
decided [2] 15:9 16:4
Dee [1] 13:4
defend [1] 18:1
defendant [5] 2:8 2:11 2:22 3:7 5:7
defendants [14] 1:9 4:10 6:11 6:16 7:1 8:1 11:10 11:23 13:6 14:2 14:8 15:11 17:7 18:23
defendants' [4] 4:16 10:1 10:3 17:6
defense [4] 18:23 19:2 19:8 19:16
definitively [1] 17:20
Delaware [2] 1:2 1:11
delay [3] 18:3 18:4 19:11
depositions [3] 15:22 18:15 20:10
describing [2] 9:2 10:21
description [1] 12:24
detailed [1] 15:4
determine [5] 5:9 6:3 10:14 14:21 18:17
difficult [2] 16:12 16:16
direction [7] 10:5 10:8 12:16 12:22 13:1 13:4 14:11
disagree [2] 9:10

19:12
discovery [6] 5:23 5:24 6:6 20:21 20:23 20:23
discuss [2] 6:5 14:8
discussed [2] 4:20 9:22
discussing [1] 13:4
DISTRICT [2] 1:1 1:2
document [2] 4:16 10:19
documents [30] 4:24 5:12 6:19 6:21 7:3 7:6 7:8 7:20 7:24 7:25 8:5 8:6 8:14 9:1 9:14 10:14 11:3 11:3 12:4 12:13 12:19 13:8 13:12 14:15 15:1 15:2 15:4 15:5 20:8 20:9
done [6] 11:23 15:25 16:7 16:9 18:25 19:14
down [4] 8:24 16:13 16:19 16:24
E [2] 4:2 4:2
e-mails [6] 4:8 9:23 11:20 11:25 12:1 13:3
early [1] 15:23
either [1] 16:7
elements [1] 19:10
employees [1] 10:6
entries [1] 10:3
enumerated [1] 12:17
ESQ [10] 1:18 1:20 2:3 2:6 2:10 2:13 2:17 2:20 3:3 3:6
evidence [2] 17:22 17:25
exactly [2] 6:25 13:16
example [2] 4:25 5:13
exception [4] 4:17 5:16 9:12 10:2
exchange [2] 5:22 9:18
exchanged [1] 17:18
excuse [1] 9:13
existed [1] 11:21
exists [1] 14:7
explanation [2] 13:24 15:10
extensive [1] 11:23
extent [1] 19:4
fact [9] 7:1 12:19 17:12 17:16 17:22 18:9 19:15 19:20 20:4
facts [1] 19:5
fail [1] 19:2
fair [1] 14:16
fall [1] 7:25
far [2] 5:18 18:7
few [3] 4:9 5:18 11:4
Finally [1] 5:11
financial [1] 5:4
fine [1] 15:13
FINEMAN [1] 2:13
FINGER [1] 2:13
firms [1] 8:11
first [5] 10:1 11:5 11:14 12:6 20:13
five [5] 10:2 17:1 17:1 17:2 17:2
five-page [2] 8:20 16:24
FLACHSBART [4] 2:17 20:17 20:20 21:3
follow [1] 15:21
Forbes [1] 10:19
foreign [1] 4:25
form [1] 19:10
Formes [1] 8:12
forward [3] 14:13 15:7 17:25
four [2] 7:5 19:23
fourth [1] 12:7
French [1] 5:1
Friday [1] 14:25
FRIEDLANDER [1] 3:2
G [2] 1:18 4:2
GEDDES [1] 1:17
GIULIANI [1] 3:6
given [2] 6:20 18:25
giving [1] 18:13
glad [3] 8:19 21:3 21:6
gone [1] 9:13
good [5] 4:7 4:11 4:13 12:11 17:3
Gunning [1] 1:23
hand [1] 18:16
hear [1] 8:23
heavier [1] 16:23
HELLER [1] 2:16
helpful [1] 11:10
high-PRIORITY [1] 6:14
higher [1] 10:23
hired [1] 10:25
hold [2] 5:23 5:24
Honor [16] 4:11 4:21 6:8 6:10 10:11 12:24 14:6 14:18 14:24 15:14 15:21 17:3 17:9 20:17 21:4 21:10
HONORABLE [1] 1:14
hope [2] 16:6 16:6
identified [2] 14:20 21:4
identify [3] 14:2 14:25 21:5
identifying [1] 13:20
in-camera [1] 14:3
Inc [9] 1:4 1:7 1:7 1:8 1:8 1:8 2:8 2:8 2:11
inclined [1] 8:22
including [1] 10:6
incorrectly [1] 21:5
indicate [3] 12:25 14:9 14:19
Infonautix [7] 7:10 7:11 7:12 7:13 7:15 7:20 17:20
information [3] 5:4 10:9 12:12
instead [1] 20:24
intend [1] 17:17
