# EXHIBIT H

ZENITH ELECTRONICS CORPORATION,Plaintiff/Counter-Defendant, v. WH-TV BROADCASTING
CORPORATION,Defendant/Counter-Plaintiff.
01 C 4366

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OFILLINOIS, EASTERN DIVISION

2003 U.S. Dist. LEXIS 13816

August 6, 2003, Decided
August 7, 2003, Docketed

PRIOR HISTORY: *Zenith Elecs. Corp. v. WH-TV Broad. Corp., 2003 U.S. Dist. LEXIS 11037 (N.D. Ill., June 25, 2003)*

DISPOSITION: [*1] Defendant WH-TV's motion to compel production of documents against Motorola, Inc.and General Instrument granted in part and denied in part.

CASE SUMMARY:

PROCEDURAL POSTURE: Defendant broadcasting corporation filed a motion to compel production of documents identified by third-party defendants as protected by the attorney-client privilege or work product doctrine.

OVERVIEW: Plaintiff sold assets of its network systems division to one third-party defendant, and transferred its documents relating to that division to third-party defendants at that time. Third-party defendants claimed the attorney-client privilege as to privileged documents that it received in the asset purchase. Defendant argued that third-party defendants could not claim the privilege as to privileged documents that predated any common interest between plaintiff and third-party defendants. Third-party defendants argued that the purchased agreement that governed the asset purchase provided that one third-party defendant purchased from plaintiff all intangible personal property to the extent used or held for use in the conduct of the business. The court disagreed that the attorney-client privilege was a corporate asset that could be sold. The court found that certain documents that were transferred could not be covered under the privilege. Defendant also contested the claim that certain communications from attorneys to third-party defendants filed were protected by the privilege. The court found that some filed were protected. The court also found certain documents to be work product.

OUTCOME: The court granted in part and denied in part

defendant's motion to compel certain documents.

LexisNexis(R) Headnotes

COUNSEL: For ZENITH ELECTRONICS CORPORATION, plaintiff: Michael D. Sher, Lawrence Mitchell Benjamin, David A. Eide, Dan J. Hofmeister, Jr., Neal, Gerber & Eisenberg, Chicago, IL.

For ZENITH ELECTRONICS CORPORATION, plaintiff: Ramon Coto-Ojeda, Coto Malley & Tamargo LLP, San Juan, PR.

For WH-TV BROADCASTING CORPORATION, defendant: Sheldon Davidson, Marc David Janser, James B. Sloan, Thomas F. Sax, Kimberly J. Stone, Stanley Carlylle Sneeringer, Pedersen & Houpt, P.C., Robert Gerald Foster, Pedersen & Houpt, Chicago, IL.

For WH-TV BROADCASTING CORPORATION, defendant: Edgar Cartagena-Santiago, Ramon E Dapena, Goldman Antonetti & Cardova, P.S.C., San Juan, PR.

For CRAIG CHAMBERS, MARINO LAMANTIA, respondents: Robert Radasevich, Lawrence Mitchell Benjamin, David A. Eide, Neal, Gerber & Eisenberg, Chicago, IL.

For MOTOROLA, INC, GENERAL INSTRUMENT CORPORATION, third-party defendants: Michael R. Dockterman, David M. Simon, Vilia Maria Drazdys, Melissa Suzanne Skilken, Wildman, Harrold, Allen & Dixon, Chicago, IL.

For WH-TV BROADCASTING CORPORATION, counter-claimant: [*2] Sheldon Davidson, Marc David Janser, Thomas F. Sax, Kimberly J. Stone, Pedersen & Houpt, P.C., Chicago, IL.

For WH-TV BROADCASTING CORPORATION, counter-claimant: Edgar Cartagena-Santiago, Ramon E Dapena, Goldman Antonetti & Cardova, P.S.C., San

Juan, PR.

For ZENITH ELECTRONICS CORPORATION, counter-defendant: Michael D. Sher, Lawrence Mitchell Benjamin, David A. Eide, Dan J. Hofmeister, Jr., Neal, Gerber & Eisenberg, Chicago, IL.

For ZENITH ELECTRONICS CORPORATION, counter-defendant: Ramon Coto-Ojeda, Coto Malley & Tamargo LLP, San Juan, PR.

For MOTOROLA INC, GENERAL INSTRUMENT CORPORATION, counter-defendants: David M. Simon, Vilia Maria Drazdys, Wildman, Harrold, Allen & Dixon, Chicago, IL.

For MOTOROLA INC, counter-defendant: Melissa Suzanne Skilken, Wildman, Harrold, Allen & Dixon, Chicago, IL.

For ZENITH ELECTRONICS CORPORATION, cross-claimant: Michael D. Sher, Lawrence Mitchell Benjamin, David A. Eide, Dan J. Hofmeister, Jr., Neal, Gerber & Eisenberg, Chicago, IL.

For ZENITH ELECTRONICS CORPORATION, cross-claimant: Ramon Coto-Ojeda, Coto Malley & Tamargo LLP, San Juan, PR.

For GENERAL INSTRUMENT CORPORATION, cross-defendant: Michael R. Dockterman, [*3]David M. Simon, Vilia Maria Drazdys, Wildman, Harrold, Allen & Dixon, Chicago, IL.

For WH-TV BROADCASTING CORPORATION, third-party plaintiff: Sheldon Davidson, Thomas F. Sax, Kimberly J. Stone, Pedersen & Houpt, P.C., Chicago, IL.

For WH-TV BROADCASTING CORPORATION, third-party plaintiff: Edgar Cartagena-Santiago, Ramon E Dapena, Goldman Antonetti & Cardova, P.S.C., San Juan, PR.

JUDGES: George W. Lindberg, Senior U.S. District Judge.

OPINIONBY: George W. Lindberg

OPINION: MEMORANDUM OPINION AND ORDER

WH-TV Broadcasting Corporation ("WH-TV") moves to compel the production of documents identified by Motorola, Inc. ("Motorola") and General Instrument ("GI") as prot ected by the attorney-client privilege or work product doctrine. The court has reviewed Motorola's and GI's privilege log and, where necessary, has conducted an in camera review of documents referenced in the log. n1 For the following reasons, WH-TV's motion is granted in part and denied in part.

------------------Footnotes----------------

n1 WH-TV has withdrawn its motion as to Group 2 (attached non-privileged e-mails); Group 6, Entry 9 (attached non-privileged e-mails); and Groups 23, 49, and 61.

-----------------End Footnotes-------------

[*4]

I. Attorney-Client Privilege

Where legal advice of any kind is sought from a professional legal adviser in his or her capacity as such, communications relating to that purpose, made in confidence by the client, are protected by the attorney-client privilege, unless the privilege is waived. *United States v. White, 950 F.2d 426, 430 (7th Cir. 1991)*. The purpose of the attorney-client privilege is "to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" *Swidler & Berlin v. United States, 524 U.S. 399, 403, 141 L. Ed. 2d 379, 118 S. Ct. 2081 (1998)* (quoting *Upjohn Co. v. United States, 449 U.S. 383, 389, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981))*. "Because the privilege is in derogation of the search for the truth, it is construed narrowly." *United States v. Evans, 113 F.3d 1457, 1461 (7th Cir. 1997)*. The party claiming the privilege bears the burden of proving its essential elements. *Vardon Golf Co. v. Karsten Mfg. Corp., 213 F.R.D. 528, 531 (N.D. Ill. 2003)*.

A. Zenith [*5] Documents Predating Common Interest

Zenith sold certain assets of its Network Systems Division to GI in August 2000, and transferred its documents relating to that division to GI and Motorola at that time. GI and Motorola claim the attorney-client privilege as to privileged Zenith documents that it received in the asset purchase. WH-TV argues that GI and Motorola cannot claim the attorney-client privilege as to privileged Zenith documents that predate any common interest between Zenith and GI and Motorola. Motorola and GI respond that the Asset Purchase

Agreement that governed the asset purchase provided that GI purchased from Zenith "all intangible personal property to the extent used or held for use in the conduct of the Business (including, without limitation, ... all rights, privileges, claims, causes of action and options relating to or pertaining to the Business or the Assets) ..." (emphasis added).

The court disagrees that the attorney-client privilege is a corporate asset that can be sold. "When control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 349, 85 L. Ed. 2d 372, 105 S. Ct. 1986 (1985).*[*6] However, the mere transfer of some assets from one corporation to another - as was done in this case - does not transfer the attorney-client privilege. See, e.g., *In re In-Store Advertising Sec. Litig., 163 F.R.D. 452, 458 (S.D.N.Y. 1995); 124 F.R.D. 662, 664; Sobol v. E.P. Dutton, Inc., 112 F.R.D. 99, 103 (S.D.N.Y. 1986).*

GI and Motorola contend that In re In-Store Advertising Secs. Litig. is distinguishable because in that case, unlike here, there was no indication that the parties contractually agreed to transfer the attorney-client privilege. The court finds this distinction unconvincing. GI's and Motorola's position would allow anyone to evade waiver of the privilege, despite the transfer of privileged documents to a third party, merely by agreeing to transfer the privilege and accepting consideration for it.

