# PART III

LEXSEE 200 FRD 213

IN RE: COPPER MARKET ANTITRUST LITIGATION; VIACOM, INC., as successor by merger to CBS Corp. (f/k/a Westinghouse Electric Corp.) and EMERSON ELECTRIC CO., Plaintiffs,-against-SUMITOMO CORPORATION, SUMITOMO CORPORATION OF AMERICA, GLOBAL MINERALS AND METALS CORPORATION, R. DAVID CAMPBELL, and CREDIT LYONNAIS ROUSE, LTD., Defendants.

Index No. M8-85 (LTS), MDL Docket No. 1303 (W.D. Wisc.)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

200 F.R.D. 213; 2001 U.S. Dist. LEXIS 5269

April 30, 2001, Decided
April 30, 2001, Filed

**SUBSEQUENT HISTORY:** Summary judgment denied by, Summary judgment granted by, Motion denied by *In re Copper Antitrust Litig.*, 153 F. Supp. 2d 996, 2001 U.S. Dist. LEXIS 15431 (W.D. Wis., 2001)

**PRIOR HISTORY:** *Metallgesellschaft AG v. Sumitomo Corp. (In re Copper Antitrust Litig.)*, 117 F. Supp. 2d 875, 2000 U.S. Dist. LEXIS 20283 (W.D. Wis., 2000)

**DISPOSITION:** [**1] Plaintiffs' motion to compel production of documents listed on privilege log denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs' lawsuit alleged that defendants conspired to manipulate global copper prices. Plaintiffs move to compel the production of documents listed on the privilege log produced by a non-party public relations firm in response to a subpoena.

**OVERVIEW:** Defendant corporation retained the public relations firm to handle public relations arising from the copper trading scandal. Plaintiffs served a subpoena requesting that the public relations firm produce all documents relating to its public relations consulting work for defendant in connection with the copper trading scandal. The public relations firm produced documents and created a privilege log which was reviewed by defendant's counsel before production to plaintiffs' counsel. Counsel for defendant discovered 17 documents it believed to be privileged and informed plaintiffs' counsel. Plaintiffs sought to compel production of the claimed privilege documents, arguing that such documents were not protected by the attorney-client privilege or work-product immunity. The court rejected plaintiffs' contentions. It held that the disputed discovery was protected from disclosure. It was clear to the court that the materials listed on the privilege log were prepared in collaboration with defendant's counsel in the context of the litigation ensuing from the copper trading scandal.

**OUTCOME:** The court denied plaintiffs' motion. The public relations firms' independent contractor status provided no basis for excluding its communications with defendant's counsel from the protection of the attorney-client privilege.

**LexisNexis(R) Headnotes**

*Civil Procedure > State & Federal Interrelationships > Federal Common Law*
*Evidence > Privileges*
[HN1] Where subject matter jurisdiction is based on a federal question, privilege issues are governed by federal common law.

*Evidence > Privileges > Attorney-Client Privilege*
[HN2] Proposed Rule of Evidence 503, also known as Supreme Court Standard 503, establishes a benchmark for determining the scope of the attorney-client privilege under federal common law: A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative, or (2) between his lawyer and his lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common interest, or (4) between representatives of the client or between the client and a representative of the client, or (5) between lawyers representing the client.

200 F.R.D. 213, *; 2001 U.S. Dist. LEXIS 5269, **1

*Evidence > Privileges > Attorney-Client Privilege*
[HN3] Under Supreme Court Standard 503, confidential communications made for the purpose of obtaining legal advice between a client's representative and the client's attorney, between representatives of a client, or between attorneys for a client should be protected from disclosure under the attorney-client privilege.

*Evidence > Privileges > Attorney-Client Privilege*
[HN4] Supreme Court Standard 503 restates, rather than modifies, the common-law lawyer-client privilege. Thus, it has considerable utility as a guide to the federal common law.

*Evidence > Privileges > Attorney-Client Privilege*
[HN5] Consistent with Supreme Court Standard 503, courts have held that the attorney-client privilege protects communications between lawyers and agents of a client where such communications are for the purpose of rendering legal advice.

*Evidence > Privileges > Attorney-Client Privilege*
[HN6] The attorney-client privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice. In applying the principles set forth by the Supreme Court in Upjohn, there is no reason to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice. The court's concern is with identifying those representatives who can fairly be equated with the client for purposes of the privilege.

*Evidence > Privileges > Attorney-Client Privilege*
*Civil Procedure > Disclosure & Discovery > Work Product*
[HN7] See *Fed. R. Civ. P. 26(b)(3)*.

*Civil Procedure > Disclosure & Discovery > Work Product*
[HN8] A document is prepared "in anticipation of litigation" within the meaning of the *Fed. R. Civ. P. 26* if, in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation. Documents prepared in the ordinary course of business, or that would have been created whether or not litigation was anticipated, are not protected by work-product immunity. It is firmly established, however, that a document that assists in a business decision is protected by work-product immunity if the document was created because of the prospect of litigation. In addition, documents prepared in anticipation of litigation need not be created at the request of an attorney. Once it is established that a document was prepared in anticipation of litigation, work-product immunity protects documents prepared by or for a representative of a party, including his or her agent.

*Civil Procedure > Disclosure & Discovery > Work Product*
[HN9] The work product privilege is not automatically waived by disclosure to third parties. Courts find a waiver of work-product immunity only if the disclosure substantially increases the opportunity for potential adversaries to obtain the information. Disclosure of work product to a party sharing common interests is not inconsistent with the policy of privacy protection underlying the doctrine.

*Civil Procedure > Disclosure & Discovery > Privileged Matters*
*Civil Procedure > Disclosure & Discovery > Work Product*
[HN10] Inadvertent production will not waive the privilege unless the conduct of the producing party or its counsel evinced such extreme carelessness as to suggest that it was not concerned with the protection of the asserted privilege. The following factors have been identified for consideration in determining whether inadvertent production constitutes waiver of a claim of privilege: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the time taken to rectify the error, (3) the scope of the production, (4) the extent of the disclosure, and (5) overriding issues of fairness.

*Civil Procedure > Disclosure & Discovery > Privileged Matters*
*Civil Procedure > Disclosure & Discovery > Work Product*
[HN11] The mere fact of disclosure does not establish that a party's precautions undertaken to protect the privileged evidence were unreasonable. Rather, a court must examine whether the procedures followed in maintaining the confidentiality of the documents were so lax, careless, inadequate or indifferent to consequences as to constitute a waiver. Inadvertent production will not waive the privilege unless the conduct of the producing party or its counsel evinced such extreme carelessness as to suggest that they were not concerned with the protection of the privilege.

*Civil Procedure > Disclosure & Discovery > Privileged Matters*
*Civil Procedure > Disclosure & Discovery > Work Product*
[HN12] The relevant correction period begins when the party realizes that an error has been made.

*Civil Procedure > Disclosure & Discovery > Privileged Matters*

Case 1:04-cv-01264-SLR    Document 299-5    Filed 11/15/2005    Page 4 of 18

Page 3

200 F.R.D. 213, *; 2001 U.S. Dist. LEXIS 5269, **1

*Civil Procedure > Disclosure & Discovery > Work Product*
[HN13] Where a large number of documents are involved, there is more likely to be an inadvertent disclosure than a knowing waiver.

