IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BTG INTERNATIONAL INC., INFONAUTICS CORPORATION AND TUCOWS INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 04-1264-SLR |
| v. | ) ) | |
| AMAZON.COM, INC., AMAZON SERVICES, INC., OVERSTOCK.COM, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

## NOTICE OF DEPOSITION AND SUBPOENA DIRECTED TO NAYAN V. PATEL

**PLEASE TAKE NOTICE** that pursuant to Rules 30 and 45 of the Federal Rules of

Civil Procedure, Plaintiff BTG International Inc. will take the deposition of Nayan V. Patel, on

December 5, 2005, beginning at 9:00 a.m. at Orrick, Herrington & Sutcliffe LLP, 1000 Marsh

Road, Menlo Park, California 94025, or at a date, time, and place to be otherwise agreed upon.

The deposition will be conducted before an officer authorized to administer oaths, and will

continue from day-to-day thereafter until complete. The deposition will be recorded

stenographically and may be recorded by videotape. You are invited to attend and examine the

deponent.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Federal Rules of Civil

Procedure, Plaintiff BTG International Inc. will serve upon Nayan V. Patel a Subpoena in a Civil

Case. Attached hereto is a true and correct copy of that Subpoena.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

Steven J. Balick (I.D. # 2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiffs*

*Of Counsel:*

Ronald J. Schutz
Jake M. Holdreith
Niall A. MacLeod
Michael A. Collyard
Stephanie L. Adamany
ROBINS, KAPLAN, MILLER & CIRESI LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402
Telephone: 612-349-8500

Dated: November 18, 2005

163756.1

AO 88 (Rev. 11/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

NORTHERN    DISTRICT OF    CALIFORNIA

| | |
|---|---|
| BTG International Inc., Infonautics Corporation, and Tucows, Inc., | **SUBPOENA IN A CIVIL CASE** |
| Plaintiff(s), | Case Number:[1]  04-1264 SLR (Dist. of Del.) |
| V. | |
| Amazon.com, Inc., Amazon Services, Inc., and Overstock.com, Inc., | |
| Defendant(s). | |

TO:    **Nayan V. Patel**
      **305 Calero Avenue**
      **San Jose, CA 95123**

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| **Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, CA 94025 (or at another agreed upon location)** | **12/05/05 at 9:00 am** |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
| **Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, CA 94025 (or at another agreed upon location)** | **12/05/05 9:00 am** |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| , Counsel for Plaintiff | November 17, 2005 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Stephanie L. Adamany, Esq., Robins, Kaplan, Miller & Ciresi L.L.P., 2600 One Atlanta Plaza, 950 East Paces Ferry Rd. N.E., Atlanta, GA 30326-1119. (404) 760-4300
(See Rule 45, Federal Rules of Civil Procedure Parts C & D on reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

AO 88 (Rev. 11/91) (Subpoena in a Civil Case)

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                                    DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

_____

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)    A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)    (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)    (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)    fails to allow reasonable time for compliance;

(ii)    requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B)( iii) of this rule, such a person may in order to

attend trial be commanded to travel from any such place within the state in which the trial is held, or the demanding party to contest the claim.

(iii)    requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)    subjects a person to undue burden.

(B) if a subpoena

(i)    requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)    requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's's study made not at the request of any party, or

(iii)    requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1)    A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)    When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A
## INSTRUCTIONS

1.    In producing documents, provide all documents and things known or available to you, whether such documents or things are within your direct possession, custody, or control.

2.    Please produce electronic documents in an intelligible format together with a description of the system from which it was derived sufficient to permit rendering of the materials intelligible.

3.    Please produce all responsive documents and things as you keep them in the ordinary course of business, or indicate the number of the request to which the documents and/or things are responsive.

4.    If you have no documents or things responsive to a particular request, please list the number of the request and state that no such documents or things exist responsive to that request.

5.    If any document or thing is withheld under a claim of privilege, furnish a list signed by the person supervising your response identifying each such document by production number together with the following information:

    a.    The date of such document or thing;
    b.    The place at which such document or thing was created and the medium involved;
    c.    The identity of each person who has custody or control of the document or thing;
    d.    The name, title, position, and contact information of every recipient of the original or any copy of the document or thing;
    e.    The number of pages in any document and any attachments, or a full and complete description of any thing;
    f.    The identity of each person involved, together with his or her job title at the time of creation of the document or thing;
    g.    The subject matter of the document or thing;
    h.    The basis on which the privilege is claimed;
    i.    Whether any non-privileged matter is contained within the document or thing; and

      j.      The precise location of any redactions if the document or thing is redacted.

## DEFINITIONS

For purposes of these requests, the following terms shall have the meaning set forth below.

1.      The term "BTG" shall mean BTG International Inc. and its officers, agents, employees, and representatives.

2.      The term "Amazon.com" shall refer to Amazon.com, Inc., a publicly held corporation with its principal place of business in Seattle, Washington, and includes, without limitation, its past and present divisions, subsidiaries, directors, agents, representatives, employees, attorneys, or any predecessor with an interest.

3.      The term "Amazon Services" shall refer to Amazon Services, Inc. and is a publicly held corporation with its principal place of business in Carson City, Nevada, and includes, without limitation, its past and present divisions, subsidiaries, directors, agents, representatives, employees, attorneys, or any predecessor with an interest.

4.      The term "Netflix" shall refer to Netflix, Inc. and is a publicly held corporation with its principal place of business in Los Gatos, California, and includes, without limitation, its past and present divisions, subsidiaries, directors, agents, representatives, employees, attorneys, or any predecessor with an interest.

5.      The term "B&N" shall refer to Barnesandnoble.com, Inc. and Barnesandnoble.com, LLC and includes, without limitation, their past and present divisions, subsidiaries, directors, agents, representatives, employees, attorneys, or any predecessor with an interest. Barnesandnoble.com, Inc. is a publicly held corporation with its principal place of business in New York, NY, and Barnesandnoble.com LLC is managed by Barnesandnoble.com

Inc. and is a Delaware limited liability company, having its principle place of business located at 76 Ninth Avenue, New York, NY.

6.    The term "Overstock" shall refer to Overstock.com, Inc. and is a publicly held corporation with its principal place of business in Salt Lake City, UT, and includes, without limitation, its past and present divisions, subsidiaries, directors, agents, representatives, employees, attorneys, or any predecessor with an interest.