interest [4] 9:11 9:15 9:21 16:20
INTERNATIONAL [1] 1:4
interrogatories [2] 17:19 18:21
Interrogatory [5] 18:25 19:3 19:7 19:20 20:3
inventor [1] 15:22
Inventors [1] 7:10
involved [4] 4:15 13:21 13:22 13:24
issue [8] 6:17 11:5 15:20 16:1 17:5 17:8 18:11 21:4
issues [12] 4:9 4:10 4:14 4:16 4:20 5:6 5:18 6:6 6:15 13:5 15:16 21:6
itself [1] 14:17
J [3] 1:23 2:13 2:20
John [4] 1:18 2:3 3:6 6:10
JOSEPH [1] 2:20
Judge [1] 1:14
July [3] 15:24 16:6 16:7
June [2] 1:12 15:23
KAPLAN [1] 1:20
KAREN [1] 3:3
kind [5] 5:22 9:12 12:5 14:13 18:21
KLARQUIST [1] 2:6
knew [1] 17:21
knowledge [1] 18:2
known [1] 17:17
KRISTIN [1] 2:6
L [2] 1:14 3:3
laches [10] 17:7 17:17 18:10 18:23 19:2 19:3 19:6 19:8 19:15 20:5
laid [1] 19:9
large [1] 11:19
last [3] 4:21 6:18 10:18
late [1] 15:23
law [4] 7:21 8:21 10:4 18:10
lawyer [3] 13:21 13:22 13:24
LAYTON [1] 2:13
least [2] 12:10 16:6
legal [3] 9:21 13:4 18:11
legally [1] 19:10
letter [4] 6:12 8:20 14:21 17:6
letters [1] 4:8
licenses [1] 5:13
list [2] 8:4 15:5
listed [3] 9:25 12:8 12:11
literally [1] 11:25
litigation [4] 11:1 13:9 13:13 13:15
LLP [3] 1:20 2:2 3:6
log [8] 7:2 7:4 9:25 11:4 11:19 12:4 14:10 14:17
logs [5] 5:7 6:24 10:1 10:3 14:7
look [7] 9:8 10:14 10:20 13:23 14:14 14:20 15:7
looked [2] 6:14 12:20
Luman [14] 3:6 6:10 6:10 9:1 9:22 10:12 10:18 14:19 14:24 15:21 16:2 16:10 18:14 21:10
MacLeod [15] 1:20 4:11 4:12 8:24 11:16 11:19 12:23 13:11 14:5 14:18 14:24 15:13 16:14 16:16 18:20
magazine [2] 8:12 10:19
manner [2] 19:19 20:7
marketing [1] 8:11
MARUGLES [1] 3:2
matter [1] 7:19
may [7] 4:23 5:22 6:24 7:1 9:12 14:5 17:9
mean [3] 13:2 14:14
20:22
mediation [1] 5:21
meet [5] 5:19 5:20 6:1 21:3 21:6
meeting [1] 20:24
mentioned [4] 5:16 10:18 10:20 20:5
might [2] 16:8 19:2
MILLER [1] 1:20
minds [1] 19:5
mine [1] 16:23
Minneapolis [1] 1:21
Minnesota [1] 1:21
moment [1] 4:18
month [1] 19:14
MORRIS [1] 2:10
most [2] 13:8 13:11
motion [1] 11:13
move [2] 15:20 16:10
moved [1] 15:7
N [1] 4:2
nature [1] 15:23
necessarily [2] 12:21 13:17
need [7] 4:15 6:16 11:6 16:4 20:7 20:9 21:8
needed [1] 19:5
needs [2] 12:14 12:15
net [1] 9:19
Netflix [3] 1:7 2:11 18:24
Netflix.com [1] 17:4
never [2] 17:20 20:22
New [4] 2:7 2:7 2:21 2:21
news [1] 4:13
next [1] 19:25
Niall [2] 1:20 4:12
NICHOLS [1] 2:10
NIRO [2] 2:16 2:16
Noble [4] 5:20 6:1 6:6 20:16
non-attorneys [1] 12:15
notice [1] 17:15
now [8] 4:14 6:2 7:16 9:3 19:7 19:16 20:7 21:1
number [3] 8:3 8:4 14:3
O [1] 4:2
o'clock [1] 1:12
objections [1] 5:5
offer [2] 8:19 13:2
Official [1] 1:23
one [13] 4:17 5:16

6:17 7:8 7:24 8:4 8:5 9:1 10:11 10:20 14:5 14:18 19:25