Nor is the court persuaded by GI's and Motorola's reliance on *Rhode Island Depositors Econ. Prot. Corp. v. Mapleroot Dev. Corp., 710 A.2d 167 (R.I. 1998).* In that case, the Rhode Island Supreme Court considered the right of the Rhode Island Depositors Economic Protection Corporation (DEPCO) to invoke the attorney-client[*7] privilege of a credit union, whose assets DEPCO had purchased under an agreement that transferred the credit union's privileges to DEPCO. *Id. at 168-69.* The court held that DEPCO had acquired the credit union's attorney-client privilege in the transaction. *Id. at 171.* However, unlike in this case, DEPCO was established by state legislation, and the court construed DEPCO's enabling legislation to allow DEPCO to acquire failed lenders' attorney-client privileges in order to accomplish its statutory mission of aiding failed institutions in making prompt payments to depositors. See *id. at 170-71.*

The court concludes that Zenith's attorney-client privilege simply was not a property right that could be sold. Accordingly, the court finds that GI and Motorola cannot invoke the attorney-client privilege for the

following Zenith documents that were transferred to GI and Motorola: Group 9, Entry 1 (6/29/00 e-mails from Tom Hagensick to Peter Slate); the first two e-mails in Group 9, Entry 2 (two 6/29/00 e-mails from Hagensick to Slate); the first two e-mails in Group 9, Entry 3 (two 6/29/00 e-mails from Hagensick to Slate); Group 35 (2/23/99 draft[*8] contract with notes); and Group 72 (6/14/00 e-mail from Hagensick to Slate).

B. Communications Not Directed to an Individual

WH-TV also contests GI's and Motorola's claim that certain communications from attorneys to their files are protected by the attorney-client privilege, even though the communications were not directed to an individual. A memorandum prepared as a record of a communication between an attorney and a client, where the communication was for the purpose of rendering legal advice, is protected by the attorney-client privilege, just as is the underlying communication. See *Heidelberg Harris, Inc. v. Mitsubishi Heavy Indus., Ltd., 1996 U.S. Dist. LEXIS 258,* No. 95 C 673, *1996 WL 732522,* at *5 (N.D. Ill. 1996). However, an attorney's memorandum to file that does not record such an attorney-client communication is not protected by the attorney-client privilege. n2 Id.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -
- - -

n2 Such communications could be protected by the work product doctrine. However, GI and Motorola do not claim that the work product privilege applies to these documents, and accordingly that privilege is waived.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

[*9]

The court finds that the following attorney communications to file are protected by the attorney-client privilege, as they record confidential conversations between attorney and client: Group 74 (5/9/00 notes of Paul Fleck regarding discussion with Dick Smith); and Group 76 (Fleck's notes regarding discussion with Smith). The court finds that, in the notes contained in Group 75, only the line referencing a conference with Lee Zimmerman and Smith is protected by the attorney-client privilege; the court directs GI and Motorola to produce the remainder of the notes, in redacted form.

GI and Motorola claim that certain draft agreements containing handwritten notes are protected by the attorney-client privilege. "Drafts [of agreements] prepared by or commented upon by an attorney necessarily contain legal advice from the attorney as to the wording of the contracts for the benefit of the client, and thus are privileged." *McCook Metals L.L.C. v. Alcoa Inc.*, 192 F.R.D. 242, 255 (N.D. [degree] . 2000). The court finds that Groups 96-98, 100-01, 106, and 114 (draft agreements with notes) are protected by the attorney-client privilege, since they are drafts of agreements[*10] prepared by, or commented upon by an attorney.

## C. Documents Distributed Outside Control Group

WH-TV next contends that GI and Motorola waived the attorney-client privilege as to certain documents by circulating them too widely. When a corporate document is shown to employees outside the company's "control group," the attorney-client privilege is either inapplicable or is waived. See *Trustmark Ins. Co. v. General & Cologne Life Re of Am.*, 2000 U.S. Dist. LEXIS 18917, No. 00 C 1926, *2000 WL 1898518*, at *4 (N.D. Ill. Dec. 20, 2000). An employee is a member of the control group if the employee "is in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney, or if he is an authorized member of a body or group which has that authority [degree] ...." *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 432 N.E.2d 250, 255, 59 Ill. Dec. 666 (Ill. 1982). Thus, "an employee whose advisory role to top management in a particular area is such that a decision would not normally be made without his advice or opinion ... is properly within the control group." *Id. at 258.* WH-TV concedes [*11]that the following individuals were members of the Motorola/GI control group: William Luehrs, Tom Hagensick, Don Landise, Don Alexander, Chuck Sindelar, Tom Lynch, and Doug Means.

The court finds that the attorney-client privilege is inapplicable or waived as to the following documents, because they were directed to or shown to individuals whom Motorola and General Instrument have failed to establish are a member of a control group: Group 24, Entries 1-3 (e-mail chain beginning with 3/14/01 e-mail and attached draft letter from Matthew Gettinger to Luehrs) n3; Group 52, Entry 1 (1/02/01 e-mail from Brian Zorc to Charles Fish) n4; Group 52, Entry 2 (1/10/01 e-mail chain) n5; Group 52, Entry 3 (1/02/01 e-mail from Zorc to Gettinger) n6; Group 56, Entry 1 (9/27/02 e-mails from Joe Sullivan to Gettinger, and Gettinger to Sullivan) n7; Group 56, Entry 2 (9/27/02 e-mails from Sullivan to Gettinger, and Gettinger to Sullivan, 10/1/01 e-mails from Sullivan to Gettinger) n8;

Group 56, Entry 4 (9/27/02 e-mail from Sullivan to Gettinger) n9; Group 78 (5/9/00 memorandum from Sue J. Hodges to "GI Motorola"); Group 81 (5/23/00 draft agreement from Winston & Strawn to "GI Motorola").

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 These e-mails were copied to an individual with the title "Motorola Manager Technology/Engineering Project." Motorola and GI do not identify the role this employee played.

[*12]

n4 The e-mail was copied to individuals with the titles "Motorola Manager Technology/Engineering Project" and "Motorola Manager, Engineering." Motorola and GI do not identify the roles these employees played.

n5 The e-mail was copied to individuals with the titles "Motorola Manager Technology/Engineering Project" and "Motorola Manager, Engineering." Motorola and GI do not identify the roles these employees played.

n6 The e-mail was copied to an individual with the title "Motorola Manager, Engineering." Motorola and GI do not identify the role this employee played.

n7 These e-mails were copied to an individual with the title "Manager, Finance." Motorola and GI do not identify the role this employee played.

n8 These e-mails were copied to an individual with the title "Manager, Finance." Motorola and GI do not identify the role this employee played.

n9 This e-mail was copied to an individual with the title "Manager, Finance." Motorola and GI do not identify the role this employee played.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

Nor are the documents in Group 92 protected by the attorney-client privilege. GI's and[*13] Motorola's privilege log inaccurately describes these documents as a June 21, 2000 communication from attorney Lee Zimmerman to file, containing draft contract schedule, with notes. In fact, Group 92 contains a June 21, 2000 memorandum from Zenith attorney Peter Slate to Zimmerman and attorney K. Michael Garrett, attaching revised disclosure schedules. The memorandum is copied to three individuals who are not identified in the privilege log. The copied individuals include Jackie Petrovic, who is not listed in GI's and Motorola's schedule that identifies the title and position of individuals in the privilege log. GI and Motorola are ordered to produce the documents in Group 92.

The privilege log also describes the documents in Group 95 inaccurately. The log similarly states that these documents are a June 8, 2000 communication from Zimmerman to file, containing draft contract schedules, with notes. In reality, Group 95 contains a June 8, 2000 memorandum from Slate to Zimmerman and Garrett, attaching revised disclosure schedules. As with Group 92, the memorandum is copied to Petrovic, who is not identified in the privilege log or schedule. GI and Motorola are ordered to produce the[*14] documents in Group 95.

D. Other Claims of Attorney-Client Privilege

The court finds that the following constitute attorney-client privileged communications: Group 2 (5/25/01 e-mail from Luehrs to Beverly Wyckoff) n10; Group 3 (4/9/01 e-mail from Luehrs to Gettinger); Group 7, Entry 1 (12/15/00 e-mail from Hagensick to Luehrs); the first document in Group 7, Entry 2 (12/15/00 e-mail from Hagensick to Luehrs); fourth e-mail in Group 9, Entry 3 (11/10/00 e-mail from Luehrs to Richard Vitkus); Group 12 (6/29/01 e-mail from Luehrs to Gettinger); Group 18, Entry 3 (11/28/01 e-mail chain); Group 28, Entries 1-3 (6/27/01 e-mail chain; 6/28/01 e-mail chain; 6/28/01 draft letter); first four e-mails in Group 28, Entry 8 (6/28/01 e-mail from Don Landise to Gettinger; 6/27/01 e-mails from Gettinger to Landise, Landise to Luehrs, and Luehrs to Wyckoff); first four e-mails in Group 28,

Entry 9 (6/28/01 e-mail from Landise to Gettinger; 6/27/01 e-mails from Gettinger to Landise, Landise to Luehrs, and Luehrs to Wyckoff); first four e-mails in Group 28, Entry 10 (6/28/01 e-mail from Landise to Gettinger; 6/27/01 e-mails from Gettinger to Landise, Landise to Luehrs, and Luehrs to Wyckoff); [*15] Group 39 (6/13/01 memorandum from Luehrs to Lawrence Benjamin); Group 41 (6/7/01 memorandum from Luehrs to Benjamin); Group 57, Entries 1 and 2 (5/17/01 and 10/24/02 e-mail chains); Group 104 (5/25/00 e-mail from Marc Tayer to Zimmerman); Group 105 (5/30/00 e-mail from Tayer to Zimmerman); Group 112 (3/9/00 e-mail from Christine Foh to Don McLellan).