*Civil Procedure > Disclosure & Discovery > Privileged Matters*
*Civil Procedure > Disclosure & Discovery > Work Product*
[HN14] The standard for testing the adequacy of the privilege log is whether, as to each document, it sets forth specific facts that, if credited, would suffice to establish each element of the privilege or immunity claimed. The focus is on the specific descriptive portion of the log, and not on the conclusory invocations of the privilege or work-product rule.

*Civil Procedure > Disclosure & Discovery > Privileged Matters*
*Civil Procedure > Disclosure & Discovery > Work Product*
[HN15] See *Fed. R. Civ. P. 45(d)(2)*.

*Civil Procedure > Disclosure & Discovery > Privileged Matters*
*Civil Procedure > Disclosure & Discovery > Work Product*
[HN16] U.S. Dist. Ct. S.D.N.Y. R. 26.2(a)(2)(A) requires provision of certain specified types of information with regard to documents withheld upon claim of privilege including, where not apparent, the relationship of the author, addressees and recipients to each other.

*Civil Procedure > Disclosure & Discovery > Privileged Matters*
*Civil Procedure > Disclosure & Discovery > Work Product*
[HN17] Distribution of legal advice within corporation is privileged.

*Civil Procedure > Disclosure & Discovery > Privileged Matters*
*Civil Procedure > Disclosure & Discovery > Work Product*
[HN18] Selection of documents in anticipation of litigation is protected as work-product.

*Civil Procedure > Disclosure & Discovery > Privileged Matters*
*Civil Procedure > Disclosure & Discovery > Work Product*
[HN19] Fax cover sheet indicating that the attached document is drafted by attorneys is privileged.

*Civil Procedure > Disclosure & Discovery > Privileged Matters*

[HN20] Memoranda of information or advice directed to or received from an attorney, prepared by an agent of the client or attorney, as a record of that advice or request, are protected by the attorney-client privilege.

**COUNSEL:** For Robinson Lerer & Montgomery, Third-Party Respondent: Roberta Kaplan, Esq., PAUL, WEISS, RIFKIND, WHARTON & GARRISON, New York, New York.

For Sumitomo Corporation, Sumitomo Corporation of America, Defendants: Roberta Kaplan, Esq., PAUL, WEISS, RIFKIND, WHARTON & GARRISON, New York, New York.

For Viacom Inc., Emerson Electric Co., Plaintiffs: Patricia A. Griffin, Esq., KING & SPALDING, New York, New York.

**JUDGES:** LAURA TAYLOR SWAIN, United States District Judge.

**OPINIONBY:** LAURA TAYLOR SWAIN

**OPINION:** [*215]

LAURA TAYLOR SWAIN, United States District Judge

Plaintiffs Viacom Inc. and Emerson Electric Co. ("Plaintiffs") move to compel the production of documents listed on the privilege log (the "Privilege Log") produced by non-party Robinson Lerer & Montgomery ("RLM") in response to a subpoena issued from this Court on March 9, 2000. For the reasons set forth below, Plaintiffs' motion is denied.

### FACTUAL BACKGROUND

This motion arises out of multi-district litigation pending in the Western District of Wisconsin. On or about September 27, 1999, Plaintiffs brought an action against Sumitomo Corporation [**2] ("Sumitomo"), Sumitomo Corporation of America, Global Minerals and Metals Corporation and Credit Lyonnais Rouse, Ltd., alleging that the defendants conspired to manipulate global copper prices. By the subpoena dated March 9, 2000, Plaintiffs requested that RLM produce documents relating to RLM's public relations consulting work for Sumitomo. Because the March 9, 2000 subpoena issued from this Court, the Court has jurisdiction to determine Plaintiffs' motion. *Fed. R. Civ. P. 45(c)(2)(B)*. Although the parties differ as to the legal significance of their respective factual proffers, none of the facts proffered is disputed in any material respect. The relevant factual background is as follows.

Case 1:04-cv-01264-SLR    Document 299-5    Filed 11/15/2005    Page 5 of 18

Page 4

200 F.R.D. 213, *215; 2001 U.S. Dist. LEXIS 5269, **2

The signal event giving rise to the underlying antitrust litigation occurred during a deposition conducted in April 1996 by the Commodities Futures Trading Commission ("CFTC"), when Yasuo Hamanaka ("Hamanaka"), then head of Sumitomo's Non-Ferrous Metals Division, disclosed that he had executed an unauthorized power of attorney relating to hundreds of millions of dollars in copper trading. Anticipating a CFTC investigation and other litigation, Sumitomo retained RLM, a "crisis management" public [**3] relations firm, on or about May 23, 1996, to handle public relations matters arising from the copper trading scandal. Declaration of Yasutomo Katsuno, dated August 30, 2000, P 2 (hereinafter "Katsuno Decl."); Affidavit of Elizabeth Sigler Mather, sworn to August 31, 2000, P 7 (hereinafter "Mather Aff."). Both the investigation and civil litigation ensued promptly.

Sumitomo hired RLM because it had no prior experience in dealing with issues relating to publicity arising from high profile litigation, and because Sumitomo lacked experience in dealing with the Western media. Only two of the three executives in Sumitomo's Corporate Communications Department had English language facility and those individuals' English language skills were not sufficiently sophisticated for media relations. Katsuno Decl., PP 4-5; Mather Aff., PP 11-15. Working largely out of Sumitomo's Tokyo headquarters with Sumitomo's Corporate Communications Department, RLM acted as Sumitomo's agent and its spokesperson when dealing with the Western press on issues relating to the copper trading scandal. Katsuno Decl., PP 8-9. The chief object of RLM's engagement was damage control, i.e., the management of press statements [**4] in the [*216] context of anticipated litigation "to ensure that they do not themselves further damage the client." Mather Aff., P 2. "RLM's primary goal in representing Sumitomo was to help the Company make the statements it needed to make, but to do so within the necessary legal framework -- all with the realization, indeed the expectation, that each such statement might subsequently be used by Sumitomo's adversaries in litigation." Mather Aff., P 23. In the course of providing its services to Sumitomo, RLM conferred frequently with Sumitomo's outside counsel, Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss") (Mather Aff., P 24) and Sumitomo's in-house counsel. Katsuno Decl., P 10.

RLM dealt with the western press on Sumitomo's behalf, while Sumitomo's internal Corporate Communications Department dealt with the Japanese press. Katsuno Decl., P 8. RLM's public relations duties included preparing statements for public release and internal documents designed to inform Sumitomo employees about what could and could not be said about the scandal. Affidavit of Roberta Kaplan, sworn to August 30, 2000, PP 6-8 (hereinafter the "Kaplan Aff."). RLM's duties also included drafting, in collaboration [**5] with Sumitomo's counsel, public relations documents, press releases, talking points, and Questions and Answers ("Q and As") to be used as a framework for press inquiries. The press releases were intended for different audiences, including regulators and other parties with whom Sumitomo anticipated litigation. Mather Aff., P 30. RLM prepared many drafts of the documents, incorporating legal advice from Paul Weiss and Sumitomo in-house counsel. Mather Aff., P 28. All documents prepared by RLM relating to legal issues arising from the CFTC investigation or the Hamanaka scandal were vetted with Sumitomo's in-house counsel and/or outside counsel. Mather Aff., P 26. RLM had the authority to make decisions on behalf of Sumitomo concerning its public relations strategy. Katsuno Decl., PP 3-6, 8-10; Mather Aff., PP 11-21.

RLM was the functional equivalent of an in-house public relations department with respect to Western media relations, having authority to make decisions and statements on Sumitomo's behalf, and seeking and receiving legal advice from Sumitomo's counsel with respect to the performance of its duties. Mather Aff., P 21; Katsuno Aff., PP 9-10.