7.    The terms "you," "your" or "Mr. Patel" shall refer to Nayan Patel, and includes, without limitation, his past and present partners, associates, agents, representatives, attorneys, employees, others acting or purporting to act on his behalf, and any predecessor with an interest.

8.    The term "person" means any individual, firm, partnership, incorporated or unincorporated association, or any other legal or commercial entity.

9.    The term "document[s]" shall refer broadly to all categories of tangible and intangible information envisioned by Rule 34(a) of the Federal Rules of Civil Procedure, without limitation as to the type of document (whether copy or original), and shall include without limitation any writings or tangible objects produced or reproduced mechanically, electronically, photographically, or chemically. "Document[s]" shall further be defined to include things. No material may be withheld on the ground that it is not a "document."

10.    The terms "refer," "referring," "relate," or "relating" as used herein, include, but are not limited to, the following meanings: bearing upon, concerning, constituting, discussing, describing, evidencing, identifying, concerning, mentioning, in connection with, pertaining to, respecting, regarding, responding to, or in any way factually or logically relevant to the matter described in the request.

11.    The term "patents-in-suit" shall refer to the following patents: United States Patent 5,712,979 and United States Patent 5,717,860.

12.    The term "related patents" shall refer to the following patents: United States Patent 5,819,285 and United States Patent 5,812,769.

13.    The term "this case" shall refer to the case *BTG International Inc. v. Amazon.com, Inc., et al.*, case number 04-1264 (SLR), venued in the United States District Court for the District of Delaware.

## DOCUMENTS AND THINGS TO BE PRODUCED

1.    For  documents and other materials created or authored prior to December 31, 1995:

a) all documents, design documentation, specifications, source code, computer files, and other materials related to any internet services project between IBM (and/or ISSC)  and PC Gifts & Gourmet (also known as PC Flowers) purportedly described in Exhibit 1 attached hereto.

b) all documents, source code, computer files, and other materials that show or explain user tracking, customer tracking, URL tracking, URL, or tracking the navigation path of a computer user.

c) all documents, source code, computer files, and other materials referring or relating to identifying referring WWW sites or referring URLs or hypertext links, or tagging of URLs for any purpose.

2.    All documents and things, source code and computer files, referring or relating to WWW or internet users being referred from one web site to a second web site, whereat the

Uniform Resource Locator (URL) at the second web site contained information representative of the referring web site or the source of the referral.

3.    All documents referring or relating to United States Patent 5,712,979 and/or United States Patent 5,717,860 and any related patents.

4.    All documents referring or relating to any events, facts, and documents concerning your knowledge of the patents-in-suit or related patents, BTG, Amazon.com, Amazon Services, Netflix, B&N, Overstock or this case.

5.    All documents referring or relating to any actual or potential litigation between BTG and Amazon.com, Amazon Services, Netflix, B&N, Overstock, Josh Kopelman, Terry Graber, Marvin Weinberger or Edwin Watkeys.

6.    All documents referring or relating to communications between you and any third party regarding United States Patent 5,712,979 and/or United States Patent 5,717,860 and/or the related patents.

# EXHIBIT   1

I hereby certify that this correspondence is being deposited with the U.S. Postal Service with sufficient postage as First Class Mail, in an envelope addressed to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450, on the date shown below.

Dated: April 22, 2005    Signature: _____
                                    (Jeffrey B. Dickey)

Docket No.: TOBINB 3.0-001 CONT CONT II
(PATENT)

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent Application of:      :
*William J. Tobin*                :
                                  :
Application No. 09/782,271        :   Group Art Unit: 3629
                                  :
Filed: February 13, 2001          :   Examiner: Freda A. Nelson
                                  :
For: METHOD AND SYSTEM FOR        :
     CUSTOMIZING MARKETING        :
     SERVICES ON NETWORKS         :
     COMMUNICATING WITH HYPERTEXT  :
     TAGGING CONVENTIONS          :

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

### DECLARATION OF WILLIAM J. TOBIN UNDER 37 C.F.R. § 1.131

I, WILLIAM J. TOBIN, declare as follows:

1.   I am the sole inventor of the inventions defined by the claims pending in the application identified above.

2.   I am currently the chairman and founder of Commerce Technology Licensing, L.L.C., which provides consulting services to companies involved in e-commerce on the Internet and assists them with developing their own Web sites, including building co-branded platforms, business models, and programs for marketing partner relationships.

3.   In 1989, I co-founded PC Flowers, Inc. ("PC Flowers"), and began selling floral and balloon products over the Prodigy network, a PC-based-online-computer network, which was jointly developed and launched by IBM Corp. ("IBM") and Sears, Roebuck & Co.  Subsequently, in October 1994, the

**BEST AVAILABLE COPY**

TOBINB 3.0-001 CONT CONT II
U.S. Application No. 09/782,271

name of PC Flowers was changed to PC Flowers and Gifts ("PCF&G"), when I expanded the business to include other event-driven products, such as gift baskets, gourmet foods, and the like.

4.    In 1992, *Inc.* magazine elected me as their "Entrepreneur of the Year," in recognition of my work as an e-commerce pioneer, and in 1994, *Advertising Age* and *Newsweek* magazines named me one of the top 100 marketing executives in the United States at an awards ceremony in New York City, New York.

5.    In June 1994, I had an initial meeting with several IBM representatives, including at least Carolyn Chin and Bill Korn, at IBM's facilities located in Thornwood, New York, to discuss my concept for an "interactive online mall" business model for the Internet based in part upon my success with PC Flowers on the Prodigy network.   By "interactive online mall," I am referring to my idea of a group of retailers operating under a common location on the Internet accessible by consumers.  I intended to use the idea of an "interactive online mall" as a vehicle to establish a presence for PC Flowers' business on the Internet.  After several initial meetings, IBM agreed to work on this project.

6.    IBM also agreed to design and develop an Internet-commerce-server system and software to launch, implement, and maintain the PC Flowers Web site.

7.    From June 1994 to September 1994, I regularly met with IBM representatives at their offices, and had numerous

telephone discussions with them, to further discuss my concept for an interactive online mall, and to advance the development of this project by IBM.