**ones** [2] 10:21 14:20
**opening** [3] 15:15 16:2 16:11
**opposing** [1] 12:8
**opposition** [1] 15:18
**order** [3] 7:25 8:20 15:25
**ordered** [1] 19:24
**original** [1] 7:9
**ours** [1] 17:13
**outlined** [1] 7:5
**Overstock** [1] 10:2
**Overstock.com** [3] 1:8 3:7 6:11
**owner** [4] 7:10 9:3 9:4 17:12
**P** [1] 4:2
**P.A** [1] 3:2
**p.m** [3] 1:12 4:5 21:13
**part** [1] 8:4
**participating** [1] 17:14
**participation** [1] 17:23
**particular** [3] 10:13 18:24 20:4
**parties** [4] 5:12 5:22 8:11 17:18
**partly** [1] 6:2
**party** [1] 13:10
**PASCALE** [1] 3:3
**pass** [1] 9:6
**passed** [2] 7:14 15:2
**patent** [5] 7:11 9:3 9:4 9:15 17:13
**patents** [12] 7:9 7:10 7:13 7:14 7:17 7:18 7:18 7:23 9:17 9:20 13:13 13:14
**people** [5] 8:8 8:9 10:5 12:25 13:3
**perhaps** [7] 10:15 10:16 11:7 12:6 12:17 14:2 14:9
**personally** [1] 18:6
**plaintiff** [4] 1:5 1:22 4:12 6:7
**plaintiff's** [1] 4:9
**plaintiffs** [1] 6:20
**point** [3] 14:18 18:9 19:13
**position** [3] 5:21 10:11 18:7
**positions** [1] 18:18
**practice** [1] 6:22
**predecessor** [2] 17:12 17:20
**prejudiced** [1] 19:11
**preserving** [1] 5:5
**pretty** [2] 6:17 7:21
**previous** [2] 9:4 14:21
**privilege** [18] 6:24 7:2 7:2 7:4 7:6 7:19 7:22 8:9 8:13 8:15 9:6 9:24 11:3 11:12 11:19 12:4 12:9 14:7
**privileged** [9] 6:19 6:23 6:25 10:9 10:22 12:12 12:19 13:2 13:12
**privileges** [1] 7:13
**problem** [4] 14:6 14:7 14:13 16:5
**problems** [2] 20:25 21:1
**proceed** [1] 19:19
**Proceedings** [1] 4:4
**process** [1] 4:17
**produce** [2] 4:24 15:2
**produced** [1] 10:16
**production** [4] 4:16 5:10 5:15 5:18
**program** [2] 17:10 17:23
**programs** [2] 17:11 17:14
**proposals** [1] 5:23
**protection** [1] 13:18
**provide** [1] 15:4
**proving** [1] 18:24
**public** [1] 10:24
**punish** [1] 12:3
**pursue** [1] 17:17
**pushing** [1] 21:1
**put** [2] 17:15 17:25
**quickly** [1] 16:8
**quite** [2] 5:17 11:23
**quote** [2] 4:24 14:6
**R** [1] 4:2
**rather** [1] 16:4
**read** [1] 19:5
**ready** [1] 18:14
**really** [7] 12:19 13:1 15:16 16:8 16:17 18:20 20:11
**reason** [1] 18:12
**reasonableness** [1] 18:3
**reasons** [2] 18:4 19:1
**rebut** [3] 19:17 19:21 20:6
**receive** [2] 5:8 5:9
**received** [2] 4:8 6:13
**receivers** [1] 8:6
**receives** [1] 9:19
**recessed** [1] 21:13
**reduction** [1] 6:22
**refused** [1] 5:20
**refute** [3] 19:17 19:21 20:6
**regard** [3] 5:5 5:6 19:4
**related** [4] 4:24 5:4 5:12 6:21
**relates** [1] 7:9
**relations** [1] 10:24
**remember** [1] 4:23
**reply** [1] 15:18
**Reporter** [1] 1:23
**requested** [2] 4:23 5:12
**requesting** [1] 21:2
**required** [1] 18:8
**respect** [14] 5:11 5:17 6:18 10:13 11:5 12:5 12:7 13:6 13:8 15:3 15:12 20:4 20:16 20:20
**respected** [1] 14:7
**respond** [3] 15:11 20:6 20:17
**response** [3] 11:14 17:21 17:25
**revenues** [1] 9:19
**review** [2] 13:18 14:4
**RICHARDS** [1] 2:13
**RICHETTI** [1] 2:20
**right** [20] 4:14 6:2 6:9 8:23 11:2 12:2 13:14 14:23 14:23 15:8 15:20 16:3 17:1 18:19 19:25 20:7 20:14 21:7 21:7 21:11
**rights** [1] 7:11
**ROBINS** [1] 1:20
**ROBINSON** [1] 1:14
**Rodger** [2] 2:10 17:4
**roughly** [1] 