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -
- - -

n10 WH-TV has withdrawn its motion as to the attached non-privileged e-mails in Group 2.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

The court finds that the following documents do not contain communications related to seeking legal advice, and therefore are not protected by the attorney-client privilege: second document in Group 7, Entry 2 (Hagensick notes); third e-mail in Group 9, Entry 2 (11/10/00 e-mail from Hagensick to Luehrs); third e-mail in Group 9, Entry 3 (11/10/00 e-mail from Hagensick to Luehrs); Group 11, Entry 1 (6/22/01 e-mail from Hagensick to Douglas Means); Group 11, Entry 2 (6/01 e-mail from Luehrs to Means); Group 11, Entry 3 (6/22/01 e-mails from Means to Hagensick, and from Hagensick[*16] to Means); Group 11, Entry 4 (6/22/01 e-mails from Ly Tran to Means, from Means to Hagensick, and from Hagensick to Means); Group 11, Entry 5 (6/22/01 e-mails from Hagensick to Means, and from Means to Hagensick); Group 11, Entry 6 (6/25/01 e-mail from Hagensick to Means; 6/22/01 e-mails from Hagensick to Means, and from Means to Hagensick); Group 11, Entry 7 (6/25/01 e-mail from Hagensick to Means); Group 11, Entry 8 (6/25/01 e-mails from Means to Hagensick, and from Hagensick to Means; 6/22/01 e-mails from Hagensick to Means, and from Means to Hagensick); Group 12, Entry 3 (11/28/01 e-mail from Landise to John Ryan); Group 21, Entries 1-4 (8/7/01 e-mails from Wyckoff to Gettinger, from Gettinger to Landise, from Landise to Gettinger, and from Gettinger to Wyckoff); fifth e-mail in Group 28, Entry 8 (7/2/01 e-

mail from Gettinger to Landise); fifth and sixth e-mails in Group 28, Entry 9 (7/2/01 e-mails from Gettinger to Landise, and Landise to Gettinger); fifth through seventh e-mails in Group 28, Entry 9 (7/2/01 e-mails from Gettinger to Landise, and Landise to Gettinger); Group 48 (1/19/01 e-mail from Ron Van Kovering to Fish); Group 50 (12/12/01 e-mail from Landise to Gettinger); [*17] final e-mail in Group 56, Entry 2 (10/1/02 e-mail from John Hewitt to Sullivan); second e-mail in Group 56, Entry 4 (9/30/02 e-mail from Landise to Ronald Stelzner); and Group 73 (11/10/00 e-mail from Hagensick to Gettinger).

## II. Work Product Doctrine

The work product doctrine, codified in *Federal Rule of Civil Procedure 26(b)(3)*, protects from disclosure documents and tangible things prepared in anticipation of litigation or for trial, by or for a party, or by or for a party's attorney. *Fed. R. Civ. P. 26(b)(3)*. Generally, because "prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced[,] ... the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Binks Mfg. Co. v. National Presto Indus., Inc., 709 F.2d 1109, 1118-19 (7th Cir. 1983)* (citation omitted). "The mere fact that litigation does eventually ensue does not, by itself, cloak materials prepared by an attorney with the protection of the work product privilege ... 'The work product[*18] rule does not come into play merely because there is a remote prospect of future litigation.'" *Id. at 1118* (quoting *Diversified Indus. v. Meredith, 572 F.2d 596, 604 (8th Cir. 1977)).* Because litigation may be anticipated when almost any incident occurs, "a substantial and significant threat of litigation is required before a discovery opponent's anticipation will be considered a reasonable and justifiable motivation for production of a document." *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc., 145 F.R.D. 84, 87 (N.D. Ill. 1992)*.

Motorola and GI state that they anticipated litigation on September 12, 2000, when they received an e-mail from WH-TV. The e-mail stated that WH-TV was seeking cash, set-top boxes, and solutions to all outstanding problems by December 1, 2000. The e-mail further stated:

We would rather solve matters this way, quickly, and get on with development plans. We also believe that this is far better for you than what the board was recommended to do by the outside experts.

Motorola and GI contend that this e-mail conveyed a substantial and significant threat of litigation. The court disagrees. [*19] The e-mail does not indicate what the alternative recommendation was, and litigation is not the only inference one can draw.

Motorola and GI next state, in conclusory fashion, that "WHTV continued its demands and threats of litigation (as discussed in great detail in the pending summary judgment motions) at the November 6, 2000 Philadelphia meeting with Zenith and Motorola, and in other correspondence in 2000 and the first several months of 2001." Motorola and GI do not cite to any correspondence or other evidence in support of this conclusion, or to any specific portion of the voluminous summary judgment record. This is insufficient to meet Motorola's and GI's burden of esta blishing when they began to anticipate litigation; it is not the role of the court to sift through the record to make that determination. Accordingly, the court will use the date this suit was filed -- June 11, 2001 -- as the date by which Motorola and GI must have begun to anticipate litigation.

The court finds that Motorola and GI have failed to establish that the following documents were prepared in anticipation of litigation, and that they therefore deserve protection under the work product doctrine: Group[*20] 5, Entry 5 (draft letter dated "after 3/8/01"); second document in Group 7, Entry 2 (Hagensick notes) Group 8, Entries 1-3 (10/31/00 e-mail from Hagensick to Luehrs); Group 9, Entries 1-3 (6/29/00 e-mail chain; 11/10/00 e-mail chains); Group 21, Entries 1-4 (8/7/01 e-mails from Wyckoff to Gettinger, from Gettinger to Landise, from Landise to Gettinger, and from Gettinger to Wyckoff); Group 56, Entries 1, 2, and 4 (9/27/02, 10/1/02, and 9/30/02 e-mail chains); and Group 73 (11/10/00 e-mail from Hagensick to Gettinger).

The court finds that the following documents are protected under the work product doctrine: Group 1, Entries 1-4 (6/11/01 e-mail and attached annotations document from Landise to Gettinger); Group 28, Entries 11-12 (6/20/01 draft letters); Group 53, Entries 1, 3-5 (9/23/02 e-mail chains); Group 54, Entries 2-5 (10/24/02 and 10/25/02 e-mail chains); and Group 65, Entries 1 and 2 (8/26/02 e-mails from Ryan to "SBNS East Eng Staff" and from Tom Pennacchia to Ryan).

Finally, WH-TV argues that documents protected by the work product doctrine may nevertheless be discoverable "if they contain admissions by hostile, testifying witnesses that may be used for impeachment purposes. [*21] " *Federal Rule of Civil Procedure 26(b)(3)* provides that materials protected under the work product doctrine, other than an attorney's mental processes, may nevertheless be subject to disclosure if the party seeking discovery shows a substantial need for the materials, and an inability to obtain the substantial

equivalent of the information by other means. To obtain the benefit of this exception to the work product doctrine, however,

a party must present more than speculative or conclusory statements that the [material] will contain invaluable impeachment material. And, the impeachment value must be substantial because every prior statement has some impeachment value and otherwise the exception would swallow the rule.

*Duck v. Warren, 160 F.R.D. 80, 83 (E.D. Va. 1995)*; see also 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice & Procedure 2d § 2025 (2d ed. 1994) (quoting *Hauger v. Chicago R.I. & P. R. Co., 216 F.2d 501, 508 (7th Cir. 1954))* ("A court is not justified in ordering a litigant to permit his adversary to inspect witness statements, which he has procured in preparing for trial, upon the adversary's[*22] mere surmise or suspicion that he might find impeaching material in the statements.").

While the burden of making this showing may be a relatively light one, given that WH-TV can only speculate as to the contents of the documents at issue, WH-TV has offered nothing to show a substantial need. Accordingly, the court denies WH-TV's request that the court review documents protected by the work product doctrine to determine whether they nevertheless should be produced.

ORDERED: WH-TV's Motion to Compel Production Against Motorola and General Instrument [525-1] is granted in part and denied in part.