On March 9, 2000, Plaintiffs served [**6] a subpoena requesting that RLM produce all documents relating to RLM's public relations consulting work for Sumitomo in connection with the copper trading scandal. Kaplan Aff., P 10. RLM produced approximately 15,000 pages of documents in response. Kaplan Aff., P 12. Most of the documents were produced in April 2000, approximately six weeks after the subpoena was issued. Kaplan Aff., P 12. In preparing for the production, the attorney in charge at Paul Weiss gave instructions to the persons reviewing the documents as to what documents should be produced, what documents should be withheld, and what material should be redacted. Kaplan Aff., P 18. On June 27, 2000, RLM delivered the Privilege Log along with the final portion of its production. Kaplan Aff., P 23. On June 23-24 2000, prior to the final production, Paul Weiss undertook a re-review of the documents. Kaplan Aff., P 20. As a result of that review, Paul Weiss discovered that 17 documents it contends are privileged and/or work-product had been produced in error. n1 The attorney in charge of the production reviewed the 17 documents the next business day and, the following day, simultaneously with RLM's final production, Paul Weiss [**7] informed Plaintiffs' counsel that in preparing the Privilege Log it had discovered that certain documents (hereinafter the "Disputed Documents") had been inadvertently produced. Kaplan Aff., PP 20-22.

Case 1:04-cv-01264-SLR   Document 299-5   Filed 11/15/2005   Page 6 of 18

Page 5
200 F.R.D. 213, *216; 2001 U.S. Dist. LEXIS 5269, **7

n1 Plaintiffs contend that approximately 30 documents were produced in error. RLM sets the number at 17, contending that certain pages identified by Plaintiffs as separate documents are in fact portions of a single documents. In any event, there appears to be no dispute as to the universe of "Disputed Documents." As explained below, RLM's counsel has provided a reconciliation of the parties' respective document schedules.

RLM has asserted both attorney-client privilege and work-product immunity with respect to the 583 communications listed on the Privilege Log. Plaintiffs argue that the [*217] documents listed in the Privilege Log are not protected by the attorney-client privilege or work-product immunity. Plaintiffs contend that the attorney-client privilege is inapplicable because RLM, a third party, was involved [**8] in the communications as to which the privilege is asserted. Similarly, Plaintiffs argue that the work-product doctrine is inapplicable because of RLM's third-party status, because its public relations work for Sumitomo was not exclusively litigation-related, and because the work was not done at the request of Sumitomo's attorneys. They further assert that any privilege that may be applicable to the documents listed on the Privilege Log has been waived by disclosure of the information to RLM, a third party, and/or by the production of the Disputed Documents.

**DISCUSSION**

ATTORNEY-CLIENT PRIVILEGE

[HN1] Where, as here, subject matter jurisdiction is based on a federal question, privilege issues are governed by federal common law. See *von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987), cert. denied, 481 U.S. 1015, 95 L. Ed. 2d 498, 107 S. Ct. 1891 (1987). [HN2] Proposed Rule of Evidence 503, also known as Supreme Court Standard 503, establishes a benchmark for determining the scope of the attorney-client privilege under federal common law:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing [**9] confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative, or (2) between his lawyer and his lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common interest, or (4) between representatives of the client or between the client and a representative of the client, or (5) between lawyers representing the client.

Supreme Court Standard 503(b). n2 [HN3] Under Supreme Court Standard 503, confidential communications made for the purpose of obtaining legal advice between a client's representative and the client's attorney, between representatives of a client, or between attorneys for a client should be protected from disclosure under the attorney-client privilege.

n2 "[HN4] Supreme Court Standard 503 restates, rather than modifies, the common-law lawyer-client privilege. Thus, it has considerable utility as a guide to the federal common law . . . ." 3 Jack B. Weinstein & Margaret Berger, Weinstein's Federal Evidence, (Joseph M. McLaughlin ed., Matthew Bender 2d ed. 1997) § 503[02], at 510-11. "See also *United States v. Spector*, 793 F.2d 932, 938 (8th Cir. 1986) ("courts have relied upon it as an accurate definition of the federal common law of attorney-client privilege. . . . 'Consequently, despite the failure of Congress to enact a detailed article on privileges, Standard 503 should be referred to by the Courts.") (citation omitted), cert. denied, 479 U.S. 1031, 93 L. Ed. 2d 830, 107 S. Ct. 876 (1987); *United States v. (Under Seal)*, 748 F.2d 871, 874 n. 5 (4th Cir. 1984) (Supreme Court Standard 503 "provides a comprehensive guide to the federal common law of attorney-client privilege").

[**10] [HN5]

Consistent with Supreme Court Standard 503, courts have held that the attorney-client privilege protects communications between lawyers and agents of a client where such communications are for the purpose of rendering legal advice. *Upjohn Co. v. United States*, 449 U.S. 383, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981); *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989), cert. denied, 502 U.S. 810, 116 L. Ed. 2d 31, 112 S. Ct. 55 (1991) (attorney-client privilege protects communications made to agents assisting client); *CSC Recovery Corp. v. Daido Steel Co., Ltd.*, 1997 U.S. Dist. LEXIS 16346, No. 94 Civ. 9214, 1997 WL 661122 at *3 (S.D.N.Y. Oct. 22, 1997) (attorney-client privilege protects communications between clients and attorneys and agents of both); *H.W. Carter & Sons, Inc. v. William Carter Co.*, 1995 U.S. Dist. LEXIS 6578, No. 95 Civ. 1274, 1995 WL 301351 at *3 (S.D.N.Y. May 16, 1995) (communications by public relations consultants who assisted attorneys in rendering legal advice

Case 1:04-cv-01264-SLR    Document 299-5    Filed 11/15/2005    Page 7 of 18

Page 6

200 F.R.D. 213, *217; 2001 U.S. Dist. LEXIS 5269, **10

protected by the attorney-client privilege).

In Upjohn Co. v. United States, the Supreme Court reviewed the principles underlying the scope of the attorney-client [**11] privilege in the corporate context with respect to communications between a client's representative or agent and a client's attorney. The Court focused on the purpose of the attorney-client privilege: "The privilege recognizes that sound legal advice or advocacy [*218] serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client. . . . 'The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out.'" *Upjohn, 449 U.S. at 389* (quoting *Trammel v. United States, 445 U.S. 40, 51, 63 L. Ed. 2d 186, 100 S. Ct. 906 (1980)).* The Supreme Court's analysis in Upjohn looked to which of the corporate client's agents possess the relevant information the attorney needs to render sound legal advice. See *Upjohn, 449 U.S. at 391-392* (restricting relevant communications to those made by the control group of a corporation frustrates the purpose of the privilege because it discourages communication by the corporation's non-control group agents who possess the information [**12] needed by the attorney). See also *United States v. Kovel, 296 F.2d 918, 922 (2d Cir. 1961)* ("what is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer.").

The Upjohn Court based its holding that the communications at issue were privileged on determinations that the communications had been made to Upjohn's counsel by its employees acting at the direction of their corporate superiors; that the information was needed to supply a basis for legal advice concerning potential litigation relating to the subject matter of the communications; that the communications concerned matters within the scope of the employees' corporate duties; and that the employees were aware that the communications were for the purpose of rendering legal advice for the corporation. See *Upjohn, 449 U.S. at 394.* The Supreme Court held that, "consistent with the underlying purposes of the attorney-client privilege, these communications must be protected against compelled disclosure." *Upjohn, 449 U.S. at 395.* The Supreme Court's functional approach in Upjohn thus looked to whether the [**13] communications at issue were by the Upjohn agents who possessed relevant information that would enable Upjohn's attorney to render sound legal advice.