8.  Around September 1994, IBM assigned its IBM Services Solutions Corporation ("ISSC") division, located in Palo Alto, California, to the development of the PCF&G Web site.  ISSC would take primary responsibility for the development and implementation of this project.  Rodney Robinson, ISSC's manager, was assigned to oversee this project.  (Attached hereto as Exhibit A is a Declaration of Rodney Robinson, corroborating many of the facts set forth herein.  See, e.g., Robinson Decl. ¶ 4.)

9.  By this time in September 1994, I had already conceived my inventions for tracking consumer activity and traffic between Internet Web sites, referred to here as the "Tracking Tools Inventions."  These inventions, which formed the predicate of a marketing and advertising system and method that I called the "Internet Consumer Incentive Traffic Program," can be summarized as follows:

A.  Each referring partner's Web site would have a Web page containing a graphical hyperlink to the PC Flowers & Gifts Web site.  In addition to pointing to the PCF&G Web site, the hyperlink would also contain an "electronic token," which identified the referring partner's Web site.  Each referring partner would be assigned an unique token.  When an Internet user accessed the

3

TOBINB 3.0-001 CONT CONT II
U.S. Application No. 09/782,271

hyperlink, he/she would be directed to the PCF&G Web site, where software would identify the referring partner by the unique token. The purpose of passing the token through the hyperlink was to track the identity of the referring partner so that a commission could be paid for a sale of a product on the PCF&G Web site.

B.  Because the PCF&G Web site would have multiple Web pages that would be interconnected with each other by hyperlinks, it would be necessary to keep track of the identity of the referring partner as the consumer navigated from one PCF&G Web page to another.  This would be accomplished by dynamically inserting the unique token associated with the referring partner into the hyperlinks of each PCF&G Web page that pointed to another PCF&G Web page.  In this way, we could identify the referring partner to whom a commission should be paid when a customer at the PCF&G Web site ordered a product from any page of the PCF&G Web site.

C.  The consumer's computer would save the referring partner's token on his/her computer.  If the consumer subsequently returned directly to the PCF&G Web site (not through the hyperlink on the referring partner's site), the saved token would be used by PCF&G to identify the referring

4

TOBINB 3.0-001 CONT CONT II
U.S. Application No. 09/782,271

partner, who had originally referred the consumer

to the PCF&G Web site so that a commission could

be paid.  In this manner the referring partner got

credit (during subsequent direct transactions) for

the fact that it had made the initial introduction

between the consumer and PCF&G.

These inventions could be used alone or in combination with each other.

10.  By no later than October 1994, I first discussed these inventions with Mr. Robinson during visits to IBM's office in Thornwood, New York.   IBM, through Mr. Robinson, agreed to develop the software needed to implement these inventions along with other software and a server system that IBM had agreed to develop and design for the PCF&G Web site.

11.  Thereafter and through May 1994, I met and spoke regularly with Mr. Robinson, other ISSC employees, and IBM personnel on an almost daily basis to continue the implementation of the Web site server, software for the PC Flowers/PCF&G business, and the "Tracking Tools Inventions." I attended these meetings at IBM's offices in Thornwood, New York and White Plains, New York.  At times, these meetings were also conducted with ISSC employees in California via telephone.

12.  In December 1994, I organized a meeting in Cambridge, Massachusetts between several IBM personnel and Shikar Gosh, the president and founder of Open Market Systems, which had already developed a secure credit card

TOBINB 3.0-001 CONT CONT II
U.S. Application No. 09/782,271

transaction system for online use. I believed that Open Market Systems would be able to assist in the implementation of the necessary credit card software for the PCF&G Web site.

During the return trip, after having witnessed the Open Market Systems demonstration, Jerry Waldbaum of IBM decided that, rather than use Open Market Systems' software, IBM would develop its own credit-card software for the PCF&G Web site, and would assign numerous software programmers to ensure that the software was ready for the Mecklermedia conference in April 1995.

13. On January 9, 1995, an article was published in *PC Week* magazine, in which it was mentioned that, "Tobin and IBM are developing an electronic token system that gives Web servers credit for referrals that result in a sale." (Attached hereto as Exhibit B is a copy of the January 9, 1995 *PC Week* magazine article.) The information contained in this article was provided to its author by myself, or possibly together with others of IBM. We disclosed this information to the article's author in anticipation of a test run of the PCF&G Web site, along with the "Tracking Tools Inventions," for use before the Valentine's Day holiday season, *i.e.,* before February 14, 1995. In fact, ISSC had completed a basic prototype of the "Tracking Tools Inventions" (minus the software required to facilitate secure-online-commercial transactions via credit card, which had not yet been developed) before publication of the January 9 *PC Week* article. The reason I know this is because

6

TOBINB 3.0-001 CONT CONT II
U.S. Application No. 09/782,271

I did not want the author to publish anything about this system until such time that we had a functional prototype of the "Tracking Tools Inventions."

14.   In mid-January through mid-February 1995, ISSC and I conducted an initial test of the "Internet Consumer Incentive Traffic Program," which included the "Tracking Tools Inventions," in cooperation with *Pathfinder* and Mecklermedia, who provided use of their Web sites as test partners.   We had a prototype of the "Tracking Tools Inventions" at this time, but were unable to take orders electronically on the PCF&G Web site because IBM had not yet completed the software necessary for secure-credit-card transactions.   As a result, we had to take orders by telephone.

15.   Another article appearing in *Computerworld* magazine published on February 13, 1995, discussed the collaboration between PCF&G and IBM to develop PCF&G's electronic token system, stating that "[w]hile logging the origin of traffic is not new, paying the originator for these hand-offs is a new twist."   (Attached hereto as Exhibit C is a copy of the February 13, 1995 *Computerworld* article.)

16.   After we completed the test of the prototype PCF&G Web site, I continued working closely with ISSC to further refine the PCF&G Web site as well as the "Tracking Tools Inventions."

17.   In April 1995, I gave a keynote address at a Mecklermedia conference, during which I discussed the

TOBINB 3.0-001 CONT CONT II
U.S. Application No. 09/782,271

"Internet Consumer Incentive Traffic Program," which included the "Tracking Tools Inventions."

18. At all times, from the time I first began discussing my "Tracking Tools Inventions" with IBM and ISSC through the time of the April 1995 Mecklermedia conference, I understood, and believed that all parties involved in the project understood, that our discussions concerning this project were confidential.