7:2
**run** [1] 8:24
**S** [1] 4:2
**save** [1] 11:22
**says** [1] 9:8
**SCAVONE** [1] 2:16
**schedule** [2] 15:11 15:24
**searching** [1] 11:23
**second** [2] 12:6 17:5
**see** [3] 6:24 20:11 20:12
**sender** [1] 8:6
**sent** [1] 6:12
**September** [2] 20:1 20:12
**server** [1] 5:6
**Services** [2] 1:7 2:8
**set** [1] 16:13
**sets** [1] 16:19
**settlement** [1] 5:23
**SHAW** [1] 2:3
**shifted** [1] 18:10
**short** [5] 6:15 12:13 15:3 15:9 16:19
**showing** [1] 19:6
**sides** [1] 14:14
**significant** [1] 17:8
**simultaneous** [1] 11:9
**sit** [1] 16:24
**SLR** [1] 1:9
**Smith** [3] 2:10 17:3 17:4
**soon** [1] 6:3
**sooner** [1] 16:4
**sort** [5] 7:5 7:9 8:16 8:17 18:12
**sound** [1] 16:21
**sounds** [2] 11:6 11:7
**SPARKMAN** [1] 2:6
**speak** [1] 14:25
**specifically** [1] 15:17
**STARGATT** [1] 2:2
**start** [1] 4:10
**STATES** [1] 1:1
**stay** [3] 20:20 20:23 20:23
**step** [1] 14:12
**STEVEN** [1] 2:13
**strange** [1] 18:22
**subject** [2] 17:19 18:16
**submit** [1] 15:9
**SUE** [1] 1:14
**sued** [1] 17:10
**suggested** [1] 15:14
**suggestion** [1] 14:5
**suit** [3] 7:9 13:13 13:14
**supplement** [3] 17:24 18:8 20:3
**supplementation** [2] 19:23 20:13
**supplementing** [1] 18:13
**supply** [1] 8:21
**supplying** [1] 12:13
**support** [5] 8:21 19:15 20:8 20:9 20:10
**supportable** [1] 18:18
**suppose** [1] 14:13
**supposed** [1] 12:18
**suspect** [1] 21:2
**talks** [1] 6:15
**TAYLOR** [1] 2:2
**technical** [2] 5:3 10:24
**terms** [2] 17:2 18:3
**test** [4] 12:9 12:18 14:16 18:17
**Thank** [3] 6:9 18:19 21:11
**themselves** [2] 10:7 18:17
**they've** [8] 5:3 5:7 5:13 5:20 18:7 18:25 19:14 20:8
**third** [4] 5:12 8:10 12:7 13:10
**third-party** [2] 5:12 8:11
**thousands** [2] 11:25 12:1
**through** [1] 7:4
**titles** [1] 8:7
**today** [1] 6:15
**transfer** [1] 9:8
**transferred** [1] 9:13
**trial** [1] 6:13
**trouble** [1] 8:14
**truth** [1] 14:15
**TUCOWS** [9] 7:12 7:15 7:20 9:4 9:11 9:13 9:17 9:17 9:18
**TUCOWS/Infonautix** [1] 9:5
**Tuesday** [1] 1:12
**TUNNELL** [1] 2:10
**two** [6] 6:15 8:4 11:16 16:19 17:1 17:2
**type** [1] 15:24
**typically** [1] 11:12
**under** [1] 18:10
**understand** [2] 18:12 19:18
**understood** [1] 19:4
**UNITED** [1] 1:1
**unquote** [2] 4:25 14:6
**unusual** [1] 13:17
**up** [4] 6:24 14:9 15:21 15:23
**upcoming** [1] 6:3
**update** [1] 4:19
**using** [3] 11:11

20:10 20:25
**Valerie** [1] 1:23
**valuation** [1] 6:22
**viewed** [1] 17:7
**vigorously** [1] 17:17
**vs** [1] 1:6
**W** [2] 2:3 2:17
**waiting** [3] 5:8 5:15 5:25
**waiver** [2] 9:12 10:10
**wants** [1] 5:25
**websites** [3] 4:25 5:2 5:4
**week** [1] 16:15
**WILLIAM** [1] 2:17
**Wilmington** [1] 1:11
**win** [1] 19:9
**without** [2] 8:17 10:9
**wondering** [1] 15:17
**worked** [1] 4:18
**write** [1] 16:24
**yesterday** [1] 14:19
**York** [4] 2:7 2:7 2:21 2:21
**YOUNG** [1] 2:2