The motion is granted as to the following documents: Group 5, Entry 5; Group 7, Entry 2 (notes only); Group 8; Group 9, Entries 1-2; first through third e-mails in Group 9, Entry 3 (two 6/29/00 e-mails from Hagensick to Slate; 11/10/00 e-mail from Hagensick to Luehrs); Group 11; Group 21, Entries 1-4; Group 24, Entries 1-3; fifth e-mail in Group 28, Entry 8 (7/2/02 e-mail from Gettinger to Landise); fifth and sixth e-mails in Group 28, Entry 9 (7/2/01 e-mails from Gettinger to Landise, and Landise to Gettinger); fifth through seventh e-mails in Group 28, Entry 10 (7/2/01 e-mails from[*23] Gettinger to Landise, and Landise to Gettinger); Group 35; Group 48; Group 50; Group 52; Group 56, Entries 1-2, 4; Groups 72-73; portion of Group 75 that does not specifically reference conference with Zimmerman and Smith; Group 78; Group 81; Group 92; and Group 95.

The motion is denied as to the following documents: Group 1, Entries 1-4; Groups 2-3; Group 7, Entry 1; Group 7, Entry 2 (12/15/00 e-mail only); fourth e-mail in Group 9, Entry 3 (11/10/00 e-mail from Luehrs to Vitkus); Group 12; Group 18, Entry 3; Group 28, Entries 1-3; first four e-mails in Group 28, Entry 8 (6/28/01 e-mail from Landise to Gettinger; 6/27/01 e-mails from Gettinger to Landise, Landise to Luehrs, and Luehrs to Wyckoff); first four e-mails in Group 28, Entry 9 (6/28/01 e-mail from Landise to Gettinger; 6/27/01 e-mails from Gettinger to Landise, Landise to Luehrs, and Luehrs to Wyckoff); first four e-mails in Group 28, Entry 10 (6/28/01 e-mail from Landise to Gettinger; 6/27/01 e-mails from Gettinger to Landise, Landise to Luehrs, and Luehrs to Wyckoff); Group 28, Entries 11-12; Group 39; Group 41; Group 53, Entries 1, 3-5; Group 54, Entries 2-5; Group 57, Entries 1-2; Group 65, Entries 1-2; Group 74; the [*24]portion of Group 75 that specifically references conference with Zimmerman and Smith; Group 76; Groups 96-98; Groups 100-01; Groups 104-06; Group 112; and Group 114.

ENTER:

George W. Lindberg

Senior U.S. District Judge

DATED: AUG 06 2003

# EXHIBIT I

GRACO CHILDREN'S PRODUCTS, INC., Plaintiff, v. REGALO INTERNATIONAL LLC, Defendant.
CIVIL ACTION NO. 97-6885

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1999 U.S. Dist. LEXIS 11392

July 29, 1999, Decided
July 29, 1999, Filed, Entered

DISPOSITION: [*1] Defendant Regalo International LLC's Motion for Reconsideration DENIED. Regalo International LLC's Motion for Certification DENIED.

CASE SUMMARY:

PROCEDURAL POSTURE: Defendant manufacturer filed a motion for reconsideration of a prior order disqualifying defendant's attorney in plaintiff manufacturer's patent infringement action.

OVERVIEW: Plaintiff manufacturer successfully defended its patent against a competitor's infringement and then bought assets of the competitor. Plaintiff later filed a patent infringement suit against defendant manufacturer. Defendant hired the same attorney that represented the competitor in the initial patent suit and settlement. The attorney was disqualified, and defendant filed a motion for reconsideration. The court found that plaintiff's asset purchase was directly relevant in the prior litigation and that the attorney's representation involved those assets. Under professional conduct rules, the attorney could not subsequently represent defendant because it had materially adverse interests to those of plaintiff. The attorney was privy to the terms of the settlement agreement, and plaintiff had the right to assert the attorney-client privilege as against the attorney. The prior and instant litigation were substantially related, in that each involved the same patent infringement, and plaintiff's disclosure of confidences could be presumed. No error of law was committed in denying the motion, and as a result, no manifest injustice existed in granting the motion.

OUTCOME: Defendant manufacturer's motion for reconsideration of the disqualification of its attorney in plaintiff manufacturer's patent infringement action was denied. The court declined to certify its order for appeal, as it was not a collateral order subject to the final judgment rule.

LexisNexis(R) Headnotes

COUNSEL: For GRACO CHILDREN'S PRODUCTS, INC., PLAINTIFF: ANTHONY S. VOLPE, JOHN J. O'MALLEY, VOLPE AND KOENIG, P.C., PHILADELPHIA, PA USA. RICHARD B. O'PLANICK, WOOSTER, OH USA.

For REGALO INTERNATIONAL LLC, DEFENDANT: HUGH J. HUTCHINSON, LEONARD, TILLERY AND SCIOLLA, PHILA, PA USA. PAUL G. NEIMAN, PAUL J. YECHOUT, MOSS AND BARNETT, MINNEAPOLIS, MN USA.

JUDGES: Robert F. Kelly, J.

OPINIONBY: ROBERT F. KELLY

OPINION: MEMORANDUM

R.F. KELLY, J.

July 29, 1999

Currently before the Court is Defendant Regalo International LLC's ("Regalo") Motion for Reconsideration of the Court's Order disqualifying Mr. Frederick Tecce ("Tecce") as Regalo's attorney. This Court held oral argument on June 24, 1999, and after reviewing Regalo's Memorandum in Support of its Motion, and Plaintiff Graco Children's Products Incorporated's ("Graco") response thereto, Regalo's Motion for Reconsideration is denied.

BACKGROUND

On December 13, 1993, Graco filed a civil action alleging that playyards sold by Century Products Company ("Century Products") infringe Graco's U.S. Patent [*2] No. *4,811,437* (the " *'437* patent"). Century Products denied infringement and challenged the validity and enforceability of the *'437* patent on several grounds. On December 5, 1995, after a sixteen-day trial, the jury found that Century Products had infringed the *'437* patent under the doctrine of equivalents and awarded Graco

$2,100,000 in lost profit damages. Tecce represented Century Products in the prior '437 patent litigation with Graco, including the appeal and the resulting Settlement Agreement.

On November 10, 1997, Graco brought the instant patent litigation against Regalo, alleging infringement of the '437 patent and seeking injunctive relief and monetary damages. On April 13, 1998, Regalo's original counsel in this action withdrew from representation and Tecce entered his appearance on Regalo's behalf. The following June, Graco purchased certain assets and liabilities of Century Products. These assets related to Century Products' infant care products business including its car seat, car seat stroller, infant carriers and playyard product lines. As a result of this purchase, the newly acquired assets and product lines were formed into the Century Products Division of Graco[*3] ("Century Products Division"). Tecce is now, in effect, defending the same patent against the interests of the client he represented in the prior litigation.

On October 20, 1999, Graco filed a Motion to Disqualify Tecce asserting that, as a result of Graco's purchase of certain Century Products assets and Tecce's prior representation of Century Products, Tecce represented a competitor of Graco and its Century Products Division in an infringement action that is substantially related to the instant action. Upon review of the parties' briefs and supplements, and after hearing oral argument on the issue, this Court granted Graco's Motion and ordered Tecce to remove himself from the current litigation. Tecce now seeks the Court's reconsideration of the said Order.

## STANDARD

"The United States Court of Appeals for the Third Circuit has held that 'the purpose of a motion of reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence.'" *Cohen v. Austin, 869 F. Supp. 320, 321 (E.D. Pa.1994)* (citing *Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985)*, cert. denied, *476 U.S. 1171, 90 L. Ed. 2d 982, 106 S. Ct. 2895 (1986))*;[*4] *Drake v. Steamfitters Local Union No. 420, 1998 U.S. Dist. LEXIS 13791, No. CIV.A.97-585, 1998 WL 564486*, at *3 (E.D.Pa.Sept. 3, 1998). Accordingly, a district court will grant a party's motion for reconsideration in any of three situations: (1) the availability of new evidence not previously available, (2) an intervening change in controlling law, or (3) the need to correct a clear error of law or to prevent manifest injustice. *Reich v. Compton, 834 F. Supp. 753, 755 (E.D. Pa. 1993)* (citing *Dodge v. Susquehanna Univ., 796 F. Supp. 829, 830 (M.D. Pa. 1992))*. It is not sufficient for the Defendant to simply express his/her dissatisfaction

with the Court's decision, for this does not present a proper basis for reconsideration. See *Glendon Energy Co. v. Borough of Glendon, 836 F. Supp. 1109, 1122 (E.D.Pa. 1993)*. In this case, Plaintiffs contend that reconsideration is warranted to correct a clear error of law, to prevent manifest injustice, and because new evidence exists. I shall begin my analysis with a discussion of the clear error of law and manifest injustice issues. n1

------------------Footnotes---------------

n1 For purposes of clarity and efficiency, both issues will be addressed together. Regalo's arguments regarding clear error and manifest injustice are not mutually exclusive, in that, both hinge on the argument that no conflict exists. I am confident in my decision and remain unpersuaded by Regalo's argument that Graco seeks a tactical advantage in seeking disqualification. I granted the Motion to Disqualify because I found that there was a conflict of interest and disqualification was the means to cure such conflict. As I am now forced to justify my decision, I am doing so in a manner that will serve, not only as the method of clarifying any confusion that may exist as a result of my Order disqualifying Mr. Tecce, but also as quasi-reconsideration of that same Order. Although I do not believe that the Motion to Reconsider should be granted as a matter of law, I am utilizing this Memorandum as a manifestation of any "reconsideration" that I have done in the privacy of my chambers as a matter of fact.