In *In re Bieter Co., 16 F.3d 929 (8th Cir. 1994),* the Eighth Circuit applied these principles to a claim of attorney-client privilege with respect to communications with a consultant who had been retained by a real estate development company, finding that the consultant's confidential communications to the company's attorneys were protected by the attorney-client privilege. The court held that in determining whether a corporation's communications were protected by the attorney-client privilege, there was no reason to distinguish between persons on the corporation's payroll and the consultant. *In re Bieter, 16 F.3d at 937.*

In Bieter, a real estate partnership had hired a consultant to assist in a real estate development. The venture failed and the real estate partnership commenced litigation. Because the consultant was involved in the subject matter of the litigation arising from the failed real estate venture, the court in Bieter determined that the consultant was "precisely the sort of [**14] person with whom a lawyer would wish to confer confidentially in order to understand [the real estate firm's] reasons for seeking representation." *Id., at 938.* In sum, the Eighth Circuit asked whether the consultant's relationship to the company was of the kind that justified application of the attorney-client privilege and found that, because the consultant was involved in the activities which were the subject matter of the ensuing litigation and because the consultant possessed the information required by the attorney for informed advice, the consultant's confidential communications to counsel were protected. Id.

The Court finds persuasive the reasoning of the Bieter court. Upjohn teaches that [HN6] the attorney-client privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn, 449 U.S. at 390.* The Supreme Court in Upjohn looked to whether the corporation's agents possessed the information needed by the corporation's attorneys in order to render informed legal advice. [*219] See *Upjohn, 449 U.S. at 391.* [**15] In applying the principles set forth by the Supreme Court in Upjohn, there is no reason to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice. See *In re Grand Jury Subpoenas Dated January 20, 1998, 995 F. Supp. 332, 340 (E.D.N.Y. 1998)* (citing Bieter for the principle that the court's concern is with "identifying those representatives who can fairly be equated with the 'client' for purposes of the privilege"). These principles, although articulated in the context of corporate employee relationships, inform this Court's analysis of RLM's ability to assert the attorney-client privilege with respect to its communications with Sumitomo's inside and outside counsel, and Sumitomo's disclosure of privileged information to RLM. Moreover, although the immediate context of the Bieter court's decision was factual commu-

Case 1:04-cv-01264-SLR    Document 299-5    Filed 11/15/2005    Page 8 of 18

Page 7
200 F.R.D. 213, *219; 2001 U.S. Dist. LEXIS 5269, **15

nications with a consultant who had in effect functioned as a principal with respect to the events underlying the litigation, the principles to be gleaned from the decision are not so limited. [**16]

RLM was, essentially, incorporated into Sumitomo's staff to perform a corporate function that was necessary in the context of the government investigation, actual and anticipated private litigation, and heavy press scrutiny obtaining at the time. Sumitomo retained RLM to deal with public relations problems following the exposure of the copper trading scandal. Sumitomo's internal resources were insufficient to cover the task. RLM's public relations duties included preparing statements for public release and internal documents designed to inform Sumitomo employees about what could and could not be said about the scandal. Kaplan Aff., PP 6-8. RLM possessed authority to make decisions on behalf of Sumitomo concerning its public relations strategy. Katsuno Decl., PP 3-6, 8-10; Mather Aff., PP 11-21. The legal ramifications and potential adverse use of such communications were material factors in the development of the communications. In formulating communications on Sumitomo's behalf, RLM sought advice from Sumitomo's counsel and was privy to advice concerning the scandal and attendant litigation.

In addition, RLM's communications concerned matters within the scope of RLM's duties for [**17] Sumitomo, and RLM employees were aware that the communications were for the purpose of obtaining legal advice from Paul Weiss and/or Sumitomo's in house attorneys. Under the principles set out in Upjohn, RLM's independent contractor status provides no basis for excluding RLM's communications with Sumitomo's counsel from the protection of the attorney-client privilege. Cf. *McCaugherty v. Siffermann*, 132 F.R.D. 234, 239 (N.D. Cal. 1990) (under Upjohn, there is no principled basis for distinguishing consultant's communications with attorneys and corporate employee's communications with attorneys when each acted in the scope of their employment).

The Court therefore finds that, for purposes of the attorney-client privilege, RLM can fairly be equated with the Sumitomo for purposes of analyzing the availability of the attorney-client privilege to protect communications to which RLM was a party concerning its scandal-related duties. Accordingly, confidential communications between RLM and Sumitomo's counsel, or between RLM and Sumitomo, or among RLM, Sumitomo's in-house counsel and Paul Weiss that were made for the purpose of facilitating the rendition of legal services [**18] to Sumitomo can be protected from disclosure by the attorney-client privilege. n3

n3 RLM asserts that communications prepared in collaboration with Paul Weiss which reflected legal advice from Sumitomo's in-house and outside counsel and which were prepared in anticipation of litigation in connection with the copper trading scandal are protected from disclosure under the attorney-client privilege.

The Court finds unpersuasive Plaintiffs' argument that third-party consultants come within the scope of the privilege only when acting as conduits or facilitators of attorney-client communications. The case law cited by Plaintiffs arises in a factual context that is readily distinguishable from this case. See, e.g., *United States v. Kovel*, 296 F.2d 918 (privilege applies to communications of a third-party made at the request of an attorney [*220] or the client where the purpose of the communication was to put in usable form information obtained from the client); cf. *Occidental Chemical Corp. v. OHM Remediation Services, Corp.*, 175 F.R.D. 431, 436-37 (W.D.N.Y. 1997) [**19] (no privilege attaching to communications from consultant who was not hired to assist in the rendition of legal services). For example, in *United States v. Ackert*, 169 F.3d 136 (2d Cir. 1999), a recent case following the reasoning in Kovel and relied upon by Plaintiffs, the court determined that communications between an investment banker and an attorney made for the purpose of providing information to the attorney so that he could better advise his client were not privileged. In so finding, the court held that the communications with the third-party investment banker did not serve to facilitate or translate communications with the attorney's client. Moreover, in Ackert, the investment banker was neither the attorney's client nor an agent of the client.

By contrast, in this case, RLM is the functional equivalent of a Sumitomo employee. Accordingly, the analysis set forth in Kovel and its progeny concerning whether the privilege applies to communications made to third parties for the purpose of facilitating attorney-client communications is inapposite. n4

n4 By letter dated January 10, 2001, Plaintiffs asserted that *Calvin Klein Trademark Trust v. Wachner, et al.*, 198 F.R.D. 53, 2000 WL 1781621 (S.D.N.Y. 2000) further supports their position. That case has superficial similarities to the instant matter in that it concerns whether documents and testimony from a public relations company (RLM in that case also) were entitled to protection. Calvin Klein differs, however, from this case in that in Calvin Klein, RLM was hired by the client's attorneys to assist them in their representation of the

Case 1:04-cv-01264-SLR   Document 299-5   Filed 11/15/2005   Page 9 of 18

Page 8
200 F.R.D. 213, *220; 2001 U.S. Dist. LEXIS 5269, **19

plaintiff and there was no suggestion that RLM performed business functions for the client or entered into communications with counsel for that purpose. Thus, the court's analysis focussed on whether RLM served the "translator" function discussed in Kovel. As explained herein, RLM was retained by Sumitomo and was the functional equivalent of a Sumitomo employee.