19. Through mid-1995, I continued my discussions with the ISSC team, meeting with them regularly and speaking with them by telephone to further discuss the design of the PCF&G Web site and continued development of the "Tracking Tools Inventions" for full commercial use. ISSC had hoped to finalize the programming for the "Tracking Tools Inventions," along with the secured-credit-card-transaction software by November of 1995, to coincide with the completion of PCF&G's redesigned Web site and the 1995 Christmas-gift-giving-holiday season.

20. However, in around May 1995, it appeared to me that IBM was losing interest in and rethinking the viability of the IBM "interactive online mall" concept and e-commerce on the Internet. The fact that IBM was losing interest was confirmed during my conversations with Mr. Robinson. Between the end of May 1995 and the beginning of June 1995, I met with Ms. Chin, Mr. Korn, and several other IBM representatives in Thornwood, New York to discuss the status

8

TOBINB 3.0-001 CONT CONT II
U.S. Application No. 09/782,271

of the project and to voice my concerns about IBM's dedication to the project.

21. In early July 1995, I met with Basel Dalloul, Chairman and CEO of Magnet Interactive Communications, LLC ("Magnet"), to ask that Magnet assist in the continued development and implementation of the "Tracking Tools Inventions" for PCF&G's Web site. I explained to Mr. Dalloul the three different aspects of the "Tracking Tools Inventions" described in paragraph 9. (Attached hereto as Exhibit D is a Declaration of Basel Dalloul dated November 1, 2003.)

22. It was my understanding that Magnet would review and revise IBM's development efforts for the "Tracking Tools Inventions" for full commercial use on the newly-designed PCF&G Web site. Thus, ISSC and I began providing information regarding IBM's/ISSC's development efforts to Magnet.

23. At this time, IBM agreed to sever its ties with PCF&G and transfer the development and programming of the "Tracking Tools Inventions" from IBM/ISSC to Magnet. During this time, I worked closely with IBM and ISSC to ensure that transition from IBM to Magnet went smoothly.

24. From July 1995 through December 1995, Magnet worked to develop the software that I had requested.

25. PCF&G and Magnet formalized their agreement on October 9, 1995. (Attached hereto as Exhibit E is a copy of the October 9, 1995 Agreement.)

9

TOBINB 3.0-001 CONT CONT II
U.S. Application No. 09/782,271

26.  By around November 1995, Magnet completed a working version of the PCF&G Web site, which incorporated the "Tracking Tools Inventions."

27.  On December 4, 1995, PCF&G publicly launched its newly designed Web site, along with the "Tracking Tools Inventions," which was part of the "Internet Consumer *Incentive Traffic Program.*" *(Attached hereto as Exhibit F is a copy of a letter dated December 27, 1995, to prospective PCF&G marketing partners.)* The "Internet Consumer Incentive Traffic Program" allowed PCF&G to: (i) identify the referring partner who referred a customer to PCF&G's Web site by way of a token-embedded-graphical hyperlink in order to provide the referring partner with a commission for the sale; (ii) track the identity of the referring partner as the consumer navigated throughout PCF&G's Web site; and (iii) allow the consumer to save the token on his/her computer to continue to track the referring partner's identity should the consumer revisit PCF&G's Web site in the future.  This concept became the foundation of the marketing and advertising service provided by PCF&G.

28.  Attached hereto as Exhibit G is a copy of a letter dated October 26, 1995, which I wrote to Rodney Robinson.  In that letter, I inadvertently stated that I "conceived" of the "Internet Consumer Incentive Traffic Program" in "January of 1995."  As discussed above, this statement is not accurate because I actually conceived the "Tracking Tools Inventions" no later than October 1994 because I was already discussing

09/782,271

them with Rodney Robinson and his team. Mr. Robinson confirms my recollection in his Declaration. (Robinson Decl. ¶ 4.)

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that any such willful false statements may jeopardize the validity of the present patent application or any patent issuing thereon.

Dated: 4/22/05

_____
William J. Tobin

464738_1.DOC

11



## DECLARATION OF RODNEY ROBINSON

I, RODNEY ROBINSON, declare as follows:

1.    I am presently employed by Teknowledge Corporation, which is located in Palo Alto, California. My title is Director of Financial Systems.

2.    I am an American citizen currently residing in Los Altos Hills, California.

3.    From 1985 until 1997, I was employed by IBM Corp. ("IBM"), including IBM Services Solutions Corporation ("ISSC"), a division of IBM, located in Palo Alto, California.

4.    I recall first meeting Bill Tobin in September 1994, at IBM's offices in Thornwood, New York. It was about this time, over a dinner in New York City with Mr. Tobin, that Mr. Tobin first discussed with me the "Tracking Tools Inventions," which are described in paragraph 9 of Mr. Tobin's declaration.  (Attached hereto as Exhibit A is a copy of the Declaration of William J. Tobin.)  My meetings with Mr. Tobin came about because IBM had assigned ISSC, including my team and myself, to work on developing software necessary to implement Mr. Tobin's ideas for an "interactive online mall" and the "Tracking Tools Inventions." IBM also assigned ISSC with the task of designing and developing a server system for launching a Web site for Mr. Tobin's business, PC Flowers & Gifts ("PCF&G"), on the Internet. I was the project manager for each of these projects.

5.    After these initial meetings with Mr. Tobin and continuing through December 1994, I remember meeting regularly with Mr. Tobin and speaking to him on an almost daily basis with respect developing software to implement the "Tracking Tools Inventions," as well as the other software for his PCF&G business.  Those meetings took place at IBM's offices in Thornwood, New York, and White Plains, New York.  At other times, the meetings took place via telephone with other ISSC employees, as well as me, in California.

Declaration of Rodney Robinson[1]



6.    I also recall discussing the software that would be required to implement Mr. Tobin's "Tracking Tool Inventions" with my ISSC colleague, Steve Zorn. My conversations with Mr. Zorn must have taken place before December 9, 1994 (the date upon which a written agreement between IBM and Mr. Tobin's company, PC Gift & Gourmet, was executed), inasmuch as I utilized the time and cost estimates that Steve and I developed during this period to provide input to the general manager for electronic marketing services for IBM, Carolyn Chin. Ms. Chin required this information so that she would know approximately what her division of IBM was committing itself to in terms of software-programming time and estimated-development costs. It was customary practice at IBM to prepare this information in advance so that IBM could determine the overall resources necessary to allocate to a project such as Mr. Tobin's, as well as estimate the costs to IBM, before committing to any formal-contractual agreements.