------------------End Footnotes------------

[*5]

A. Clear Error of Law and Manifest Injustice: n2

------------------Footnotes---------------

n2 Although, it appears that Regalo's position is simply that it does not agree with the Court's decision, it raises such discontent under the notion

that the Court committed clear error of law, or in the alternative, a manifest injustice.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Regalo asserts that the "record provides no basis in law or logic to allow Graco to cloak itself in the identity of a separate, distinct and independent corporate entity for its own personal gain." Regalo represents to the Court that it is, at the least, "at a complete loss to understand the basis for the disqualification of Mr. Tecce." n3 Although not addressed in the Order at issue here, the Court is compelled to discuss the reason for it's decision to disqualify Tecce. Regalo believes that, as a matter of law, there is no conflict present and that this argument raises the issue that the law was improperly or incorrectly applied.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n3 During oral argument, counsel for Tecce stated: "I have no reservation in stating to the court. . . and I apologize when I said in my brief, in a sense that I'm baffled by why that order should be entered. I personally remain baffled. . . ." (Tr. at 38-39, June 24, 1999).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*6]

Regalo contends that Century Products is a separate and distinct entity from Graco or Graco's unincorporated Century Products Division. The basis of this argument comes from Regalo's notion that Tecce formerly represented Century Products, a Delaware Corporation having no right, title or interest in the '437 Patent. Regalo further contends that the sale of certain assets does not mean that the corporate structure and independent identity of the corporation itself has changed or disappeared. Thus, according to Regalo, Century Products is Tecce's former client, and it continues to exist as a corporate entity having no interest in this lawsuit. However, on June 16, 1998, Century Holding Company n4 sold the Century Products Unit of Century Products

Company as an ongoing business entity with physical assets, intangible property, such as trademarks and contract rights, and associated good will to Graco as the acquiring subsidiary of Rubbermaid Inc. Graco argues that as a result of Graco's acquisition of these assets, it should be considered Tecce's "former client." n5

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n4 Century Holding Company is the sole stockholder of Century Products Company.

[*7]

n5 Graco contends that it is the successor-in-interest to Century Products' interests and rights under the November 21, 1996 Settlement Agreement and Exchange of Release between and among Century Products Company, Century Holding Company, and Graco.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

The decision to disqualify a competent lawyer, freely chosen by a party, is of serious concern to the Court. "Ethical questions cannot be resolved by a scientific application of principles and precedents because 'no code of ethics could establish unalterable rules governing all possible eventualities.'" *Fed. Deposit Ins. Corp. v. Amundson, et al. 682 F. Supp. 981, 985* (citing *Black v. State of Mo., 492 F. Supp. 848, 861 (W.D.Mo.1980)*(citing *Cannon v. U.S. Acoustics Corp., 398 F. Supp. 209, 215 (N.D.Ill.1975),* modified on other grounds , *532 F.2d 1118 (7th Cir.1976)))*. A district court, in exercising its discretionary power,

should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing [*8]the applicable disciplinary rule. It should consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions.

*United States v. Miller, 624 F.2d 1198, 1201(3d Cir.1980).* "The party seeking to disqualify opposing counsel bears the burden of clearly showing that continued representation would be impermissible." *Cohen v. Oasin, 844 F. Supp. 1065, 1067 (E.D.Pa. 1994)*(citing *Commercial Credit Business Loans, Inc. v. Martin, 590 F. Supp. 328, 335-36 (E.D.Pa. 1984)).* However, any doubts as to the existence of a violation of the rules should be resolved in favor of disqualification. See *International Business Mach. Corp. v. Levin, 579 F.2d 271, 283 (3d Cir.1978).*

The United States District Court for the Eastern District of Pennsylvania recognizes the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania as the standards for professional conduct that attorneys appearing before this court must comply with. *Commonwealth Ins. Co. v. Graphix Hot Line, Inc., 808 F. Supp. 1200, 1203 (E.D.Pa.1992).*[*9] Rule 1.9 of the Pennsylvania Rules of Professional Conduct states the following:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after full disclosure of the circumstances and consultation.

When analyzing an attorney disqualification issue based on prior representation, the court should focus, not on whether the relationship at issue is "in all respects that of attorney and client, but whether there exist sufficient aspects of an attorney-client relationship 'for purposes of triggering inquiry into the potential conflict. . .'" *Ramada Franchise System, Inc. v. Hotel of Gainesville Assoc., 988 F. Supp. 1460, 1463 (N.D.Ga. 1997)*(citing *Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 749 (2d Cir.1981)*(citations omitted)). Therefore, it is not the adverse interest of a client (in the traditional sense) at stake. Id.; *Marshall v. State of New York Div. of State Police, 952 F. Supp. 103, 108 (N.D.N.Y.1997).*[*10] Neither party rebuts the fact that Century Products was a former client of Tecce's. Clearly, an attorney-client relationship existed between them. n6 Thus, it is the job of this Court to decide whether or not the attorney-client relationship passed to Graco's Century Division when Graco purchased Century Products' assets.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -
- - -

n6 If the moving party is able to meet the burden of showing that an attorney-client relationship exists, and that the prior representation was "substantially related" to the current litigation, the court will make an irrebuttable presumption that relevant confidential information was disclosed during the former period of representation. *Ramada Franchise, 988 F. Supp. at 1463; Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 646 F.2d 1020, 1028* (5th Cir.), cert. denied, *454 U.S. 895, 70 L. Ed. 2d 211, 102 S. Ct. 394 (1981).*

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

1. Attorney-Client Relationship:

The authority to assert and waive the corporation's attorney-client[*11] privilege follows the passage of control of the corporation. Id.; *Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 349, 85 L. Ed. 2d 372, 105 S. Ct. 1986 (1985).* "The right to assert the attorney client privilege is an incident of control of the corporation and remains with the corporation as it undergoes mergers, takeovers, and name changes." Id.; *NCL Corp. v. Lone Star Bldg. Ctrs., Inc., 144 B.R. 170, 174 (S.D.Fla.1992).* Other courts have found that assignees of most or all of a corporation's assets could assert the corporation's attorney-client privilege. *988 F. Supp. at 1464; In re Financial Corp. of Am., 119 B.R. 728 (Bankr.C.D. Cal. 1990)*(holding that the authority to assert the corporation's attorney-client privilege passes with the transfer of substantially all of the corporation's assets and liabilities). In *In re Crescent Beach Inn, 37 B.R. 894* (Bankr.D.Me.), the court suggested that the issue of whether or not a successor entity could invoke the attorney-client privilege should be interpreted in light of the surrounding circumstances. *Ramada Franchise, 988 F. Supp. at 1464;*[*12] *Crescent Beach, 37 B.R. at 896.*

My decision to grant Graco's Motion to Disqualify was made in significant part because of the circumstances surrounding Graco's purchase of Century Products assets. Graco submits that the assets that it purchased, while not all of Century Products assets, were those pertaining to the accused product in the prior litigation. Graco purchased certain assets and liabilities relating to its infant care products business including its car seat, car seat stroller, infant carriers and playyard product lines. The agreement included the purchase of Century Products' operations in Canton, Macedonia, and

Twinsburg, all in Ohio, and in Mexico along with working capital and brand names. The '437 Paten t at issue in the prior and current litigation is for Graco's travel playpen, or "foldable playyard." *Graco Children's Products, Inc. v. Century Products Company, Inc., 1996 U.S. Dist. LEXIS 10356, No. CIV.A.93-6710, 1996 WL 421966,* at *1 (E.D.Pa. July 23, 1996). When Graco purchased the assets that it did from Century Products (i.e., those relating to infant playyard product lines), it purchased assets that were directly relevant in the prior litigation. I believe [*13]that Tecce's representation in the prior litigation was in the interest of those assets that Graco has in its possession now. Therefore, while it is not evident just how much, or what percentage of Century Products assets were transferred, it is my belief that the purchase gave Graco the authority to assert the attorney client privilege. n7 As far as the current litigation involves the '437 Patent, and as a result of Graco's purchase of the assets involved in the previous case involving the validity of that patent, I find that the right to assert the attorney-client privilege does pass to Graco.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -
- - -

n7 The privilege should be limited to confidences regarding Century Products' previous representation involving infant playyard product lines.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

2. Substantial Relationship:

The next phase of our analysis is the "substantial relationship" inquiry. To perform a "substantial relationship" analysis under Rule 1.9, a court must first examine the nature and scope of the present lawsuit against the former client. [*14]*Brennan v. Independence Blue Cross, 949 F. Supp. 305, 308 (E.D.Pa.1996),* See also *INA Underwriters Ins. Co. v. Nalibotsky, 594 F. Supp. 1199, 1206 (E.D.Pa. 1984).* Clearly, the nature and scope of the current litigation is similar to that of the former litigation. Both cases are patent infringement actions initiated by Graco involving the same '437 Patent. Tecce's representation in the former litigation assisted Century Products in defending against Graco's charges of infringement on the '437 patent. Graco asserts that there can be no doubt that the two cases involve the

same subject matter and thus, the cases are sufficiently similar, if not, identical. Again, simply because both cases involve the same patent, notwithstanding the fact that the same defenses are being raised by Tecce in the current litigation (i.e., the validity and enforceability of the '437 Patent), this Court finds that the nature of the present lawsuit is very similar to past one involving Century Products.