[**20]

WORK-PRODUCT IMMUNITY

Plaintiffs contend that communications to and from RLM are not protected by work-product immunity because RLM was hired by Sumitomo as a public relations consultant and was not hired to assist Paul Weiss in providing legal advice. Plaintiffs argue that the materials that RLM claims are protected by work-product immunity were generated in the ordinary course of RLM's public relations services provided in connection with the copper trading scandal. In addition, Plaintiffs argue that communications between Paul Weiss and Sumitomo which were disclosed to RLM are not protected by work-product immunity because any such immunity was waived upon disclosure to RLM. Under the circumstances of this case, Plaintiffs' contentions concerning the applicability of work-product immunity to the items listed on the Privilege Log are misplaced.

Analysis of work-product immunity begins with *Federal Rule of Civil Procedure 26(b)(3)*. [HN7] Rule 26(b)(3) provides in relevant part:

> a party may obtain discovery of documents . . . otherwise discoverable . . . and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative [**21] (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

*Fed. R. Civ. P. 26(b)(3)*.

[HN8] A document is prepared "in anticipation of litigation" within the meaning of the Rule if, "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." *United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998)* (rejecting the formulation that work-product immunity protects only documents primarily to assist in litigation and adopting the broader [*221] test set forth in 8 Charles Alan Wright, et al., Federal [**22] Practice & Procedure § 2024, at 343 (2d ed. 1994)). Documents prepared in the ordinary course of business, or that would have been created whether or not litigation was anticipated, are not protected by work-product immunity. Id. It is firmly established, however, that a document that assists in a business decision is protected by work-product immunity if the document was created because of the prospect of litigation. Id. In addition, contrary to Plaintiffs' assertions, documents prepared in anticipation of litigation need not be created at the request of an attorney. *Bank of New York v. Meridien BIAO Bank Tanzania, 1996 U.S. Dist. LEXIS 12377, No. 95 Civ. 4856, 1996 WL 490710, at *2 (S.D.N.Y. Aug. 27, 1996)*. Once it is established that a document was prepared in anticipation of litigation, work-product immunity protects "documents prepared by or for a representative of a party, including his or her agent." *Occidental Chemical Corp. v. OHM Remediation Services Corp., 175 F.R.D. at 434*.

RLM asserts, and Plaintiffs do not dispute, that RLM has not withheld purely business-related documents and other types of non-privileged communications with Sumitomo's attorneys. The [**23] Privilege Log, together with the affidavits submitted by RLM and the supplements thereto, make clear that the materials listed on the Privilege Log were prepared in collaboration with Sumitomo's counsel, including Paul Weiss, in the context of the litigation ensuing from the copper trading scandal. Kaplan Aff., at PP 7-8; Mather Aff., PP 24-30. n5 The uncontroverted affidavits submitted by RLM in opposition to the instant motion make clear that RLM's services were provided initially because of the prospect of the CFTC's investigation and then because of the actual litigation which ensued thereafter.

---

n5 The Privilege Log indicates the number of pages of each document and the date of the document, describes the document, names the author or authors, the addressees, person copied and identifies the privileges asserted with respect to the document.

---

RLM specializes in litigation-related crisis manage-

Case 1:04-cv-01264-SLR    Document 299-5    Filed 11/15/2005    Page 10 of 18

Page 9
200 F.R.D. 213, *221; 2001 U.S. Dist. LEXIS 5269, **23

ment. Mather Aff., P 3. The firm was hired shortly after Hamanaka's confession, when it was apparent that the CFTC [**24] might commence an enforcement action against Sumitomo. Mather Aff., P 7. Elizabeth Mather, RLM's principal representative for the Sumitomo engagement, states that "from the outset, RLM knew its representation was litigation-related." Mather Aff., P 8. Further, it is clear that Sumitomo retained RLM to make sure that its public statements would not result in further exposure in the litigation which grew out of the copper trading scandal. Mather Aff., PP 23-24, 29-30; Katsuno Decl., P 10. In light of these uncontroverted facts, the Court finds that the materials listed on the Privilege Log were prepared by RLM or delivered to RLM in anticipation of litigation and that such documents are protected by work-product immunity. For the same reasons, listed documents prepared by Sumitomo or its counsel also are protected by work-product immunity. n6

> n6 Plaintiffs contend that any claim to work-product immunity was waived upon the documents disclosure to RLM. Even if RLM were not the functional equivalent of a Sumitomo employee, disclosure of the documents to RLM does not constitute waiver of the work-product immunity. [HN9] The work product privilege is not automatically waived by disclosure to third parties. *In re Pfizer Inc. Securities Litigation*, 1993 U.S. Dist. LEXIS 18215, No. 90 Civ. 1260, 1993 WL 561125 at *6 (S.D.N.Y. Dec. 23, 1993) (citations omitted). Courts find a waiver of work-product immunity only if the disclosure "substantially increases the opportunity for potential adversaries to obtain the information." *In re Grand Jury*, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982). Disclosure of work product to a party sharing common interests is not inconsistent with the policy of privacy protection underlying the doctrine. See *Stix Products v. United Merchants & Manufacturers*, 47 F.R.D. 334, 338 (S.D.N.Y. 1969) ("The work product privilege should not be deemed waived unless the disclosure is inconsistent with maintaining secrecy from possible adversaries."). Here, RLM and Sumitomo clearly shared a common interest.

[**25]

INADVERTENT PRODUCTION/WAIVER

Plaintiffs contend that the Disputed Documents should be produced because RLM waived any claim to privilege by producing them. However, "[HN10] inadvertent production will not waive the privilege unless the conduct of the producing party or its counsel evinced such extreme carelessness as to suggest [*222] that it was not concerned with the protection of the asserted privilege." *Lloyds Bank PLC v. Republic of Ecuador*, 1997 U.S. Dist. LEXIS 2416, *10, No. 96 Civ. 1789, 1997 WL 96591 at *3 (S.D.N.Y. Mar. 5, 1997), quoting *Desai v. American International Underwriters*, 1992 U.S. Dist. LEXIS 6894, No. 91 Civ. 7735, 1992 WL 110731 at *1 (S.D.N.Y. May 12, 1992).

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 104 F.R.D. 103, 105 (S.D.N.Y. 1985), aff'd, 799 F.2d 867 (2d Cir. 1986), identifies the following factors for consideration in determining whether inadvertent production constitutes waiver of a claim of privilege: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the time taken to rectify the error, (3) the scope of the production, (4) the extent of the disclosure, and (5) overriding issues of fairness.

The [**26] Reasonableness of Precautions

[HN11] The mere fact of disclosure does not establish that a party's precautions undertaken to protect the privileged evidence were unreasonable. See *Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, 1997 U.S. Dist. LEXIS 18818, No. 96 Civ. 7590, 1997 WL 736726, at *5 (S.D.N.Y. Nov. 26, 1997); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 443 (S.D.N.Y. 1995). Rather, a court must examine whether "the procedure[s] followed in maintaining the confidentiality of the document[s] [were] . . . so lax, careless, inadequate or indifferent to consequences as to constitute a waiver." *Martin v. Valley National Bank of Arizona*, 1992 U.S. Dist. LEXIS 11571, No. 89 Civ. 8361, 1992 WL 196798, at *3 (S.D.N.Y. Aug. 6, 1992) (citations omitted). Inadvertent production will not waive the privilege unless the conduct of the producing party or its counsel evinced such extreme carelessness as to suggest that they were not concerned with the protection of the privilege. See *Lloyds Bank PLC*, 1997 WL 96591, at *3 (citations omitted).