7.    I recall that even before IBM entered into the December 9, 1994 written agreement with PC Gift & Gourmet, I had already assigned an ISSC programmer named Nayen Patel to begin programming the required software for the "Tracking Tools Inventions."

8.    It was my understanding that IBM had also agreed to develop secure-credit-card-transaction software so that consumers could place orders electronically through PCF&G's Web site using a credit card.

9.    By no later than early January 1995, ISSC had programmed a basic prototype of the Tracking Tools Inventions.

10.    We conducted a test of the "Internet Consumer Incentive Traffic Program," which included the "Tracking Tools Inventions," before the Valentine's Day holiday (February 14, 1995), in cooperation with Mecklermedia and Pathfinder, who had provided their Web sites as

test partners. Although we had a prototype of the "Tracking Tools Inventions" for this test, consumers had to place orders manually via telephone because IBM had not yet completed the programming for the secure-credit-card-transaction software.

11.    In April 1995, I attended a Mecklermedia conference, along with Mr. Tobin, during which Mr. Tobin discussed the idea of the "Internet Consumer Incentive Traffic Program," which included the "Tracking Tools Inventions," during a keynote address.

12.    At all times, from the time Mr. Tobin first began discussing the "Tracking Tools Inventions" with my colleagues and I, to the time of the Mecklermedia conference in April 1995, I understood that our discussions concerning this project were confidential.

13.    From April 1995 through mid-1995, Bill Tobin continued discussing with us on a regular basis the further development of the "Tracking Tools Inventions" for full commercial use, as well as the redesign of the PCF&G Web site. ISSC had hoped to complete the programming of the "Tracking Tools Inventions" for commercial use on PCF&G's Web site, along with the secure-credit-card-transaction software, by November 1995.

14.    I recall that Mr. Tobin took his project, with IBM's and ISSC's cooperation, to Magnet Interactive Communications, LLC ("Magnet"), after IBM began losing interest in the "interactive online mall" concept. In fact, ISSC forwarded to Magnet much of the IBM-developed software, including a framework for performing the functions of the "Tracking Tools Inventions."

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: 8/31/2004

Rodney Robinson

# PCWEEK

THE NATIONAL NEWSPAPER OF CORPORATE COMPUTING



**CLIENT/SERVER DEPLOYMENT**
Page 77

**A PLEDGE TO LEGENT**
Page 111

## Cisco plans to double throughput in its next-generation routers

BY ERIC SMALLEY

Cisco Systems Inc. is laying plans for its next-generation backbone router, which could double aggregate throughput over current Cisco 7000 models.

The high-end line is scheduled to be unveiled in the second quarter and will feature a new architecture, Cisco officials confirmed last week. The plans call for a 1G-bps bus and the use of MIPS Technologies Inc. R4000 RISC chips.

The routers will yield an aggregate throughput of 550,000 packets per second, the officials said.

The upgrade, which does not involve technology from Cisco's recent acquisition of ATM vendor Lightstream Corp., comes at a time when some users

*See CISCO, Page 118*


CISCO 7520 CHASSIS

## Power, Radius show Mac clones

### POWERPC Apple OEMs target different audiences

BY ROBERT HESS
MACWEEK STAFF

SAN FRANCISCO—Last week's MacWorld Expo here served as the coming-out party for two trailblazers in the Macintosh cloning business.

Power Computing Corp. will take the low road and focus on inexpensive alternatives to Apple Computer Inc.'s offerings, while Radius Inc. is aiming high with several models intended for the desktop-publishing and digital

video-editing markets.

Stephen Kahng, president and CEO of Power Computing, announced that his firm will start shipping computers running the Mac operating system in March and expects to sell up to 100,000

*See MAC CLONES, Page 118*

## CompuServe, Apple shave on-line fees

BY ANNE KNOWLES

CompuServe Inc. and Apple Computer Inc. are moving quickly to cut prices on their proprietary on-line services, hoping to forestall future competition from rivals planning to charge users for content instead of connect time.

This week, CompuServe is expected to announce a revamped pricing scheme with an increase in the monthly charge from $8.95 to $9.95. But charges for hourly connection time will decrease from $9 60 to $4.80 for all access speeds, according to CompuServe officials in Columbus, Ohio.

Last week, Apple reduced its hourly fees for eWorld from $4.95 to $2.95 and doubled the number of hours users receive free for the monthly $8.95 fee.

"You will continue to see base fees going down as other pricing structures come into the market," said Peter Friedman, vice president and general manager

*See ONLINE, Page 123*



## Lotus to spotlight enhanced Notes API

### GROUPWARE Object-oriented tool due this month

BY PAULA ROONEY

The Lotus Notes API, long considered the product's Achilles' heel, has a new identity.

Lotus Development Corp. will spotlight at its Lotusphere conference later this month an enhanced object-oriented Notes API that lets developers dig deeper into the functionality of the groupware package.


LOTUS' NOTES TOOLS

The API is an upgrade of the high-level HiTest API Lotus acquired when it purchased Edge Research Inc., of Portsmouth, N.H., last summer.

Enhancements to the API will let developers access and manipulate Notes features such as Access Control Lists and full-text search capabilities, and sources familiar with the upgrade.

The upgraded API, now being beta tested, will be available this month as part of the Cambridge, Mass., company's Lotus Inside Edge CD ROM for developers, sources said.

In addition, Lotus will release a C++ Notes API with Notes 4.0, due for release by the middle of this year, sources said.

An industrial-strength API for Notes will address what many users consider the groupware's chief defect.

"This is a significant upgrade," said one source familiar with the HiTest beta release who requested anonymity. "It has a lot more Notes coverage and lets you work with many aspects of Notes."

*See NOTES, Page 115*


WHAT ABOUT OS/2?

0001L2554102P
70-04202 052 A
DAVID GOODWIN LIBRARY MGR     0160
PRINCETON UNIVERSITY         99
PRINCETON UNIVERSITY NJ 08544

ACCESS
WILL GET
A 32-BIT
UPGRADE
FOR WIN 95,
BUT NOT
FOR NT.
PAGE 52

# Servers & Databases

PC WEEK • JANUARY 9, 1995 • PAGE 49

ALPHA V
WINDOWS
DATABASE
FEATURES
RICH VISUAL
BASIC-LIKE
LANGUAGE.
PAGE 52

## NEWS BRIEFS

**Computer Connections' Tape Shuttle backs up small LANs**

Computer Connections America Inc. is now shipping a 1.50-byte tape drive for backing up notebooks, PCs, and small LANs. The Tape Shuttle-1500 is compatible with DOS, Windows, OS/2, NetWare, System 7, and Unix. Capable of backing up 24M bytes of data per minute, the tape drive supports SCSI, said company



**TAPE SHUTTLE-1500 supports SCSI.**

officials. Priced at $1,699, Tape Shuttle-1500 is available directly from Computer Connecting and through dealers, VARs, and distributors.