Next, the court must inquire whether "in the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present[*15] action? In particular, could any such confidences be detrimental to the former client in the current litigation?" *Nalibotsky, 594 F. Supp. 1199 at 1206.* The Court must decide whether the client may have disclosed confidences to his attorney which could be relevant to the present action, and if so, could any such confidences be detrimental to the former client in the current litigation.

In *Realco Servs., Inc., v. Holt, 479 F. Supp. 867 (E.D.Pa.1979),* the court stated that a lawyer "might have acquired" substantially related information in issue if:

(a) the lawyer and the client ought to have talked about particular facts during the course of the representation, or (b) the information is of such character that it would not have been unusual for it to have been discussed between lawyer and client during their relationship.

*Id. at 871-72.* Tecce has been unable to sufficiently counter Graco's arguments in support of disqualification. I have the discretion to grant or deny a Motion to Disqualify and I have decided to do so under the notion that a conflict does exist. Throughout the hearings on this issue, the Court has been open[*16] to review evidence of specific confidences that may preclude Tecce's representation of Regalo in this matter. However, it is not necessary to find specific examples to justify disqualification. Under the "substantial relationship" inquiry, the Court needs only to find the possibility of disclosure; and the Court is not required to inquire into whether actual confidences were disclosed. *Ramada Franchise, 988 F. Supp. at 1463; Dodson v. Floyd, 529 F. Supp. 1056, 1060 (N.D.Ga.1981).* Graco has alleged that Tecce "might have acquired" certain confidences, the disclosure of which would certainly have an adverse impact on Graco's Century Division (i.e., Tecce's former client in this regard). Tecce's time records devoted to the previous litigation indicate that he spent 379 hours in two months working on preparation for the trial. This Court believes--and Graco correctly asserts--that it can be inferred that Tecce obtained and has control over information that is adverse to Graco's Century Division.

This is enough to satisfy the second prong of the substantial relationship test, however, it does not stand alone.

3. The Settlement Agreement in the Prior   [*17] Litigation:

The Comment to Rule 1.9 of the Pennsylvania Rules of Professional Conduct instructs the following:

When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited. . . . The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.

Perhaps most important in the disqualification of Tecce is the fact that the previous litigation involved a confidential settlement agreement. This settlement agreement is the "specific transaction" that should warrant attorney disqualification. Both parties in this litigation have referred to Paragraph 8 of the Settlement agreement in arguing the issue of disqualification. At oral argument, counsel for Graco clarified that Paragraph 8 of the Settlement Agreement states that "Century will refrain from using the information gathered or obtained in the aforementioned action, to cooperate with other parties attacking the validity and/or enforceability of the '437 Patent, or for any other purpose whatsoever. [*18] " (Tr. at 40, June 24, 1999). Regalo argues that this paragraph of the Settlement Agreement is the only paragraph that has any relevance to this case. Regalo asserts that it was agreed that Century would refrain from using information gathered or obtained to attack the validity of the patent, and that because validity was taken out of the case, no conflict exists pursuant to any settlement provisions. n8

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -
- - -

n8 Both parties have suggested that an amicable means of settling this issue would come from Regalo's withdrawal of any of its defenses as to the validity and enforceability in return for Graco's withdrawal of its Motion to Disqualify. However, no agreement of this sort ever emerged and Regalo has not yet taken the validity issue out of the case.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -

- - - -

Graco counters this by referencing that not only had Century agreed to refrain from using such information to attack the validity of the patent, but Century was to refrain from using such information "for any other purpose whatsoever." Tecce was privy to the Settlement[*19] Agreement, was involved in its negotiations, and therefore was bound by its terms pursuant to the attorney-client relationship that existed. It "is well settled that a district court has jurisdiction to enforce a settlement agreement entered into by parties to a case pending before the court." *Lawrence v. Birmingham Township, 1991 U.S. Dist. LEXIS 861, No. CIV.A. 89-2096, 1991 WL 8877,* at *2 (E.D.Pa. Jan. 25, 1991); *Pugh v. Super Fresh Food Markets, Inc., 640 F. Supp. 1306, 1307 (E.D.Pa.1986); Rosso v. Foodsales, Inc. 500 F. Supp. 274, 276 (E.D.Pa.1980).* "Such jurisdiction is founded on the policy that favors the amicable adjustment of disputes and the avoidance of costly and time-consuming litigation." Id.; *Pugh, 640 F. Supp. at 1307.* I will not ignore the policy behind Rule 1.9, and I will not undermine the importance of the settlement process by allowing Tecce's continued representation of Regalo. n9

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -
- - -

n9 While I have given the essential reasons for granting Graco's Motion to Disqualify, I find that other considerations lead to disqualification. Specifically, Tecce was: (a) involved in confidential meetings where sensitive busi ness information was reviewed for the previous trial; (b) active in the entire trial and participated in all areas of trial preparation; (c) preparation for the appeal.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -

- - - -

[*20]

The United States Court of Appeals for the Third Circuit has stated the reasons for prohibiting an attorney from representing adverse interests in the same or substantially related litigation. In *In Re Corn Derivatives Antitrust Litig., 748 F.2d 157, 162 (3d Cir.1984),* the Third Circuit explains:

It is a prophylactic rule to prevent even the potential that a former client's confidences and secrets may be used against him. Without such a rule, clients may be reluctant to confide completely in their attorneys. Second the rule is important for the maintenance of public confidence in the integrity of the bar. Finally, and importantly, a client has a right to expect the loyalty of his attorney in the matter for which he is retained.

In granting Graco's Motion to Disqualify, I believe that I was following the interest of this Circuit and preventing exactly what Rule 1.9 provides protection from. n10 Therefore, no error of law was committed or needs to be corrected, and as a result, no manifest injustice exists. n11

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n10 Although Graco submitted adequate evidence of a conflict, it should not go unsaid that my decision to grant the Motion to Disqualify was also motivated by the fact that an appearance of impropriety exists. Such impropriety stems from the same evidence that has been discussed previously.

[*21]

n11 My conclusion that there is no manifest injustice here stems from the basic notion that, in allowing Tecce to proceed with his representation in this litigation, an injustice could manifest itself later in the proceedings. Again, I granted the Motion to Disqualify to avoid such a manifestation of injustice (i.e., to avoid attorney-client confidences between Tecce and his former client that may have an adverse effect on Graco's Century Products Division and Graco--two entities that do not exist independent of each other).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -

B. Existence of New Evidence:

On October 26, 1998, the first oral argument on the disqualification issue was held. Regalo contends that since that argument, "new evidence" has been identified. The new evidence included a specific agreement by counsel for Graco to withdraw the Motion for Disqualification. Regalo claims that they never had time to fully address that agreement prior to the Court's disqualification Order, nor has Graco's counsel ever been required to address the reason why he allegedly abandoned the agreement. Regalo argues that fundamental fairness [*22]requires that both sides be given the opportunity to address this evidence.

Regalo also asserts that further new evidence concerning the settlement process has arisen since the prior hearing. In arguing this, Regalo contends that the record contains further evidence that Graco has not approached this litigation in good faith, but rather, has merely sought to gain by a war of attrition what it could not gain on the merits of the case. Regalo asks, "what other explanation could there be when each time that Defendant effectively agreed to Plaintiff's settlement demands, the demand was changed?" (Def.['s] Reply Mem. in Supp. of its Mot. for Recons. at 3).

This Court is unable to distinguish between the two pieces of evidence that have been addressed by Regalo. Both, independent of each other, relate to settlement negotiations regarding the disqualification issue. Both parties have represented to the Court that there was a possibility that the issue would be settled, however, it is clear that this is not the case. While I acknowledge that Regalo has made several attempts to settle this matter, Graco has appeared reasonable in its attempts at settling the issue as well. As the Court[*23] understands the situation, while both parties contemplated settlement, Graco offered certain stipulations that were not anticipated by Regalo, and as a result, Regalo asserts that Graco does not intend to settle the issue, but rather to harass the opposition.

During the June, 1999 oral argument, Graco explained that the stipulations that were asked for in order to settle the matter, all requested specific recitals from Regalo that they understood what claims could not be raised later. In sum, Graco asserts that it and the Graco Century Products Division, may have a legal claim against Tecce for breach of the Settlement Agreement. The stipulations sought by Graco during settlement negotiations were to prevent any potential waiver on its part regarding the possible action pending against Tecce. The Court accepts Graco's reasons for adding the stipulations to the negotiations, and will not conclude that this is new evidence for purposes of Regalo's Motion for Reconsideration. I believe that Graco has sufficiently shown that it has made good faith efforts to settle this case, and in light of the fact that I do believe that a conflict of interest exists, I will not consider the

stipulations[*24] or any part of the settlement negotiations as "new evidence."

Therefore, for the reasons stated above, Regalo's Motion for Reconsideration will be denied.