Here, the Paul Weiss attorney overseeing the production gave specific instructions to the document production [**27] team concerning which documents were to be produced, which documents were to be withheld and which documents were to be redacted. Kaplan Aff., P 18; Supplemental Affidavit of Roberta Kaplan, sworn to October 16, 2000, P 5. In addition, the production team performed an additional, final, review of the documents prior to completion of the production. Kaplan Aff., P 20. The Court finds that Paul Weiss took reasonable precautions to prevent inadvertent disclosure. These procedures were not so lax, careless, inadequate or indifferent to consequences as to render inadvertent production of the

Case 1:04-cv-01264-SLR    Document 299-5    Filed 11/15/2005    Page 11 of 18

Page 10
200 F.R.D. 213, *222; 2001 U.S. Dist. LEXIS 5269, **27

Disputed Documents a waiver.

### Time Taken to Rectify the Error

[HN12] The relevant correction period begins when the party realizes that an error has been made. *Lloyds Bank PLC, 1997 WL 96591* at *5. Here, Paul Weiss discovered the error while checking the production on June 23, 2000 and June 24, 2000. Kaplan Aff., P 20. The attorney in charge reviewed the 17 documents at issue on June 26, 2000 and notified opposing counsel of the inadvertent production on June 27, 2000. Kaplan Aff., P 22. The Court finds that there was no material delay by Paul Weiss in asserting the privilege once the [**28] error was realized.

### The Scope of the Production and the Extent of the Inadvertent Disclosure

Approximately 15,000 pages of documents were produced by RLM. Of this amount, RLM claimed privilege with respect to 583 documents; of that number 17 documents were produced inadvertently. The Court finds that the number of documents inadvertently produced in RLM's production was relatively small in comparison with the total production and is well within margin of error that courts have found acceptable. See, e.g., *Baker's Aid v. Hussmann Foodservice Co., 1988 U.S. Dist. LEXIS 14528, No. 87 Civ. 0937, 1988 WL 138254,* at *5 (E.D.N.Y. Dec. 19, 1988) (noting that "courts have routinely found that [HN13] where a large number of documents are involved, there is more likely to be an inadvertent disclosure than a knowing waiver"); *Lois Sportswear, 104 F.R.D. at 105* (where twenty-two documents out of 16,000 pages reviewed, and out of 3,000 pages requested, were claimed to be privileged, the Court held that disclosure did not constitute a waiver); *Data Systems of New Jersey, Inc. v. Philips Business Data Systems, Inc., 1981 U.S. Dist. LEXIS 10290,* No. 78 Civ. 6015, slip op. (S.D.N.Y. Jan. 8, 1981)(where [*223] one document was [**29] privileged among the several thousand produced, the Court held that the privilege was not waived); *Desai, 1992 WL 110731* (where seventeen documents were privileged out of a "large production", the court held that privilege was not waived).

### Fairness

Overall issues of fairness weigh in favor of RLM. Plaintiffs have not demonstrated that they would be prejudiced by maintaining the privilege of the Disputed Documents. Depriving a party of information in an otherwise privileged document is not prejudicial. See *Prescient Partners, 1997 WL 736726,* at *7. However, finding waiver would be prejudicial to RLM because the documents involve attorney-client communications about case strategy. Id.

Based on the foregoing, the Court finds that production of the Disputed Documents was inadvertent and that it did not result in waiver of the privilege and work-product protection claimed by RLM in the Privilege Log with respect to the Disputed Documents or other documents identified in the Privilege Log.

### RLM'S PRIVILEGE LOG

Plaintiffs contend RLM has not set forth sufficient information in the Privilege Log to support work-product immunity. "[HN14] The standard [**30] for testing the adequacy of the privilege log is whether, as to each document, it sets forth specific facts that, if credited, would suffice to establish each element of the privilege or immunity claimed. The focus is on the specific descriptive portion of the log, and not on the conclusory invocations of the privilege or work-product rule . . . ." *Golden Trade v. Lee Apparel Company, et al., 1992 U.S. Dist. LEXIS 17739,* *12, Nos. 90 Civ. 6291, 90 Civ. 6292, 1992 WL 367070 at *5 (S.D.N.Y. Nov. 20, 1992). [HN15] *Rule 45(d)(2) of the Federal Rules of Civil Procedure* provides that:

> When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications or things not produced that is sufficient to enable the demanding party to contest the claim.

*Fed. R. Civ. P. 45(d)(2).* [HN16] Local Civil Rule 26.2(a)(2)(A) of this Court requires provision of certain specified types of information with regard to documents withheld upon claim of privilege including, where not apparent, the relationship of the author, addressees and [**31] recipients to each other.

It is the proponent's burden to establish the factual basis for a claim that the attorney-client privilege or work-product immunity protects a document from disclosure. *CSC Recovery Corp., 1997 WL 661122,* at *2. Courts have discretion in determining whether a claim of privilege has been sufficiently supported. Id. (courts may rely upon privilege logs and supporting affidavits in assessing whether a claim of privilege has been adequately supported).

The Privilege Log contains information concerning the date, type of document, author, addressees, a short description of each document and the privilege or immunity asserted with respect to each. Submissions by the

Case 1:04-cv-01264-SLR Document 299-5 Filed 11/15/2005 Page 12 of 18

Page 11

200 F.R.D. 213, *223; 2001 U.S. Dist. LEXIS 5269, **31

parties in connection with this motion have made clear the relationship of authors and addressees to each other with respect to documents for which work-product immunity is claimed. Affidavits submitted in opposition to Plaintiffs' motion to compel make clear the context in which the documents identified on the Privilege Log were generated. As explained above, the affidavits establish that RLM was the functional equivalent of Sumitomo's employee for purposes of confidential communications [**32] made to Sumitomo's attorneys seeking legal advice.

Moreover, the affidavits submitted by RLM establish that work-product of RLM and Sumitomo's attorneys was created in anticipation of litigation. Accordingly, the Court finds that the Privilege Log facially meets the requirements set forth in the Local Rules.

OBJECTIONS CONCERNING PARTICULAR DOCUMENTS

Plaintiffs contend that RLM's privilege and work-product claims fail as to the Disputed Documents because RLM's participation in communications and/or preparation [*224] of certain of the documents precludes the work-product and attorney-client privilege claims. Plaintiffs also argue that RLM has failed to establish the basis of privilege claims with respect to documents heavily redacted or produced in blank and should therefore be required to produce those documents. Plaintiffs' argument concerning the significance of RLM's participation in communications is, as explained above, ineffective to defeat the work-product and attorney-client privilege claims.

With respect to their arguments concerning specific Disputed Documents, Plaintiffs submitted the Affidavit of Reginald R. Smith, sworn to July 28, 2000, (the "Smith Affidavit"), [**33] which contains Exhibit R, a chart identifying by letter designation the specific items in the Disputed Documents that Plaintiffs contend should be not be protected. Because the document designations in Exhibit R and the document designations in the Privilege Log differ, the Court, by order dated March 9, 2001, directed RLM to provide an affidavit correlating the entries listed in Exhibit R to the Smith Affidavit to corresponding entries in the Privilege Log in order to assist the Court's determination of Plaintiffs' motion. RLM provided such correlation in the Supplemental Affidavit of Roberta Kaplan, sworn to March 21, 2001 (the "Supplemental Kaplan Affidavit"). In addition to providing the correlation table, the Supplemental Kaplan Affidavit includes redacted copies of the Disputed Documents as they were kept in RLM's files, indicating portions of the documents that would have been withheld had they not inadvertently been produced. Plaintiffs submitted a letter response to the Supplemental Kaplan Affidavit dated April 2, 2001, asking the Court to conduct an in camera review of the documents listed on the Privilege Log. RLM further responded by letter dated April 10, 2001, arguing [**34] that the Court should deny Plaintiffs' request.