Computer Connections, of Bedford, Mass., is at (800) 438-5336.

**HP, Software AG to develop Adabase for HP 9000**

Hewlett-Packard Co. and Software AG have established a performance and technology lab at HP's Cupertino, Calif., facility.

The lab will be used to develop a parallel version of Software AG's Adabase database to run on HP 9000 Unixbased business servers.

The new version of the database will feature SMP (symmetric multiprocessing) capabilities and will support Software AG's Natural application-development tools. The SMP version is planned for next year. The lab can be contacted at (800) 637-7740.

**Praxis releases two DBMSs for faster data processing**

New versions of Praxis International Inc.'s Model 204 and System 1032 DBMSs are now available. Model 204 V2R2 features faster sorting, re-shaped I/O rates and lower CPU consumption, company officials said. It also provides Parallel Query Option/204, Multiprocessor/204, and Connect Star for attaching PCs or LANs via Systems Network Architecture or TCP/IP.

System 1032 V2.4 features support for binary varying data types such as video, audio, and images as well as Open Database Connectivity support.

Praxis sells both DBMSs directly. Pricing ranges from $9,000 to $250,000 for System 1032 and from $125,000 to $725,000 for Model 204.

The Cambridge, Mass., company can be reached at (617) 661-8760. ▫



**C/S case: Prudential's shift to managed care**

## Oracle to launch management tools

### DATABASES Will ease workgroup administration

BY ANNE KNOWLES



TOOLS WITHIN Oracle Workgroup/2000 will provide host performance statistics.

As part of its Jan. 17 Oracle Workgroup/2000 announcement, Oracle Corp. will debut administration tools designed to simplify management of its databases.

"We think we've covered the bases at the workgroup level," said John Morrell, senior manager for distributed solutions at the Redwood Shores, Calif., company. "A network administrator can now do what used to require a very expensive database administrator."

Oracle's announcement later this month will come on the heels of similar product plans unveiled by rivals Microsoft Corp. and Sybase Inc. Microsoft, of Redmond, Wash., is beta testing its Starfighter graphical administration tools for use with SQL Server 95. Sybase will ship SQL Server Manager, a GUI-based follow-on to its SA Companion administration tool, within the next several weeks, according to a spokesman at the

*See ORACLE, Page 52*

## IBM divisions join forces on Internet

### ON-LINE SERVICES Will offer a soup-to-nuts plan

BY KIMBERLY PATCH

Several divisions of IBM are coordinating efforts to bring users a soup-to-nuts set of Internet products and services that will include server tools and consulting.

IBM's Consulting Group is working with the company's Integrated™ Systems™ Solutions Corp. and IBM Global Network to provide an integrated set of products that will debut later this quarter, according to IBM officials.

"We're bringing out a set of products to allow companies to put up information on the Internet—from strategic planning through content creation and management support," said Joanne Bentley, manager of strategic project at Advantis, in Schaumburg, Ill.

Advantis, a joint venture between IBM and Sears, Roebuck and Co., is the U.S. provider for IBM Global Network.

IBM's efforts also include application integration that will allow users to link World-Wide Web information with existing applications, Bentley added.

Customers will be able to "pick" and choose services or have IBM manage the application from start to finish, she said.

PC Flowers, a pilot customer based in Stamford, Conn., has tapped IBM for content design, Hypertext Markup Language creation, content, management, and operations. The Internet is another ball

*See IBM INTERNET, Page 52*

## NEWS ANALYSIS

## Despite advances, modular servers still face skeptical IS managers

BY STEPHANIE LAPOLLA

Last fall, Panda Project, a small startup based in Boca Raton, Fla., introduced a line of modular servers designed to let IS managers swap out all system components—not just the CPU—separately.

The Archistrat line, which is set to debut later this quarter, features a passive backplane architecture that allows upgrades to memory, network connec-

tions, clock speed, CPUs, and even operating systems. The goal is to provide corporate sites with a one-time system investment flexible enough to grow with a company, officials said.

Although it sounds ideal, buyers remain skeptical that such a scheme is practical. "There is more to a box than just the processor—how does [swapping components] impact device drivers...

*See MODULAR, Page 52*

# Access update will be for Win 95, not NT

## DATABASES Microsoft keeps to upgrade cycle

BY TIM SMALLEY BOWEN

The first and only 32-bit version of Microsoft Corp.'s Access database currently planned will be a Windows 95 upgrade and not a native Windows NT release.

As a Windows 95 application, the Access upgrade will run on Windows NT, but will lack the necessary optimization to take advantage of NT's security and symmetric multiprocessing, according to officials at the company's Redmond, Wash., company. The upgrade is due 30 to 90 days after the release of Windows 95, which is now slated for August, they said.

The 32-bit upgrade path for Access represents no change in the company's earlier stated plans and is in line with the upgrade cycle for Access. Anticipated demand for a native Windows NT version of the desktop database is expected to be low, said Sarah Leary, product manager for Microsoft Office.

"We just don't see the demand for a native Windows NT version of Access. As a Windows 95 application, it will have to run

under NT," Leary said. "Our focus for 32-bit is Windows 95. We do not plan to have an NT version of Access, although we will evaluate customer demand."

To date, Access has dominated the Windows desktop database market, garnering an estimated 46.5 percent of the market in 1994, with $243.9 million in projected sales, according to estimates from International Data Corp., in Framingham, Mass.

Despite that dominance, one analyst concurred with Leary's assessment of demand for a native Windows NT version of Access. "As things evolve, we don't foresee a big desktop database market on Windows NT," said Nicole Roth, an analyst with IDC.

"I don't think there's a huge client market on NT for Access," Roth added, noting that desktop databases such as Access won't require the horsepower of an NT workstation.

The information network that gathers data from GPS is still based on a single IBM mainframe running IBM's DB2 database. Chin is moved between the networks using Trinzic Corp.'s InfoPump middleware.