C. Certification of Appealability:

In the event that this Court denied the Motion for Reconsideration, and in light of the fact that it has denied the Motion, Regalo seeks to have the disqualification Order certified for immediate appeal pursuant to *28 U.S.C. § 1292*(b). Regalo's request for certification is denied.

In *Richardson-Merrell v. Koller, 472 U.S. 424, 86 L. Ed. 2d 340, 105 S. Ct. 2757 (1985),* the United States Supreme Court held that "orders disqualifying counsel in civil cases . . . are not collateral orders subject to appeal as 'final judgements.'" *Richardson-Merrell, 472 U.S. at 440.* The Supreme Court's holding applies to all orders disqualifying counsel, thus limiting the appealability of disqualification orders.

However, Section 1292(b) provides that a district court may certify an order for appeal if it concludes that the Court's decision to disqualify involves (1) a controlling question of law as to which there is substantial ground for [*25]difference of opinion and (2) that an immediate appeal from the Order may materially advance the ultimate termination of the litigation. *28 U.S.C. § 1292*(b). None of the issues discussed above involve controlling question of law as to which there is substantial ground for difference of opinion. The Order granting disqualification was based on well-settled principals of law and the application of that law to the specific facts of this case. Therefore, the issue does not reach the threshold for certification under Section 1292(b). See *Decora Inc. v. DW Wallcovering, Inc., 901 F. Supp. 161, 165,* (S.D.N.Y.1995). Since there exist no controlling questions of law as to which there is substantial ground for difference of opinion, and considering that an immediate appeal from the Order would only serve to delay, rather than advance the ultimate termination of the litigation, the Motion for Certification is denied.

CONCLUSION

Accordingly, for the reasons stated herein, and for those stated regarding the prior Order disqualifying counsel for Regalo, the Motion for Reconsideration is denied. The Motion for Certification pursuant to *28 U.S.C. § 1292*[*26] (b) is also denied.

An appropriate Order follows.

ORDER

AND NOW, this 29th day of July, 1999, upon consideration of Defendant Regalo International LLC's Motion for Reconsideration of the Court's Order disqualifying Mr. Frederick Tecce as Regalo's attorney, and Plaintiff Graco Children's Products, Incorporated's response thereto:

1. It is hereby ORDERED that the Motion for Reconsideration is DENIED.

2. Regalo International LLC's Motion for Certification pursuant to *28 U.S.C. § 1292*(b) is also DENIED.

BY THE COURT:

Robert F. Kelly, J.

# EXHIBIT J

IN RE APPLICATION OF THE FEDERAL TRADE COMMISSION FOR AN ORDER COMPELLING
AVRETT FREE & GINSBERG TO COMPLY WITH A SUBPOENA FOR DOCUMENTARY MATERIAL
Misc. No. M18-304 (RJW)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2001 U.S. Dist. LEXIS 5059; 50 Fed. R. Serv. 3d (Callaghan)139; 2001-1 Trade Cas. (CCH) P73,288

April 19, 2001, Decided
April 19, 2001, Filed

DISPOSITION: [*1] FTC's motion to compel production of documents granted and Avrett's motion for protective order denied.

CASE SUMMARY:

PROCEDURAL POSTURE: Petitioner, the Federal Trade Commission (FTC), moved pursuant to *Fed. R. Civ. P. 37(a)* and *45(c)(2)(B)*, for an order directing respondent advertising agency to comply with a subpoena issued in connec tion with a pending action, involving respondent's client. Respondent cross-moved for a protective order pursuant to *Fed. R. Civ. P. 26(c)*, claiming an attorney-client privilege.

OVERVIEW: In the underlying pending action, the FTC alleged that respondent's client made false and unsubstantiated claims to consumers about its product, a purported treatment for cellulitis. During the product campaign, respondent did not employ its own in-house regulatory counsel. Although respondent did not have its own counsel for regulatory matters, it asserted that the draft advertisements requested by the FTC were protected by the attorney-client privilege because respondent and its client had a common legal interest in the product's advertising campaign. The FTC countered that respondent had no standing to assert the attorney-client privilege and that the common interest rule did not apply here. The court agreed, finding that respondent's and its client's concerns about the consequences of failing to comply with applicable laws and regulations was simply not enough to transform their mutual commercial interest in the advertising campaign into a coordinated legal strategy. Thus, the common interest rule did not apply.

OUTCOME: Petitioner's motion to compel production of documents was granted, and respondent's motion for protective order was denied.

LexisNexis(R) Headnotes

JUDGES: Robert J. Ward, U. S. D. J.

OPINIONBY: Robert J. Ward

OPINION: MEMORANDUM DECISION AND ORDER

Petitioner, the Federal Trade Commission ("FTC"), moves pursuant to *Rules 37(a) and 45(c)(2)(B), Fed. R. Civ. P.*, for an order directing a New York advertising agency, Avrett Free & Ginsberg ("Avrett") to comply with a subpoena issued in connection with Federal Trade Comm'n v. Rexall Sundown, Inc., No. 00 Civ. 7016 (S.D. Fla. filed July 19, 2000), an action pending in the United States District Court for the Southern District of Florida. Avrett cross-moves for a protective order pursuant to *Rule 26(c), Fed. R. Civ. P.*, claiming an attorney-client privilege. For the following reasons, the FTC's motion to compel is granted and Avrett's motion for a protective order is denied.

BACKGROUND

In the Florida litigation, the FTC alleges that Rexall Sundown, Inc. ("Rexall") made false and unsubstantiated claims to consumers about Cellasene, a purported treatment for cellulitis. The FTC and Rexall are currently in the fact discovery phase of the litigation. See Declaration of Stacy A. [*2] Feuer ("Feuer Decl.") P 3. Avrett is a non-party that served as Rexall's advertising agency for Cellasene, preparing print, radio, and television advertising for the product. See id. P 4. During the Cellasene campaign, Avrett did not employ its own in-house regulatory counsel.

Deborah Shur Trinker has been employed as Rexall's Vice President of Regulatory Affairs and Assistant General Counsel, with primary responsibility for assuring that Rexall product labeling, packaging, marketing, and advertising are in full compliance with all statutory and regulatory requirements. See Declaration of Deborah

Shur Trinker ("Trinker Decl.") PP 2-3. While employed by Rexall, Ms. Trinker reviewed advertising materials prepared by Avrett for a variety of products. She discussed with Avrett legal issues associated with draft advertising materials and advised Avrett on the general legal parameters for advertising dietary supplements. In addition, she advised Avrett about the potential legal objections that television networks might have concerning advertisements. Her objective was to facilitate the preparation of non-misleading, substantiated, and lawful advertisements, and to minimize the creation[*3] of materials that would be rejected for legal reasons. See id. P 5.

Thomas James, Avrett's Executive Group Account Director, stated that, as a general policy, Avrett forwarded draft advertising material to its clients for the purpose of review by the clients' attorneys. Avrett relied on the advice of its clients' attorneys to ensure that all legal and regulatory requirements were met. This advice typically took the form of annotations and modifications made by the clients' attorneys directly on draft advertising material. Avrett maintained these drafts in strict confidence. See Declaration of Thomas James ("James Decl.") P 3.

In the case of Cellasene in particular, Ms. Trinker stated that Avrett and Rexall worked collaboratively to produce truthful and substantiated advertising. Ms. Trinker communicated her input to Rexall and Avrett through the modification of Avrett's draft advertisements. See Trinker Decl. P 6. She conducted her review to assure that all legal and regulatory requirements were met. In addition, once the FTC investigation into Cellasene began on April 12, 1999, when the FTC issued the first of several Civil Investigative Demands on Rexall, Ms. Trinker[*4] had the additional objective of minimizing Rexall's exposure to liability in litigation with the FTC. See id. PP 7, 9.

On January 26, 2001, the FTC served Avrett with a Subpoena for the Production of Documentary Material, issued by the United States District Court for the Southern District of New York. See Feuer Decl. P 5. Shortly before the deadline for Avrett to produce responsive documents, an attorney representing Rexall, Edward F. Glynn, asked whether the FTC would consent to Avrett's withholding of certain documents on the basis of the attorney-client privilege. The FTC declined and informed Mr. Glynn that Rexall would have to seek judicial intervention to prevent the production of the documents. See id. P 6. Rexall did not do so. See id. P 7.

On February 28, Avrett produced approximately 722 pages of documents, but withheld fifteen documents, each a draft advertisement containing Ms. Trinker's

handwritten notes. Avrett asserted that these documents were protected by the attorney-client privilege. See id. P 8. The FTC and Avrett consulted one another in a failed effort to resolve the dispute about these fifteen documents. See id. PP 9-10. This proceeding[*5] followed.

## DISCUSSION

Although Avrett did not have its own counsel for regulatory matters, it asserts that the draft advertisements requested by the FTC are protected by the attorney-client privilege because Avrett and Rexall had a common legal interest in the Cellasene advertising campaign. The FTC counters that Avrett has no standing to assert the attorney-client privilege and that the common interest rule does not apply here.