The Court has reviewed thoroughly the Privilege Log, the Smith Affidavit, the Supplemental Kaplan Affidavit and the correspondence related thereto. If the Privilege Log was insufficient, the additional information provided to the Court clearly establishes the sufficiency of RLM's claims for purposes of Rule 45(d). Accordingly, for the reasons set forth below, the Court finds that the information provided by RLM in the Privilege Log and its factual submissions in response to this motion is sufficient to warrant denial of Plaintiffs' motion to compel. In light of the foregoing, no in camera review of the documents listed in the Privilege Log is necessary.

*Rule 45(d)(1) of the Federal Rules of Civil Procedure* provides that: "[a] person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand." *Fed. R. Civ. P. 45(d)(1)*. In the Supplemental Kaplan Affidavit, RLM explains that it produced documents to Plaintiffs as they were maintained in the usual course of business. Thus, for example, memoranda [**35] with attachments and cover sheets were produced together and logged as one document for purposes of the Privilege Log. The descriptions contained in the Privilege Log pertain to the portions of the documents that were redacted or not produced pursuant RLM's privilege claims. Supplemental Kaplan Affidavit, P 3. The Court finds that such procedures comply with *Rule 45(d)(1) of the Federal Rules of Civil Procedure.*

The Court will refer to Plaintiffs' designations in Exhibit R to the Smith Affidavit in its discussion of Plaintiffs' arguments concerning specific documents.

Documents D, M, W, GG, are blank pages that were apparently redacted completely. Plaintiffs contend that RLM has shown no valid basis for the claim of protection for these documents. Document D corresponds to Privilege Log No. 516 and is identified in the Privilege Log as a two-page document consisting of a memorandum from a Paul Weiss attorney to Masatoshi Inada (subsequently identified by RLM as a member of Sumitomo's legal department). The Court finds that RLM has identified sufficiently the basis of the privilege claim pertaining to Document D. Document M, together with Documents L, N, O, and P, corresponds to Privilege [**36] Log No. 569, which is described as [*225] an eight page memorandum. RLM represents that portions of the memorandum contain summaries of legal

Case 1:04-cv-01264-SLR    Document 299-5    Filed 11/15/2005    Page 13 of 18

Page 12
200 F.R.D. 213, *225; 2001 U.S. Dist. LEXIS 5269, **36

advice from Sumitomo counsel. Supplemental Kaplan Affidavit, PP 21-22. Document M also is identified sufficiently to support RLM's claim of privilege. See *National Education Training Group, Inc. v. Skillsoft Corp., 1999 U.S. Dist. LEXIS 8680, No. M8-85, 1999 WL 378337*, at *3 (S.D.N.Y. June 10, 1999) ([HN17] distribution of legal advice within corporation is privileged). Document W, together with Documents V and X, corresponds to Privilege Log No. 571, which describes the privileged material in the document as pertaining to summaries of legal advice. Supplemental Kaplan Affidavit, PP 25-26. Document W is described sufficiently for purposes of RLM's privilege claims. Document GG, together with documents EE, FF, and HH, corresponds to Privilege Log No. 583, which describes the entry as a thirteen-page document. The Supplemental Kaplan Affidavit further describes the document as consisting of a cover memo containing legal advice and including translations selected by Sumitomo counsel. Supplemental Kaplan Affidavit, PP 35-36. RLM has identified sufficiently the basis of the [**37] privilege claim pertaining to this document. Cf. *Plant Genetic Systems, N.V. v. Northrup King Co., 174 F.R.D. 330, 331 (D. Del. 1997)* ([HN18] selection of documents in anticipation of litigation is protected as work-product).

Document R is a fax cover sheet. According to the Supplemental Kaplan Affidavit, it is part of an eight-page document consisting of a cover memorandum with two attachments. Supplemental Kaplan Affidavit, P 23. The Privilege Log lists the document as number 570. Document R is the fax cover sheet to the first attachment. The Privilege Log indicates that the document is a memorandum concerning advice of Sumitomo counsel. The Supplemental Kaplan Affidavit further identifies the first attachment (containing document R) as a six-page client memorandum. Id. Accordingly, RLM has identified sufficiently Document R for purposes of its privilege claim. Cf. *IBJ Whitehall Bank & Trust Co. v. Cory & Associates, Inc., 1999 U.S. Dist. LEXIS 12440, No. 97 Civ. 5827, 1999 WL 617842*, at *7 (N.D. Ill. Aug. 12, 1999) ([HN19] fax cover sheet indicating that the attached document is drafted by attorneys is privileged). Document AA is also a fax cover sheet which is a constituent of a nineteen-page [**38] document identified as number 576 on the Privilege Log. The Privilege Log identifies the privileged material in the document as translations and the Supplemental Kaplan Affidavit describes the fax cover sheet as containing work product because it describes and identifies Paul Weiss' selection of articles to be translated. Supplemental Kaplan Affidavit, P 32. Accordingly, Document AA is identified sufficiently for purposes of RLM's privilege claims.

As indicated above, Documents EE, FF and HH correspond to Privilege Log No. 583. Supplemental Kaplan Affidavit, PP 35-36. As explained above and in light of the proffers set forth in the affidavits submitted by RLM in support of its privilege claims, representing that RLM's work-product was prepared in connection with the litigation arising from the copper trading scandal, the Court finds sufficient basis for RLM's privilege claims with respect to these documents.

Documents A (corresponding to Privilege Log No. 481), B (corresponding to Privilege Log No. 484), C (corresponding to Privilege Log No. 515), G (corresponding to Privilege Log No. 545), H, I and J (corresponding to Privilege Log No. 547), K (corresponding to Privilege Log No. [**39] 554), L (corresponding to Privilege Log No. 569), Q (corresponding to Privilege Log No. 570), V and X (corresponding to Privilege Log No. 571) and, BB (corresponding to Privilege Log No. 577) are described in the Privilege Log as internal RLM memoranda or memoranda between RLM and Sumitomo dealing with or summarizing advice from Sumitomo's counsel. The Privilege Log, together with RLM's supporting affidavits, identifies these documents sufficiently to identify the basis of RLM's privilege and/or work-product claims. See *National Education Training Group, Inc. v. Skillsoft Corp., 1999 WL 378337*, at *3; *Abbott Laboratories v. Airco, Inc., et al., 1985 U.S. Dist. LEXIS 14140, No. 82 C 3292, 1985 WL 3596*, at *4 (N.D. Ill. Nov. 4, 1985) ([HN20] memoranda of information or advice directed to or received from an attorney, prepared by an agent of the client or attorney, as a record of that advice or request, are protected by the attorney-client privilege). [*226]

Document F corresponds to Privilege Log No. 528 and is an RLM internal memorandum copied to Sumitomo counsel. The Supplemental Kaplan Affidavit describes the document as containing summaries of legal advice. Supplemental Kaplan Affidavit, [**40] P 15. Document F is described sufficiently for purposes of RLM's privilege claims.