Converting data from the old legacy application to the new

Microsoft sells Access directly and through resellers. The company can be reached at (800) 426-9400.

## Prudential

*from page 49*

to the volume of company transactions and other interdependent mainframes used by the company, Chin said.

Chin declined to estimate the return on investment associated with "implementing the client/server system, saying it is still too early in the process to project.

GPS (Group Provider System), the first client/server application, was implemented last August. The application, which took 14 months to build, provides information about members and physicians to 600 Prudential employees in member relations, provider relations, and directory services in the United States. That information is gathered from 300,000 doctors, hospitals and health-care providers linked nationwide to Prudential's five regional offices.

GPS uses Sybase Inc.'s SQL Server 4.9.2 running on IBM RS/6000 servers at the five regional sites to gather and store data.

aged-care network under GPS is anything but simple, however.

Managed-care data, conversion takes place during weekend hours. Data is copied from a VSAM database to DB2 and always

maintenance[?] downloaded to Sybase SQL Server using InfoPump, said Chin. InfoPump is also used for daily transaction processing tasks. "The hard part is making sure regional Sybase

servers are synchronized with national systems and DB2," he added. The process is further complicated by the variety of network protocols and other connectivity issues.

According to Chin, the fact that large volumes of VSAM mainframe data records have to be converted to both SQL Server running on regional servers and DB2 running on the mainframe makes the process very complex.

InfoPump 1.1 is used to bring data from the mainframe to SQL Server and then synchronize data between SQL Server and DB2. The InfoPump middleware runs on OS/2 servers and converts data formats between databases.

"The toughest part of this is InfoPump is so dependent on the client/server environment, which has multiple vendors' operating systems, database connectivity tools, and different network protocols," said Jeff Peckham, a senior consulting engineer from Trinzic, of Waltham, Mass. "In Prudential's case, we had Novell, Sybase running on AIX, InfoPump on OS/2, and three different network protocols to deal with—TCP/IP, LU 6.2, and Named Pipes for LAN Manager. It wasn't easy." ∎



## Oracle

*from page 49*

Emeryville, Calif., company.

"The biggest problem with Oracle is it needs a dedicated database administrator because the database is so difficult to administer," said Jim Johnson, technical consultant at Xerox Corp., an Oracle site in Rochester, N.Y. "Anything Oracle does in that direction will help."

Oracle will double the number of administration applets that ship with every Oracle database, Morrell said. New applets will include ones for backup, three for data loading, and several applets that will act as updating wizards.

The updating applets will let users move data from other databases—Microsoft's Access and FoxPro and Borland International's dBASE and Paradox—to Oracle7.

"I am interested in the updating tools because we do a lot of prototyping in Access and it would be great to easily move it all to Oracle," said Johnson.

Oracle is beta testing a set of agents that will work with SNMP products such as Hewlett-Packard Co.'s OpenView and Novell Inc.'s NetWare Management System, said Morrell. Those products will be available sometime in the second quarter, he added.

"Longer term, we're building a very expensive agent-management architecture that will go beyond SNMP," said Morrell. "It will be a set of highly intelligent agents that you can send messages to, perform the task, and report back their status."

In addition to the administration tools, Oracle will announce Shared Oracle, for controlling client access to tools that will ship with the Oracle Workgroup database, said Morrell. "It will be like a shared volume on a file manager," he said.

Oracle sells its products directly and through resellers. The company can be reached at (415) 506-7000. ∎

## Modular

*from page 49*

ers and things like that?" said Judy Perreault, manager of PC technology at Pratt & Whitney, in East Hartford, Conn.

Some vendors claim users can upgrade or change a processor, but "ultimately, something else is limited or affected," she said.

Until that perception changes, major server vendors are unlikely to provide modularity beyond the upgradable motherboards that many already offer.

"My customers want only basic chips. They are very conservative and don't want to mess with what they have," said Jim McDonnell, market manager for the network server division at Hewlett-Packard Co., in Santa Clara, Calif.

Most server vendors already offer some level of modularity. The most basic level allows system administrators to add hard drives, CD ROMs, or tape backup.

Other vendors offer servers that can be easily modified. For example, Motorola Computer Group last year unveiled its PowerStack PowerPC server, which has a snap-together enclosure that lets VARs and system in-

tegrators configure storage, performance, and user interface.

Destination Technology Inc., a small company in Lenexa, Kan., sells server systems based on modular technology that features a processor-independent motherboard that supports RISC or CISC chips.

According to users and industry analysts, it's one thing to make systems easier for third parties and integrators to reconfigure. But it's another to expect corporate sites to rely on modular systems running mission-crit-

ical applications.

However, Panda Project officials are betting their new technology will allay IS concerns.

"And at least one IS manager agrees that modular servers such as Panda's could help solve planning problems. "It's a hedge. With this you could walk into the boardroom and say, 'We have' projected this spend for our needs, but if we are wrong, it will only cost us this much more to upgrade,'" said Brian Wright, IS consultant at the California State Assembly, in Sacramento. ∎

## IBM Internet

*from page 49*

game. There are many technical hurdles, and I don't have the resources to [tackle] them alone," said PC Flowers President Bill Tobin.

Tobin is relying on IBM to provide and develop many services, including ensuring that the company's Web location is easy to find and providing secure transactions.

In addition, Tobin and IBM are developing an electronic token system that gives other Web

servers credit for referrals that result in a sale.

IBM's coordinated effort to provide Internet tools and services is based on the company's Open Blueprint, a set of guidelines outlining recommended open standards for distributed computing, said Helena Tobin, manager of open distributed marketing for IBM, in Somers.

Open Blueprint, which has been evolving for five years, is useful in coordinating Internet development efforts both for IBM and the companies it works

with, Trollman added.

The guidelines recommend standards for eight services—networking, distributed services, communications, data access, presentation, application services, system management, and local operating-system services.

IBM's strategic planning, content creation, content management, and support products and services will be available in the first quarter and will be priced on a custom basis.

IBM can be contacted at (800) 426-4168. ∎

http://proquest.umi.com/pqdweb?Did=00000...&Fmt=3&Deli=1&Mtd=1&Idx=45&Sid=4&RQT=309

ProQuest    Return to NPL Web Page          Text Version        ?Help

Searching collections: All Collections                          Article Display

Email Article          ◀ Article 45 of 50 ▶    Publisher Info.