"The attorney-client privilege generally forbids an attorney from disclosing confidential communications that pass in the course of professional employment from client to lawyer." *United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989).* Furthermore, the burden of establishing the existence of the attorney-client privilege always rests on the party asserting it. See *id. at 244.* The party must establish the relationship of attorney and client, a communication by the client relating to the subject matter upon which professional advice is sought, and the confidentiality of the expression for which the protection is claimed. See *id. at 243.*

The joint defense privilege, more commonly known as the common[*6] interest rule, is an extension of the attorney-client privilege. See *id.* This rule does not provide an independent basis for establishing the existence of an attorney-client relationship. Rather, it is an exception to the general rule that the privilege is waived when confidential information is communicated to a third party. If the third party and the client share a common legal interest, the rule applies and the privilege is not waived. See, e.g., *Strougo v. BEA Assocs., 199 F.R.D. 515, 2001 U.S. Dist. LEXIS 3816, 2001 WL 332922,* at *3 (S.D.N.Y. 2001); *United States v. Agnello, 135 F. Supp. 2d 380, 2001 U.S. Dist. LEXIS 3633, 2001 WL 310423,* at *1 (E.D.N.Y. 2001); *United States v. United Techs. Corp., 979 F. Supp. 108, 111 (D. Conn. 1997).*

The first obstacle Avrett faces in invoking the attorney-client privilege and the common interest rule is that it has not established that it had an attorney-client relationship with Ms. Trinker. "The key, of course, to whether an attorney/client relationship existed is the intent of the client and whether he reasonably understood the [communications] to be confidential." *United States v. Dennis, 843 F.2d 652, 657 (2d Cir. 1988).*[*7] Although

Avrett produced an affidavit describing its general policy of working with its clients' attorneys, it has not established that it intended Ms. Trinker to act as its attorney, or that it reasonably understood its communications with her to be confidential.

Instead of presenting evidence that may show that Avrett had an attorney-client relationship with Ms. Trinker, Avrett argues that it had such a relationship by virtue of its common interest with Rexall. This argument fails because the common interest rule is not an independent source of the attorney-client privilege, as Avrett attempts to use it. Avrett has not cited, and the Court has not found, a single case applying the common interest rule in such circumstances. n1 In any event, the Court is not convinced that Avrett and Rexall shared a common legal interest in the Cellasene advertising campaign.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -
- - -

n1 Rexall is Ms. Trinker's client, and therefore, is the only entity in a position to assert the common interest rule. In other words, if the FTC sought to discover from Rexall confidences between Rexall and Ms. Trinker on the ground that disclosure to Avrett waived the attorney-client privilege, Rexall would be in a position to argue that it had a common legal interest with Avrett. However, Rexall is not a party to this proceeding.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

[*8]

At its core, "the common interest doctrine applies when multiple persons are represented by the same attorney. In that situation, communications made to the shared attorney to establish a defense strategy remain privileged as to the rest of the world." *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 446 (S.D.N.Y. 1995)* (citations omitted). In addition, the common interest rule "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effo rt or strategy has been decided upon and undertaken by the parties and their respective counsel." *Schwimmer, 892 F.2d at 243* (citations omitted). The latter situation has been described as follows:

A community of interest exists among different persons or separate corporations whe re they have an identical legal interest . . . . The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial. The fact that there may be an overlap of a commercial and legal interest for a third party does not negate the effect of the legal interest in establishing a community[*9] of interest.

*Strougo, 199 F.R.D. 515, 2001 U.S. Dist. LEXIS 3816, *8-9, 2001 WL 332922,* at *3 (citations omitted). "What is important is not whether the parties theoretically share similar interests but rather whether they demonstrate actual cooperation toward a common legal goal." *North River Ins. Co. v. Columbia Cas. Co., 1995 U.S. Dist. LEXIS 53, No. 90 Civ. 2518, 1995 WL 5792,* at *4 (S.D.N.Y. Jan. 5, 1995).

Only communications made in the course of an ongoing legal enterprise, and intended to further the enterprise, are protected. See *Schwimmer, 892 F.2d at 243.* However, it is not necessary that there be actual litigation in progress for the common interest rule to apply. See *id. at 244.* The parties among whom information is shared must have a common legal interest - they must have demonstrated cooperation in formulating a common legal strategy. See *Bank Brussels Lambert, 160 F.R.D. at 447.* The rule "does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation." Id.

As in all communications allegedly privileged under the attorney-client relationship, "a claim resting on the common interest rule requires[*10] a showing that the communication in question was given in confidence and that the client reasonably understood it to be so given." See *Schwimmer, 892 F.2d at 244.* Finally, the Second Circuit has warned that expansions of the attorney-client privilege under the common interest rule should be "cautiously extended." *United States v. Weissman, 195 F.3d 96, 100 (2d Cir. 1999).*

Avrett places great reliance on In re Jenny Craig, Inc., No. 9260 (F.T.C. May 16, 1994) (attached to Avrett's reply brief as Exhibit A). In that case, the FTC sought documents from Jenny Craig Inc.'s ("JCI") advertising agency, J. Walter Thompson ("JWT"). The documents at issue contained handwritten attorneys' notes, memos to clients, and handwritten "interlineation" by attorneys on advertisements, drafts, and scripts. JWT agreed to provide legal review of JCI's proposed advertisements to ensure that they were in full compliance with the law. After an FTC investigation commenced against JCI, JCI sought legal litigation-related advice from JWT's in-

house counsel and JCI's own outside counsel. The parties' respective attorneys consulted one another about the FTC investigation. [*11]

The FTC argued that the attorney-client privilege was waived when JWT and JCI sent each other the relevant documents. Rejecting this argument, the Administrative Law Judge found that the parties had a common interest: first, JWT's attorneys communicated with JCI's attorneys to discuss JCI's legal strategy in response to the FTC investigation; second, JWT had a legal interest in JCI advertisements because advertising agencies may be subject to FTC enforcement proceedings. Therefore, JWT and JCI could both use the same attorney work product without waiving the attorney-client privilege.

Several cases rejecting an application of the common interest rule are instructive in demonstrating the limited scope of the rule. In *Walsh v. Northrop Grumman Corp., 165 F.R.D. 16 (E.D.N.Y. 1996)*, an employee of Salomon Brothers was asked in a deposition to reveal discussions between Salomon and Northrop Grumman. Salomon asserted the common interest rule as to information which Salomon obtained from its attorneys to defeat the contention that disclosure of the information to Northrop waived the privilege. See *id. at 18*. The court rejected an application of the rule[*12] in those circumstances. First, the court believed that the common interest rule is limited to confidences shared by one party with the attorneys of another party, not confidences shared with a party's attorneys, and then with another party. See id. Second, Salomon was advising Northrop on financial and other business strategies, and although there was plainly a mutual concern about possible litigation, "that does not transform their common interest and enterprise into a legal, as opposed to commercial, matter." *Id. at 19*.

In *Bank Brussels Lambert, supra*, the company, a member of a banking consortium, circulated a letter from its attorney among other members of the banking group. The letter concerned the viability of a potential transaction and included a concern about possible litigation. When the banking consortium subsequently brought suit, the defendants sought to obtain the letter, claiming that its disclosure to the bank group waived the attorney-client privilege. The court held that the banks had no common legal strategy:

While each member shared a concern about the threat of shareholder litigation, there is no evidence that they[*13] formulated a joint legal strategy to deal with the possibility. Coudert Brothers [Bank Brussel Lambert's counsel], for example, represented only BBL and was not retained to represent the Bank Group as a whole or any

of its other members. Nor is there any suggestion that counsel from that firm coordinated its legal efforts with attorneys for any other Bank Group member.

*160 F.R.D. at 448.*

The present case most closely resembles those cases where courts have recognized that a business strategy which happens to include a concern about litigation is not a ground for invoking the common interest rule. The Court does not dispute that Ms. Trinker's handwritten notes on Avrett's draft advertisements constitute legal advice. In addition, it is clear that both Avrett and Rexall were concerned about the consequences of failing to comply with applicable law and regulations. However, this is simply not enough to transform their mutual commercial interest in the Cellasene advertising campaign into a coordinated legal strategy. Ms. Trinker reviewed Avrett's draft advertisements for the purpose of determining their legality because Avrett and Rexall had a financial interest[*14] in seeing that the Cellasene advertising campaign was not blocked by legal obstacles. Avrett and Rexall's joint enterprise was commercial and an element of making that enterprise succeed was ensuring that advertisements were compliant. While Avrett received legal advice from Ms. Trinker that presumably assured Avrett that it would not be subject to legal action based on the advertisements, this benefit was ancillary to the business relationship.

In addition, the Court is not swayed by the fact that Avrett, as a general policy, relies on all of its clients' counsel for legal advice. An extension of the common interest rule for that reason would mean that Avrett has an attorney-client privilege with each and every one of its clients' counsel even though it has not retained any of them. The common interest rule, which must be construed narrowly, does not sanction such a result.

CONCLUSION

For the foregoing reasons, the FTC's motion to compel production of documents is granted and Avrett's motion for a protective order is denied.

It is so ordered.

Dated: New York, New York

April 19, 2001

Robert J. Ward

U. S. D. J.