Document N corresponds to Privilege Log No. 569 and is one page of an eight-page document which is described in the Privilege Log as summarizing advice from Sumitomo counsel. According to the Supplemental Kaplan Affidavit, the entire document was produced, but three lines of the memorandum denominated Document N should have been redacted for privilege as summaries of legal advice. Supplemental Kaplan Affidavit, P 22. The Court finds that RLM has sufficiently described the privilege claim pertaining to Privilege Log No. 569. Document P is also part of Privilege Log No. 569. According to the Supplemental Kaplan Affidavit, Document P is a memorandum for which no privilege is claimed except for three lines which summarize legal advice. Id. Document P thus is identified sufficiently for purposes of RLM's privilege

Case 1:04-cv-01264-SLR    Document 299-5    Filed 11/15/2005    Page 14 of 18

Page 13

200 F.R.D. 213, *226; 2001 U.S. Dist. LEXIS 5269, **40

claims. Document O is also part of Privilege Log No. 569 and consists of draft Q and As which the Supplemental Kaplan Affidavit describes as containing legal advice. Id.

Documents U and S correspond to Privilege Log No. 570, which is an eight-page memorandum with attachments. Privilege [**41] Log No. 570 identifies the basis for the privilege claim as advice from counsel. According to the Supplemental Kaplan Affidavit, portions of the document should have been redacted or withheld as privileged. Supplemental Kaplan Affidavit, P 24. Document T also corresponds to Privilege Log No. 570. RLM's description of the documents constituting Privilege Log No. 570, including the description contained in the Supplemental Kaplan Affidavit, identifies sufficiently the basis of the claim of protection for Documents U, S and T.

Document Y corresponds to Privilege Log No. 572 which is described in the Privilege Log as a memorandum to Sumitomo counsel. The Supplemental Kaplan Affidavit describes most of the document as containing non-privileged material except for certain portions which should have been redacted because the portions contain legal advice from counsel. Supplemental Kaplan Affidavit, P 28. The Court finds that Document Y is identified sufficiently for purposes of RLM's privilege claims.

Documents CC and DD correspond to Privilege Log No. 577, which identifies the privileged material in the document as pertaining to a legal advice. Supplemental Kaplan Affidavit, P 34. Documents [**42] CC and DD are identified sufficiently for purposes of RLM's privilege claims.

Document Z corresponds to Privilege Log No. 574, which describes the privileged material in the document as a draft letter from Paul Weiss concerning the resignation of Akiyama (Sumitomo's former president). Supplemental Kaplan Affidavit, PP 29-30. The Court finds that Document Z is identified sufficiently for purposes of RLM's privilege claims.

Document E corresponds to Privilege Log No. 527, which describes the document as memoranda summarizing advice from Sumitomo counsel. The Supplemental Kaplan Affidavit describes Privilege Log No. 527 as a six-page document consisting of five memoranda and an undated time line. Supplemental Kaplan Affidavit, P 12. The Supplemental Kaplan Affidavit indicates that the memoranda, which were produced to Plaintiffs, are not privileged, but that one paragraph of the time line contains privileged information concerning legal advice which should have been redacted. Supplemental Kaplan Affidavit, P 13. Plaintiffs contend that the time line contains no date, author or recipient. The information provided by the Supplement Kaplan Affidavit satisfies that Court, however, that [**43] the time line was produced together with the four preceding memoranda. The Privilege Log entry for Document E is sufficient for purposes of the preserving a claim of privilege.

**CONCLUSION**

For the reasons set forth herein Plaintiffs' motion is denied. RLM shall submit to the [*227] Court, on ten days' notice to Plaintiffs' counsel, a proposed order consistent with this opinion.

Dated: New York, New York

April 30, 2001

LAURA TAYLOR SWAIN

United States District Judge

10202F

********** Print Completed **********

Time of Request: November 15, 2005   04:18 PM EST

Print Number: 1821:71043110
Number of Lines: 642
Number of Pages: 13

Send To:  ADAMANY, STEPHANIE
          ROBINS KAPLAN MILLER & CIRESI
          800 LASALLE AVE
          MINNEAPOLIS, MN 55402-2006

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 15th day of November, 2005, the attached **NOVEMBER 15th LETTER TO THE HONORABLE SUE L. ROBINSON REGARDING PRIVILEGED DOCUMENTS** was served upon the below-named defendants at the address and in the manner indicated:

| | |
|---|---|
| John W. Shaw, Esquire<br>Young Conaway Stargatt & Taylor<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, DE  19801 | <u>HAND DELIVERY</u> |
| Jeffrey S. Love, Esquire<br>Klarquist, Sparkman, LLP<br>One World Trade Center, Suite 1600<br>121 S.W. Salmon Street<br>Portland, OR  97204 | <u>VIA ELECTRONIC MAIL</u> |
| Karen L. Pascale, Esquire<br>Bouchard Margules & Friedlander, P.A.<br>222 Delaware Avenue, Suite 1400<br>Wilmington, DE  19801 | <u>HAND DELIVERY</u> |
| John F. Luman, III, Esquire<br>Bracewell & Giuliani LLP<br>711 Louisiana Street, Suite 2300<br>Houston, TX  77002-2781 | <u>VIA ELECTRONIC MAIL</u> |

*John G. Day*
_____
John G. Day

**Other Documents**
1:04-cv-01264-SLR BTG Intl Inc. v. Amazon.com Inc., et al

U.S. District Court

District of Delaware

Notice of Electronic Filing

The following transaction was received from Day, John entered on 11/15/2005 at 6:24 PM EST and filed on 11/15/2005
**Case Name:** BTG Intl Inc. v. Amazon.com Inc., et al
**Case Number:** 1:04-cv-1264
**Filer:**
**Document Number:** 299

**Docket Text:**
Letter to The Honorable Sue L. Robinson from John G. Day regarding privileged documents. (Day, John)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=11/15/2005] [FileNumber=126897-0
] [c76c44e55feefcfa20569d619392f91cbce42a3a29b850656cff9cf1175e2ab218f
71b5c023e9d88a648bf7e05cc3c2a54d0052c4a33a41f9c25714c9fc5c41a]]

**1:04-cv-1264 Notice will be electronically mailed to:**

Stephanie L. Adamany    sladamany@rkmc.com,

Steven J. Balick    sbalick@ashby-geddes.com, jday@ashby-geddes.com; mkipp@ashby-geddes.com; dfioravanti@ashby-geddes.com; nlopez@ashby-geddes.com; tlydon@ashby-geddes.com; lmaguire@ashby-geddes.com

Glenn A. Ballard    glenn.ballard@bracewellgiuliani.com, bree.ragan@bracewellgiuliani.com; catherine.schwambach@bracewellgiuliani.com

Kristin L. Cleveland    kristin.cleveland@klarquist.com

Michael A. Collyard    macollyard@rkmc.com,

John G. Day    jday@ashby-geddes.com, sbalick@ashby-geddes.com; mkipp@ashby-geddes.com; dfioravanti@ashby-geddes.com; nlopez@ashby-geddes.com

Karen Elizabeth Keller    kkeller@ycst.com, corporate@ycst.com; corpcal@ycst.com

Jeffrey S. Love     jeffrey.love@klarquist.com

John F. Luman , III     john.luman@bracewellgiuliani.com

Niall A. MacLeod     namacleod@rkmc.com,

Karen L. Pascale     kpascale@bmf-law.com, jspeakman@bmf-law.com

John W. Shaw     jshaw@ycst.com, corporate@ycst.com; ptorterotot@ycst.com; corpcal@ycst.com

Todd M. Siegel     todd.siegel@klarquist.com

**1:04-cv-1264 Notice will be delivered by other means to:**