Print Article          ☐ Mark article        Article format:  Full Text ▼

Save Link   Saves this document as a Durable Link under "Results-Marked List"

---

## On-line options blooming: Hearts afire on the 'net

*Computerworld; Framingham; Feb 13, 1995; Booker, Ellis; Hoffman, Thomas;*

| | |
|---|---|
| **Volume:** | 29 |
| **Issue:** | 7 |
| **Start Page:** | Cover |
| **ISSN:** | 00104841 |
| **Subject Terms:** | Online information services |
| | Market potential |
| | Internet |
| | Commercialization |
| | Internet |
| | Holidays & special occasions |
| | Data bases |
| | Computer networks |
| **Classification Codes:** | 9190: *US* |
| | 7000: *Marketing* |
| | 5250: *Telecommunications systems* |
| **Geographic Names:** | US |
| **Companies:** | PC Flowers Inc |

**Abstract:**
Merchants with on-line connections - either through public data networks such as ⊕*CompuServe* and ⊕*America Online* or the Internet - generally concede they are not yet doing a big business with cybershoppers. PC Flowers is set to launch what it claims is a first-of-its-kind approach to cross-marketing in cyberspace. The electronic token service being used by PC Flowers was developed by ⊕*IBM*'s Integrated Systems Solutions Corp.

**Full Text:**
*Copyright CW Communications/Inc. Feb 13, 1995*

Love is in the air this week, and on the wire, too.

On St. Valentine's Day, modem-equipped romantics will be able to take part in a range of romantic activities, including the following:

* Sending electronic valentines to their sweethearts.

* Entering interactive "chat" rooms to find that special someone.



* Searching on-line personal ads.

* Scanning electronic-mail directories for the address of a lost love.

* Buying and sending flowers, chocolates or lingerie.

How much of this data traffic will result in lasting relationships is anyone's guess. What is clear, however, is that for every bauble being marketed electronically, relatively few will actually be sold. Merchants with on-line connections--either through public data networks such as ①CompuServe and ①America Online or the Internet--generally concede they are not yet doing a big business with cybershoppers.

## READY FOR LAUNCH

But the mechanisms to support electronic commerce are being developed at a blazing pace.

For example, take PC Flowers in Stamford, Conn., which expanded its service to the Internet last December. The florist is set to launch what it claims is a first-of-its-kind approach to cross-marketing in cyberspace.

"We'll be able to track where people are coming from and give these [other sites] a percentage of the sale," PC Flowers' President William Tobin said last week. On-line shoppers will be offered special flower deals if they enter the PC Gifts & Flowers home page (http://www.pcgifts.ibm.com) from these designated sites.

Tobin said he had negotiated contracts with two popular Internet sites: Time Warner, Inc.'s Pathfinder (http://www.timeinc.com/pathfinder/hotpae.html) and Mecklermedia Corp.'s MecklerWeb (http://www.mecklerweb.com/). Tobin said he is also negotiating deals with other Internet and public data network providers.

"We're using Internet World magazine to direct readers to the Internet Mall on MecklerWeb," said Paul Bonington, publisher of MecklerWeb and Internet World in Westport, Conn. Bonington would not disclose the details of his group's contractual arrangement with PC Flowers but said it is a small percentage of each order.

The "electronic token" service being used by PC Flowers was developed by ①IBM's Integrated Systems Solutions Corp. IBM Electronic Market Services launched PC Gifts & Flowers last December in ①IBM's first electronic commerce pilot program. While logging the origin of traffic is not new, paying the originator for these hand-offs is a new twist, Internet watchers said.

"Cross-promoting on the Internet is the way to go, and we'll see more of it," said Jayne Levin, editor in chief of "The Internet Letter," a newsletter in Washington. "Getting paid is the name of the game."

## CUPID, DRAW BACK YOUR BOW

Other Valentine's Day Web sites that have felt Cupid's sting include the following:

* Cupid's Cover. One of the best designed sites, it offers everything from a kissing booth (with audio) to Valentine's Day cards and recipes (http://www.neosoft.com/citylink).

- The Cyrano Server. This Web page writes love letters for you (http://www.nando.net).

- Godiva, the queen of confectioners, added a Valentine's Day page to its Web site (http://www.godiva.com/catalog/valentine.html).

- Four 11. This searchable E-mail system, launched last October, just might be helpful in locating a lost love. The resource contains more than 500,000 names and has 25,000 registered users, who pay a $20 yearly membership and are given more extensive searching tools (http://www.Four11.com/).

## LOOKING FOR LOVE

①America Online subscriber Sally, a recently divorced, 41-year-old mother of two in Nashville, is a fan of finding friends and lovers on-line.

"If you're bored, the kids are in bed, and you want to talk to people, it's great," she said. "Gosh, who wants to go to bars these days?"

Sally (not her real name) has had two in-person relationships with men she met through the ①America Online chat rooms, and she counts many others as on-line friends. Interactive chat, where users assume screen names and type messages back and forth, is one of the most popular services of all on-line networks.

Still, Sally wants to be clear on one point: "Can it be better in person? You bet. Nothing beats the real thing."

Yet contrary to the stereotype, relationships that begin on-line end up about as successfully as conventional relationships, said Steven Baumrucker, an M.D. in Rogersville, Tenn., and a faculty member at ETS College of Medicine in Tri-Cities, Tenn.

But the doctor's survey of 150 Internet and ①America Online users last year did find an interesting difference: On-line lovers tend to commit faster. He should know. Baumrucker, who is working on a book entitled Love at First Byte, met his wife on-line in 1989.

___

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of November, 2005, the attached **NOTICE OF DEPOSITION AND SUBPOENA DIRECTED TO NAYAN V. PATEL** was served upon the below-named counsel for defendants at the address and in the manner indicated:

Josy W. Ingersoll, Esquire                          HAND DELIVERY
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

Jeffrey S. Love, Esquire                           VIA FEDERAL EXPRESS
Klarquist, Sparkman, LLP
One World Trade Center, Suite 1600
121 S.W. Salmon Street
Portland, OR  97204

David J. Margules, Esquire                          HAND DELIVERY
Bouchard Margules & Friedlander, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE  19801

John F. Luman, III, Esquire                        VIA FEDERAL EXPRESS
Bracewell & Giuliani LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002-2781

*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon