REDACTED VERSION – PUBLICLY FILED

# EXHIBIT

# A

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT A
# [REDACTED]

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT

# B

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT B
# [REDACTED]

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT

# C





2003 Press Releases | 2002 | 2001 | 2000 | 1999 | Awards | Media Contact

Home > About > Press > 2002 PressReleases

### TUCOWS INC. ANNOUNCES SALE OF ELIBRARY AND ENCYCLOPEDIA.COM

*— Tucows Inc. Announces Sale of eLibrary and Encyclopedia.com to Alacritude, LLC —*

**TORONTO, CANADA, August 16, 2002 — Tucows Inc. (OTCBB: TCOW)**, a leading provider of Internet services to Internet service providers (ISPs) and web hosting companies worldwide, today announced the sale of its search and reference services eLibrary and Encyclopedia.com to Chicago-based Alacritude, LLC, a company investing in activities at the intersection of technology and media. eLibrary, a comprehensive, subscription-based online information resource, and Encyclopedia.com, a basic online research tool, were properties that Tucows acquired as a result of its merger with Infonautics, Inc. in August 2001.

Under the terms of the sale, Alacritude, LLC has acquired all of the assets and has assumed certain liabilities associated with the eLibrary and Encyclopedia.com services. The proceeds of the sale are approximately $1.5 million. Alacritude, which is owned by a Chicago-based group of investors, will maintain the current operations of the online services in the former Infonautics office in King of Prussia, Pennsylvania, and will retain all of Tucows' staff currently employed in King of Prussia.

"These businesses were not core to our ongoing strategy, thus the sale will allow us to devote all of our resources to our Internet services business where we believe our major opportunities lie," said Graham Morris, chief operating officer, Tucows Inc. "The impact on our financial position and results of operations is expected to be immaterial."

"Tucows' success is based upon understanding the unique needs of Internet service providers and web hosting companies, who make up one of the most important distribution channels in the Internet economy," said Elliot Noss, president and chief executive officer, Tucows Inc. "This is another step towards narrowing our focus and taking full advantage of the significant opportunity in providing Internet services like domain registration through our customers."

"Acquiring eLibrary and Encyclopedia.com is an important strategic step for Alacritude," said Patrick Spain, chairman and chief executive officer, Alacritude, LLC. "Our primary interest in these properties is to acquire a platform on which to develop and deliver to individuals the next generation of technology-based online research tools."

**About Tucows**

Tucows Inc. is a leading provider of Internet services to ISPs and web hosting companies worldwide. An ICANN-accredited registrar, Tucows provides outsourced domain name registrations for generic and country code top-level domains (TLDs), plus web certificates. Tucows also distributes software and other digital content through its integrated network of resellers and offers more than 30,000 software titles in libraries located around the world. For more information, please visit: http://www.tucows.com.

*This news release contains, in addition to historical information, forward-looking statements that involve risks and uncertainties. These forward-looking statements include statements regarding, for example, the impact of the sale of eLibrary and Encyclopedia.com to Alacritude, LLC, on Tucows' financial results. Such statements are based on management's current expectations and are subject to a number of uncertainties and risks that could cause actual results to differ materially from those described in the forward-looking statements. More information about potential factors that could affect Tucows is included in the Risk Factors sections of Tucows' filings with the Securities and Exchange Commission. All forward-looking statements included in this document are based on information available to Tucows as of the date of this document, and Tucows assumes no obligation to update such forward-looking statements.*

BTG019688

Press                                                                                        Page 2 of 2

*TUCOWS is a registered trademark of Tucows Inc. or its subsidiaries. All other trademarks and service marks are the properties of their respective owners.*

**Contact:**
Joanna Becket
Investor Relations
Tucows Inc.
416-538-5442
ir@tucows.com



- WHOIS LOOKUP -                                - SEARCH TUCOWS SITE -

www. [          ]  WHOIS          [              ] in English [SEARCH]

- TUCOWS PROPERTIES -
Software Library | Mailing Lists | Learn Web Design | Domain Direct
- TUCOWS BUSINESS RESOURCES -
Resellers | About Tucows | Partner with Tucows | Advertise With Us | Author Resource Center
- ASSISTANCE -
Feedback | Help

©2003 Tucows Inc.
TUCOWS is a registered trademark of Tucows Inc. or its subsidiaries. OpenSRS is a trademark of Tucows Inc. or its subsidiaries. All other trademarks and service marks are the properties of their respective owners. Tucows Inc. has no liability for any content or goods on the Tucows site or the Internet, except as set forth in the
terms and conditions and privacy statement.

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT

# D

From: Bryan Yearwood
Sent: 8/16/2002 1:03:30 PM (GMT -06:00)
To: Scott Williams
Attachments: ;Picture (Metafile)*
Subject: tucows

I hope they did not sell the patents too.


Friday August 16, 2:23 pm Eastern Time
Press Release
SOURCE: Tucows Inc.
Tucows Improves Productivity and Reduces Costs From the Sale of Non-Strategic
Assets
- Tucows Inc. Announces Sale of eLibrary and Encyclopedia.com To Alacritude,
LLC -
TORONTO, Aug. 16 /PRNewswire-FirstCall/ -- Tucows Inc. (OTC Bulletin Board:
TCOW <http://finance.yahoo.com/q?s=tcow.ob&d=t> - News
<http://biz.yahoo.com/n/t/tcow.ob.html>), a leading provider of Internet
services to Internet service providers (ISPs) and web hosting companies
worldwide, today announced the sale of its search and reference services
eLibrary and Encyclopedia.com to Chicago-based Alacritude, LLC, a company
investing in activities at the intersection of technology and media. eLibrary,
a comprehensive, subscription-based online information resource, and
Encyclopedia.com, a basic online research tool, were properties that Tucows
acquired as a result of its merger with Infonautics, Inc., in August 2001.

ADVERTISEMENT
<http://rd.yahoo.com/M=170261.1915300.3407676.1818058/D=fin/P=m1v0iv2313030g00/S
=7811758:LREC/A=745129/R=0/*http://finance.yahoo.com/rtq>
<http://rd.yahoo.com/M=170261.1915300.3407676.1818058/D=fin/P=m1v0iv2313030g00/S
=7811758:LREC/A=745129/R=0/*http://finance.yahoo.com/rtq>
Under the terms of the sale, Alacritude, LLC has acquired all of the assets and
has assumed certain liabilities associated with the eLibrary and
Encyclopedia.com services. The proceeds of the sale are approximately $1.5
million. Alacritude, which is owned by a Chicago-based group of investors, will
maintain the current operations of the online services in the former
Infonautics office in King of Prussia, Pennsylvania, and will retain all of
Tucows' staff currently employed in King of Prussia.
"These businesses were not core to our ongoing strategy, thus the sale will
allow us to devote all of our resources to our Internet services business where
we believe our major opportunities lie," said Graham Morris, chief operating
officer, Tucows Inc. "The impact on our financial position and results of
operations is expected to be immaterial."
"Tucows' success is based upon understanding the unique needs of Internet
service providers and web hosting companies, who make up one of the most
important distribution channels in the Internet economy," said Elliot Noss,
president and chief executive officer, Tucows Inc. "This is another step
towards narrowing our focus and taking full advantage of the significant
opportunity in providing Internet services like domain registration through our
customers."
"Acquiring eLibrary and Encyclopedia.com is an important strategic step for
Alacritude," said Patrick Spain, chairman and chief executive officer,
Alacritude, LLC. "Our primary interest in these properties is to acquire a
platform on which to develop and deliver to individuals the next generation of
technology-based online research tools."

BTG025321

About Tucows

Tucows Inc. is a leading provider of Internet services to ISPs and web hosting companies worldwide. An ICANN-accredited registrar, Tucows provides outsourced domain name registrations for generic and country code top-level domains (TLDs), plus web certificates. Tucows also distributes software and other digital content through its integrated network of resellers and offers more than 30,000 software titles in libraries located around the world. For more information, please visit: <http://www.tucows.com>.

This news release contains, in addition to historical information, forward-looking statements that involve risks and uncertainties. These forward-looking statements include statements regarding, for example, the impact of the sale of eLibrary and Encyclopedia.com to Alacritude, LLC, on Tucows' financial results. Such statements are based on management's current expectations and are subject to a number of uncertainties and risks that could cause actual results to differ materially from those described in the forward-looking statements. More information about potential factors that could affect Tucows is included in the Risk Factors sections of Tucows' filings with the Securities and Exchange Commission. All forward-looking statements included in this document are based on information available to Tucows as of the date of this document, and Tucows assumes no obligation to update such forward-looking statements.

TUCOWS is a registered trademark of Tucows Inc. or its subsidiaries. All other trademarks and service marks are the properties of their respective owners.
SOURCE: Tucows Inc.


Bryan Yearwood
Vice President
BTG
610.943.3552

BTG025322

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT

# E

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT E
# [REDACTED]

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT

# F

# growthink | RESEARCH

## *Executive Summary*

### Introduction

One hundred two (102) privately held companies headquartered in Illinois, Indiana, Michigan, Ohio and Wisconsin (collectively "the Great Lakes region") raised venture capital in 2002, with an average deal size of $11 million. These companies raised 4.5% of the total venture dollars invested nationwide, up from 3.3% in 2001.

**Total U.S. Funding by Region – 2002**

| | Dollars Invested | Pct of Total | No. of Cos. | Pct of Total | Average Deal Size |
|---|---|---|---|---|---|
| Bay Area | $7,900,310,000 | 32.0% | 670 | 28.3% | $11,791,507 |
| New England | $3,200,421,140 | 13.0% | 318 | 13.4% | $10,064,217 |
| Central US | $2,722,145,000 | 11.0% | 265 | 11.2% | $10,272,245 |
| Northeast | $2,545,337,000 | 10.3% | 281 | 11.9% | $9,058,139 |
| Southern California | $2,345,113,000 | 9.5% | 202 | 8.5% | $11,609,470 |
| Southeast | $1,998,637,000 | 8.1% | 218 | 9.2% | $9,168,060 |
| Mid-Atlantic | $1,483,815,000 | 6.0% | 142 | 6.0% | $10,449,401 |
| **Great Lakes** | **$1,121,666,000** | **4.5%** | **102** | **4.3%** | **$10,996,745** |
| Pacific Northwest | $835,250,000 | 3.4% | 108 | 4.6% | $7,733,796 |
| Southwest | $431,162,000 | 1.7% | 47 | 2.0% | $9,173,660 |
| Other | $97,360,000 | 0.4% | 15 | 0.6% | $6,490,667 |
| *Totals* | *$24,681,216,140* | *100.0%* | *2368* | *100.0%* | *$10,422,642* |

### Sectors

Over one-third (34.3%) of the capital invested in the region went to twenty six (26) companies in the Healthcare sector. Great Lakes healthcare companies raised over $384 million in 2002, led by a $150 million investment in **Ovation Pharmaceuticals** (Deerfield, IL). **Ovation Pharmaceuticals** is a specialty pharmaceutical company that acquires under-promoted branded pharmaceutical products and promising late-stage development products. The Company increases the sales of acquired products through active selling efforts, creative marketing programs, and product life cycle activities that focus on developing new formulations, new indications, and other product improvements. Also receiving a large round of funding was **National Surgical Care** (Chicago, IL), which raised $75 million. **National Surgical Care** is a recently formed company that acquires and develops ambulatory surgery centers and short-stay surgical hospitals. The Company is headed by Timothy Geary and Rick Pence, who are former executives of National Surgery Centers. HealthSouth acquired National Surgery Centers in 1998.

Forty one (41) companies in the Business Software & Services sector raised $342 million, led by Parthenon Capital's $45 million investment in **Arrow Financial Services** (Niles, IL). **Arrow Financial Services** is a purchaser and collector of consumer debt that purchases debt for its own account, collects on a contingency basis, and provides first-party collection services. In October 2002, *Inc. Magazine* ranked the Company 265th on its annual list of the fastest growing privately held companies in the United States.

Three of the top ten investments in the region were made in energy companies. These companies (classified in the "Other" category) were led by a $100 million investment in **Insight Energy** (Chicago, IL). **Insight Energy** acquires and develops small and medium sized power projects, primarily under 150

## *Profiles of Funded Ventures*

### Illinois - Chicago

### ADEXS

**Description**

ADEXS provides services to facilitate the exchange of business documents between trading partners in the form of indexed digital files on a non-system-to-system basis. The Company focuses on industries such as chemicals, pharmaceuticals, healthcare services, and manufacturing where large volumes of commerce-related documents are exchanged and where legacy processes require labor-intensive manual data entry.

**2002 Investment**

Funding Amount: $3,000,000
Funding Round: A

**Investors**

Foundation Capital

**Key Personnel**

- Tom Arnold, *CEO*
  *tarnold@adexs.com*
- Greg Buchholz, *COO*
  *gbuchholz@adexs.com*
- Atul Shevade, *VP R&D*
  *ashevade@adexs.com*

**Contact Information**

350 N. Orleans St.
Suite 950
Chicago, IL 60654
Tel: (312) 881-2200
Fax: (312) 881-2201
*www.adexs.com*

### Advanced Life Sciences

**Description**

Advanced Life Sciences is a drug development company that discovers and develops proprietary therapeutic compounds to fight infection, inflammation and cancer. The Company takes products from early stage development through clinical trials and focuses on diseases that have significant unmet medical needs in important markets.

**2002 Investment**

Funding Amount: $10,000,000
Funding Round: A

**Investors**

Undisclosed Investors

**Key Personnel**

- Michael T. Flavin, *CEO*
- John L. Flavin, *CFO*
- Sharon W. Ayd, *COO*
- Ze-Qi Xu, *Chief Scientific Officer*
- Suseelan Pookote, Ph.D., *EVP Corp Dev*
  *spookote@advancedlifesciences.com*
- Karen J. Stec, *EVP Product Dev*
  *kstec@advancedlifesciences.com*

**Contact Information**

1005 Internationale Pkwy.
Woodridge, IL 60517
Tel: (630) 739-6744
Fax: (630) 739-6754
*www.advancedlifesciences.com*

### Alacritude

**Description**

Alacritude provides research services for individuals through its eLibrary and Encyclopedia.com services. The Company offers a variety of research tools combined with a comprehensive, international digital archive of more than 13 million documents from over 2000 publications.

**2002 Investment**

Funding Amount: $3,100,000
Funding Round: A

**Investors**

Prism Opportunity Fund, 1to1 Venture Partners, Individual Investors

**Key Personnel**

- Patrick J. Spain, *CEO*
  *pjspain@alacritude.com*
- Scott Bernberg, *Dir. Technology*
  *sbernberg@alacritude.com*
- Rich Kreisman, *VP Biz Dev*
- Eric Ward, *Dir. Strategic & Financial Planning*
  *eward@alacritude.com*

**Contact Information**

2 E. Erie
Suite 2614
Chicago, IL 60611
Tel: (312) 787-6200
Fax: (312) 787-6868
*www.alacritude.com*

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT

# G

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT G
# [REDACTED]

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT

# H



BRACEWELL
&GIULIANI LLP

711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
Phone  713.223.2300
Fax  713.221.1212
www.bracewellgiuliani.com

September 16, 2005

<u>By Facsimile</u>

Mr. Niall A. MacLeod
Robins, Kaplan, Miller & Ciresi, L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota 55402-2015

   Re: C.A. No. 04-1264-SLR; *BTG International Inc. v. Amazon.com, et al.;* In
     the United States District Court for the District of Delaware

Dear Niall:

This letter is in regard to the amendments you have made to BTG's privilege log.
Stephanie Adamany's letter of July 20, 2005, lists each of the entries in your privilege log
that have been amended, and many of these changes still provide no basis for your
assertion of privileges.

The first category of documents includes internal communications and documents that
were neither sent by nor to an attorney. For the vast majority of these documents, all you
have done is add on the phrase "Performed at the direction of Bradley Ditty, Esq." In
fact, as far as we can discern for the following documents, the addition of that phrase is
the only change you have made to the privilege log:

| | | |
|---|---|---|
| 1210 | 1654 | 1847-48 |
| 1459-60 | 1657 | 1854-59 |
| 1486 | 1670-74 | 1864 |
| 1492 | 1680-82 | 1867 |
| 1565-66 | 1693-94 | 1932-33 |
| 1569 | 1729-30 | 1948-49 |
| 1571-75 | 1732 | 1952-53 |
| 1587 | 1755-59 | 1956-57 |
| 1589 | 1776-79 | 2029-30 |
| 1598 | 1781-83 | 2032 |
| 1620 | 1785-86 | 2077-80 |
| 1622 | 1789-90 | 2150-53 |
| 1633-34 | 1793 | |
| 1642-43 | 1832-34 | |



Mr. Niall A. MacLeod
September 16, 2005
Page 2

This is hardly a meaningful or substantive change to your privilege log. There is still no way to verify that the documents in question are privileged. We request an affirmation that outside counsel for BTG actually looked at the documents in question, and it can be discerned from the document that in fact Brad Ditty directed the employee and the document seeks legal advice. Alternatively, I will request that the Court view these documents to determine if they are in fact privileged.

Based upon our review, the only documents in this category you produced (a total of six documents) involve communications between BTG and its marketers Taylor Rafferty and Firefly (*see, e.g.,* entry 1483 corresponding to documents 26116-18).

The second category of documents at issue are communications with third parties. I notice that you have still refused to produce any documents or communications between BTG and Patent Logistics (documents 646, 649, 653, 791, 1114-15, 1128-71, 1175-82, 1275-76, 1304, 1410-11, 1421, 1659, 1661-68, 2053-63, and 2085-86). You have provided no explanation as why these documents are privileged. Please produce these documents, otherwise we will be forced to take this matter before the Court.

You have also failed to produce communications with Serissa Research (1125-27, 1425, 1531-34, 1576-79, 1581-83, and 1595-96). Again, you provide no basis for your assertion of privilege.

Further, you have not produced communications by and between you and your marketers Firefly (1034 and 1470) and Taylor Rafferty (1362-63, 1801, 1807, 1812, 1814, 1817, 1819, 1821, 1824, 1830, 1877, 1951, and 1954). It is odd that you would withhold these documents when you produced other communications with these entities (i.e. entry 1483 corresponding to documents 26116-18). Without question, your communications with marketers is not covered by any privilege, and these documents must be produced.

Note that Overstock's concerns regarding the propriety of BTG's privilege log is not without merit. The documents you did produce (738-43, 1096-98, 1438, 1146-47, 1462-63, 1485, 1493, 1495-96, and 1498-99) that were previously "privileged" are not, in fact, even remotely subject to any claim of privilege. Under these circumstances, Overstock.com is suspect of BTG's remaining privilege claims and insists that the documents described above be produced or inspected by the Court.

REDACTED VERSION – PUBLICLY FILED



Mr. Niall A. MacLeod
September 16, 2005
Page 3

Very truly yours,

Bracewell & Giuliani LLP

John F. Luman III

JFL/da

cc:   Jeffrey S. Love
      Kristin L. Cleveland
      Klarquist, Sparkman, LLP
      One World Trade Center – Suite 1600
      121 S.W. Salmon Street
      Portland, Oregon 97204
      *(Via Facsimile)*

      Karen L. Pascale
      David J. Margules
      BOUCHARD, MARGULES & FRIEDLANDER
      222 Delaware Avenue, Suite 1400
      Wilmington, Delaware 19801
      *(Via Facsimile)*

      Glenn A. Ballard, Jr.
      BRACEWELL & GIULIANI LLP

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT

# I

ROBBINS & MYERS, INC., Plaintiff, -vs- J.M. HUBERCORPORATION and H. MILTON HOFF, Defendants and Third-Party Plaintiffs, -vs-ROBBINS & MYERS ENERGY SYSTEMS, INC. and BERKELEY FORGE AND TOOL, INC.,Third-Party Defendants.
01-CV-0201E(F)

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEWYORK

2003 U.S. Dist. LEXIS 10001

May 9, 2003, Decided

PRIOR HISTORY: *Robbins & Myers, Inc. v. J.M. Huber Corp., 2001 U.S. Dist. LEXIS 12817 (W.D.N.Y., Aug. 23, 2001)*

DISPOSITION: [*1] Plaintiff's motion to preclude defendants' assertion of attorney-client privilege granted, and Defendants' cross-motion to compel discovery granted in part and denied in part.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff purchasing corporation (purchaser) filed a fraud suit against defendants, a selling corporation (seller) and an individual, and contended that the seller induced it to buy stock of a third corporation by misrepresenting the scope of certain liability. The purchaser sought to preclude defendants from asserting the attorney-client privilege as to several disputed issues; defendants sought the purchaser's reliance materials.

OVERVIEW: Defendants were prohibited from asserting the attorney-client privilege with respect to communications relating to the off-specification closures because the purchaser satisfied New Jersey's tripartite test. Defendants were to make available all communications made on or before November 20, 1997 related to the disputed issues based on the crime-fraud exception to the attorney-client privilege. Defendants waived any privilege associated with any document retained by the third corporation after November 20, 1997 and defendants were to supplement previous discovery responses as necessary. Defendants' cross-motion to compel discovery was granted in part and denied in part and the purchaser was to, inter alia, produce or make available for inspection all responsive and non-privileged documents requested by document requests 2-6, 10-11, and 16-17, specify by category and location the documents from which its interrogatory answers could be derived as required by Fed. R. Civ. P.

33(d), and supplement all interrogatory answers that object on the purported basis that the information sought may be "elicited through deposition testimony."

OUTCOME: The purchaser's motion to preclude defendants' assertion of the attorney-client privilege was granted, and defendants' cross-motion to compel discovery was granted in part and denied in part. The court specified the materials that were to be produced.

LexisNexis(R) Headnotes

COUNSEL: For Robbins & Myers, Inc, PLAINTIFF: Robert J Lane, Jr, Hodgson, Russ, Andrews, Woods & Goodyear, Jeffrey C Stravino, Esq, Hodgson, Russ, Andrews, Woods & Goodyear, LLP, Buffalo, NY USA.

For Robbins & Myers, Inc, PLAINTIFF: Leslie L Jacobs, Esq, Luke L Dauchot, Esq, Kenneth G Cole, Esq, Thompson, Hine & Flory, Cleveland, OH USA.

For JM Huber Corporation, H Milton Hoff, DEFENDANTS: Edward S Bloomberg, Esq, Phillips Lytle Hitchcock Blaine & Huber, Buffalo, NY USA.

For JM Huber Corporation, H Milton Hoff, DEFENDANTS: Dennis Lafiura, Esq, Pitney, Hardin, Kipp & Szuch, Morristown, NJ USA.

For JM Huber Corporation, H Milton Hoff, DEFENDANTS: David S Sager, Esq, Pitney, Hardin, Kipp & Szuch, Florham Park, NJ USA.

For JM Huber Corporation, H Milton Hoff, COUNTER-CLAIMANTS: Edward S Bloomberg, Esq, Phillips Lytle Hitchcock Blaine & Huber, Buffalo, NY USA.

For JM Huber Corporation, H Milton Hoff, COUNTER-CLAIMANTS: Dennis Lafiura, Esq, Pitney, Hardin, Kipp & Szuch, Morristown, NJ USA.

For[*2] JM Huber Corporation, H Milton Hoff, COUNTER-CLAIMANTS: David S Sager, Esq, Pitney, Hardin, Kipp & Szuch, Florham Park, NJ USA.

For Robbins & Myers, Inc, COUNTER-DEFENDANT: Robert J Lane, Jr, Hodgson, Russ, Andrews, Woods & Goodyear, Jeffrey C Stravino, Esq, Hodgson, Russ, Andrews, Woods & Goodyear, LLP, Buffalo, NY USA.

For Robbins & Myers, Inc, COUNTER-DEFENDANT: Leslie L Jacobs, Esq, Luke L Dauchot, Esq, Kenneth G Cole, Esq, Thompson, Hine & Flory, Cleveland, OH USA.

For JM Huber Corporation, H Milton Hoff, THIRD-PARTY PLAINTIFFS: Edward S Bloomberg, Esq, Phillips Lytle Hitchcock Blaine & Huber, Buffalo, NY USA.

For JM Huber Corporation, H Milton Hoff, THIRD-PARTY PLAINTIFFS: Dennis Lafiura, Esq, Pitney, Hardin, Kipp & Szuch, Morristown, NJ USA.

For JM Huber Corporation, H Milton Hoff, THIRD-PARTY PLAINTIFFS: David S Sager, Esq, Pitney, Hardin, Kipp & Szuch, Florham Park, NJ USA.

For Robbins & Myers Energy Systems, Inc, THIRD-PARTY DEFENDANT: Robert J Lane, Jr, Hodgson, Russ, Andrews, Woods & Goodyear, Jeffrey C Stravino, Esq, Hodgson, Russ, Andrews, Woods & Goodyear, LLP, Buffalo, NY USA.

For Robbins & Myers Energy Systems, Inc, THIRD-PARTY DEFENDANT: [*3] Leslie L Jacobs, Esq, Luke L Dauchot, Esq, Kenneth G Cole, Esq, Thompson, Hine & Flory, Cleveland, OH USA.

For Berkeley Forge & Tool, Inc, THIRD-PARTY DEFENDANT: Brian Melber, Esq, Personius Melber LLP, Buffalo, NY USA.

JUDGES: JOHN T.ELFVIN, S.U.S.D.J.

OPINIONBY: JOHN T.ELFVIN

OPINION: MEMORANDUM and ORDER n1

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 This decision may be cited in whole or in any part.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Inasmuch as the parties are well-acquainted with the facts of this case, the Court will not here reiterate such in any great detail. Robbins & Myers, Inc. ("R&M") bought the stock of Flow Control Equipment, Inc. ("FCE") from J.M. Huber Corporation ("Huber") pursuant to a stock purchase agreement ("the Agreement") dated November 20, 1997. FCE is in the business of selling pipeline closure products. n2 While negotiating the Agreement, Huber disclosed that there would be a problem and a potential liability involving off-specification closures n3 that had been sold. Subsequently, R&M brought this suit for various claims of fraud based on its contention that Huber[*4] had induced R&M to buy FCE by misrepresenting the scope of the off-specification closure liability. R&M contends that Huber had represented that the liability was limited to 194 units whereas the liability now appears to be for several thousand units. Pending before this Court are two discovery disputes.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n2 In 1996 FCE was a division of Huber; that February Huber incorporated its Flow Control Division as a wholly-owned subsidiary. Huber transferred various liabilities -- including liability for off-specification closures -- to FCE on July 31, 1996 pursuant to an Acquisition Agreement.

n3 "Off-specification closures" refers to those closures sold by Huber (through its FCE division) that failed to meet certain specifications.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

R&M filed a motion seeking to preclude defendants from asserting the attorney-client privilege with respect to the following disputed issues: (1) formation of FCE by Huber, (2) the transfer of liabilities from Huber to FCE (including liability for off-specification disclosures), (3)

the[*5] investigation of off-specification closures before Huber sold its FCE stock to R&M and (4) the negotiation of the FCE sale to R&M. Defendants cross-moved for discovery of (1) the due diligence performed by R&M as part of the FCE acquisition, (2) the representations allegedly made to R&M by defendants, (3) the information available to R&M when it allegedly relied on any such representations and (4) the information obtained by R&M that allegedly demonstrates such representations to have been false (collectively "R&M's Reliance Materials"). For the reasons set forth below, plaintiff's motion will be granted and defendants' motion will be granted in part and denied in part. n4

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n4 The Court declines to address the parties' claims of deficient privilege logs at this time.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

As a threshold matter, this Court must address the choice-of-law to be applied. n5 Both parties rely extensively on federal common law in their briefs. Consequently, they have implicitly consented to the application of federal common law to these[*6] discovery disputes. n6 By briefing New Jersey law as well as federal common law, defendants have likewise consented to the application of New Jersey law. This Court will thus apply, in its discretion, federal common law or New Jersey law in addressing R&M's motion; federal common law will be applied in addressing defendants' motion. Federal common law governs the attorney-client privilege in cases involving federal claims (including pendent state claims). *Rule 501 of the Federal Rules of Evidence* ("FRE"); *Bank Brussels Lambert v. Credit Lyonnais, 160 F.R.D. 437, 441 (S.D.N.Y. 1995)* (applying *FRE 501*). Plaintiff's claims are state law claims governed by state law. Nonetheless, this rule may give way where, as here, the parties' have implicitly consented to the application of federal common law.

- - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n5 A federal court exercising diversity jurisdiction

applies the substantive law of the forum state, including its choice-of-law or "conflicts" rules. *Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4-5, 46 L. Ed. 2d 3, 96 S. Ct. 167 (1975)*; *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-497, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)*; *Brink's Ltd. v. S. African Airways, 93 F.3d 1022, 1030 (2d Cir. 1996)*, cert. denied, *519 U.S. 1116, 136 L. Ed. 2d 845, 117 S. Ct. 959 (1997)*. Under New York's choice-of-law rules, a district court must give controlling effect to the law of the jurisdiction with the most significant interest in the specific issues involved in the dispute. *Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996)*. This Court, however, will dispense with the choice-of-law analysis because the parties have implicitly consented to the application of federal common law with respect to the attorney-client privilege -- as discussed more fully below.

[*7]

n6 *Tehran-Berkeley v. Tippetts-Abbett, 888 F.2d 239, 242 (2d Cir. 1989)* (holding that "implied consent to use a forum's law is sufficient to establish choice of law ***."). Although most courts applying Tehran-Berkeley do so where the parties rely exclusively on the law of one jurisdiction, several courts have relied on Tehran-Berkeley where the parties discuss the law of several jurisdictions in their briefings. See *Cowan v. Codelia, P.C., 1999 U.S. Dist. LEXIS 17606, 1999 WL 1029729, at *4 n.2 (S.D.N.Y. 1999)* (holding that parties implicitly consented to application of New York law because they cited "almost exclusively to New York law") (emphasis added); *Cafiero v. Lifton, 1996 U.S. Dist. LEXIS 13949, 1996 WL 539841, at *7 n.3 (S.D.N.Y. 1996)* (holding that parties' reliance on New York law constituted implied consent to have such applied, despite defendant's argument that Michigan law should govern); *West Tsusho Co. v. Prescott Bush & Co., 1993 U.S. Dist. LEXIS 8467, 1993 WL 228072, at *2 (S.D.N.Y. 1993)* (holding that parties consented to application of New York law despite their discussion of Japanese law as well). Despite the parties' arguments in favor of the laws of Texas, New York or New Jersey, their briefs rely extensively on federal common law governing the attorney-client privilege. Accordingly, the parties implicitly consent to the application of such federal common law.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*8]

As a preliminary matter, the party asserting the attorney-client privilege bears the burden of demonstrating its applicability. *In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000).* Nonetheless, such "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle" because it stands in derogation of the truth. Ibid.

Turning to the merits of R&M's motion, this Court assumes arguendo that the withheld communications related to the Disputed Issues are privileged. Nonetheless, applying New Jersey law, several exceptions prevent defendants from claiming the attorney-client privilege with respect to these communications. The attorney-client privilege must be "strictly construed" and the burden of asserting it rests upon defendants. *Horon Holding Corp. v. McKenzie, 341 N.J. Super. 117, 775 A.2d 111, 116-117 (N.J. Super. Ct. App. Div. 2001).* n7 The privilege is not absolute and is subject to several exceptions. *Id. at 116; Kinsella v. Kinsella, 150 N.J. 276, 696 A.2d 556, 567-568 (N.J. 1997)* (discussing exceptions to the attorney-client privilege under New Jersey [*9] law). n8

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n7 See also *United Jersey Bank v. Wolosoff, 196 N.J. Super. 553, 483 A.2d 821, 825 (N.J. Super. Ct. App. Div. 1984)* (noting that New Jersey Courts have recognized that the attorney-client privilege "results in suppression of evidence and to that extent is at war with the truth" such that "some compensating gain should be apparent" when shielding evidence from discovery).

n8 *Jadlowski v. Owens-Corning Fiberglas Corp., 283 N.J. Super. 199, 661 A.2d 814, 823 (N.J. Super. Ct. App. Div. 1995)* (holding that attorney-client privilege is "'exceedingly important' but not 'sacrosanct'" and that there are times when it "must give way to a full and fair inquiry").

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

First, New Jersey law permits a party to pierce the attorney-client privilege where (1) there is a legitimate need to reach the shielded evidence, (2) there is a showing of relevancy and materiality and (3) the information cannot be secured from any less intrusive source. *In re Kozlov, 79 N.J. 232, 398 A.2d 882, 886-887 (N.J. 1979).*[*10] The Kozlov analysis is very similar to the analysis applicable to the work-product protection and is so applied in New Jersey. See *Payton v. N.J. Turnpike Auth., 148 N.J. 524, 691 A.2d 321, 336 (N.J. 1997)* (applying Kozlov test and work-product analysis and holding that "our analysis of the applicability of the work-product doctrine is similar to that of the attorney-client privilege."). Accordingly, New Jersey law recognizes an exception to the attorney-client privilege that is not recognized under federal common law. See *Pittston Co. v. Allianz Ins. Co., 143 F.R.D. 66, 71-72 (D.N.J. 1992)* (applying Kozlou and its progeny with respect to privilege analysis and applying federal law with respect to work-product protection analysis). In *Leonen v. Johns-Manville, 135 F.R.D. 94, 100 (D.N.J. 1990)*, the district court held that New Jersey's test was satisfied where memoranda from the 1930's and 1940's contained information "that may show if and when [defendant] became aware of the health dangers associated with asbestos." Similarly, defendants' communications relating to the off-specification closures will show if and when [*11]defendants were aware of the scope of liability for such and whether defendants, through misrepresentation or omission, fraudulently induced Huber to purchase FCE. Indeed, R&M has satisfied the New Jersey test by showing that it has a legitimate need for defendants' communications related to the off-specification closures -- which are clearly relevant and material to R&M's fraud claims. n9 More importantly, the information sought -- i.e., defendants' knowledge of FCE's off-specification liability and whether it sought to foist such onto R&M -- cannot be obtained from any less intrusive source. See *Leonen, at 100.* n10 Accordingly, defendants will be prohibited from asserting the attorney-client privilege with respect to communications relating to the off-specification closures because plaintiff has satisfied New Jersey's tripartite test.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n9 See *United Jersey Bank, supra note 7, at 826-827* (finding the New Jersey test met where plaintiff's reasonable reliance on defendant's representations was critical issue in the case). Likewise, defendants' knowledge regarding the off-specification closures is

a critical component of this case. Cf. *Dontzin v. Myer, 301 N.J. Super. 501, 694 A.2d 264, 269 (N.J. Super. Ct. App. Div. 1997)* (noting that New Jersey's attorney-client rule was not applicable to real estate breach of contract case because, inter alia, "fraud and its requisite reliance on an alleged misrepresentation is not an issue").

[*12]

n10 See also *Dome Petroleum Ltd. v. Employers Mut. Liability Ins. Co. of Wisconsin, 131 F.R.D. 63, 69-70 (D.N.J. 1990)* (stating in dicta that New Jersey test was satisfied where subrogee sought privileged communications between subrogor and its insurer because the "extent of coverage and the circumstances surrounding the negotiation of the loan receipt agreement [between the subrogor and its insurer]" were material and relevant to issue of whether subrogee or insurer was responsible for subrogor's loss). Inasmuch as the Dome Petroleum court did not expressly find that the information concerning the loan receipt agreement negotiations could not be obtained from a less intrusive source, it appears that the court implicitly so held. In other words, where contract interpretation is at issue, the underlying contractual negotiations cannot be obtained from a less intrusive source than the contract negotiators themselves.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Second, the attorney-client privilege does not extend to communications made "in the course of legal service sought or obtained in aid of the commission [*13]of a crime or a fraud." N.J.S.A. 2A: 84A-20(2)(a) (West 2003) (a.k.a. N.J.R.E 504). New Jersey law provides that "fraud be given the broadest interpretation" and that it "includes virtually all kinds of deception and deceit, even though they might not otherwise warrant criminal or civil sanctions." *Ocean Spray Cranberries, Inc. v. Holt Cargo Sys., Inc., 345 N.J. Super. 515, 785 A.2d 955, 959 (N.J. Super. Ct. Law Div. 2000)* (citations omitted) (citing *Fellerman v. Bradley, 99 N.J. 493, 503, 493 A.2d 1239 (N.J. 1985)*. n11 In order to avail itself of the crime-fraud exception, R&M "must make a prima facie showing of fraud" -- which must be based on "evidence other than the contested communication itself." *Id. at 960*. This prima facie showing is essentially the probable cause requirement set forth by the Second Circuit Court of

Appeals n12 inasmuch as "both require that a prudent person have a reasonable basis to suspect perpetration or attempted perpetration of a fraud or crime." *Id. at 960-961* (emphasis added). Accordingly, R&M satisfied this showing where it demonstrated a reasonable basis to suspect that defendants knew[*14] or should have known (1) that FCE had sold several thousand off-specification closures, (2) that Schedule 3.8 of the Agreement disclosed that 194 off-specification units were "certified" as compliant n13 by FCE, (3) that R&M had an erroneous belief as to the scope of FCE's off-specification liability -- i.e., believing FCE's liability to be for 194 units rather than several thousand units -- and (4) that R&M's understanding of the scope of the off-specification liability was based upon defendants' representations or omissions. n14 Moreover, the lone case cited by defendants -- *Nat'l Utility Serv. v. Sunshine Biscuits, Inc., 301 N.J. Super. 610, 694 A.2d 319, 322-324 (N.J. Super. Ct. App. Div. 1997)* (holding that crime-fraud exception to the attorney-client privilege was inapplicable because memorandum from in-house counsel suggesting that contractual liability existed did not preclude trial counsel from asserting lack of contract as an affirmative defense three years after memo was written) -- is readily distinguishable. Consequently, defendants may not claim the attorney-client privilege or work-product protection with respect to any communications made on[*15] or before November 20, 1997 related to the Disputed Issues.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n11 *Ocean Spray, at 959* (holding that the work-product doctrine is also subject to the crime-fraud exception).

n12 See *In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1039 (2d Cir. 1984)* ("The fraudulent nature of the [client's] objective need not be established definitively; there need only be presented a reasonable basis for believing that the objective was fraudulent."); *Ocean Spray, at 959* (crime-fraud exception also applies where attorney is unaware of the fraud).

n13 Defendants contend that there is a critical difference between off-specification closures (i.e.,

several thousand) and the 194 that were "certified" as compliant. Nonetheless, if defendants were aware of and responsible for R&M's allegedly erroneous belief as to the meaning of paragraph 3 of Schedule 3.8, any difference between off-specification disclosures and "certified" disclosures would be irrelevant with respect to plaintiff's claims sounding in fraud.

n14 Cf. *In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1039-1041 (2d Cir. 1984)* (holding that the crime-fraud exception applied and requiring disclosure of communications related to defendant's sale of its subsidiary where the timing and nature of the transaction suggested a fraudulent intent or motive); *U.S. v. Gasparik, 141 F. Supp. 2d 361, 372 (S.D.N.Y. 2001)* (finding crime-fraud exception applicable where "preparation of a registration statement was a necessary step in permitting the fraudulent stock purchase scheme"); *Glidden Co. v. Jandernoa, 173 F.R.D. 459, 481-482 (W.D. Mich. 1997)* (applying crime-fraud exception under Michigan law and noting that "the wrongdoing (if any there was) would consist in the alleged nondisclosures and misstatements upon which [plaintiff] claims to have relied").

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*16]

Third, defendants have waived any attorney-client privilege or work-product protection that otherwise might have attached to any documents that were left in the possession of FCE after November 20, 1997. See *In re Grand Jury Subpoenas, 734 F. Supp. 1207, 1213 (E.D. Va.)* (holding that parent waived attorney-client privilege with respect to documents left in subsidiary's possession after sale of the subsidiary), rev'd on other grounds, *902 F.2d 244 (4th Cir. 1990)*. n15 Accordingly, defendants may not claim the attorney-client privilege or work-product protection with respect to any documents that were left in FCE's possession after it had been purchased by R&M.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n15 See also *In re In-Store Advertising Sec. Litig.,*

*163 F.R.D. 452, 458 (S.D.N.Y. 1995)* (citing In re Grand Jury Subpoenas and holding that "where confidential attorney-client communications are transferred from a corporation selling assets to the corporation buying assets, the privilege is waived as to those communications").

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*17]

Inasmuch as defendants' attorney-client privilege, if any, yields to several exceptions provided for by New Jersey law and/or has been waived, this Court need not address whether the attorney-client privilege was held by both Huber and FCE -- and whether FCE could properly waive such. n16 Accordingly, in light of the parameters of defendants' attorney-client privilege, as set forth above, this Court declines to fulfill its promise to review the several boxes of documents heretofore submitted in camera. The defendants shall make available all communications made on or before November 20, 1997 related to the Disputed Issues. n17 Nonetheless, the parties may request in camera review of any specific documents about which questions remain -- as opposed to the undifferentiated mass of documents previously submitted.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n16 Such analysis would require this Court to determine -- with respect to each communication -- whether the communication was made in the course of rendering legal advice as opposed to general business advice. See e.g., *McCaugherty v. Siffermann, 132 F.R.D. 234, 237-238 (N.D. Cal. 1990)* (reviewing transaction where parent and subsidiary shared goal of selling failed savings and loan institution under parent's control and holding that "in this setting, (where there is a clear business purpose in the environment in which the communications occurred), the court should sustain an assertion of privilege only when there is a clear evidentiary predicate for concluding that each communication in question was made primarily for the purpose of generating legal advice.").

[*18]

n17 This includes deposition testimony and any previous discovery responses that require supplementation.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Turning to the merits of defendants' motion, defendants seek R&M's Reliance Materials, which R&M is withholding on grounds of privilege or work-product protection. Although defendants have allegedly failed to comply with certain procedural requirements, this Court will overlook any such inadvertencies and address the merits of defendants' motion in an attempt to expedite a discovery dispute that has created a logjam for far too long.

R&M does not advocate inconsistent positions by claiming that FCE may waive any privilege that it holds while nonetheless maintaining that R&M has a privilege independent of FCE, especially for communications generated before November 20, 1997 -- i.e., a period when FCE was not yet a subsidiary of R&M. As noted in R&M's brief, the cases cited by defendants are distinguishable. Accordingly, neither judicial estoppel nor selective waiver is applicable. n18

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n18 Inasmuch as defendants concede the "fallacy of [the "dual role"] legal argument," in their papers opposing R&M's motion, this Court need not address defendants' half-hearted application of the same argument in defendants' motion. See Defs.' Mem. In Support of Cross-Motion, at 12.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*19]

The documents authored or received by defendant H. Milton Hoff -- which R&M claim to be privileged -- are protected by the attorney-client privilege. Indeed, FCE is the privilege holder, not Hoff. n19 Moreover, inasmuch as R&M contends that it has withheld no document authored or received by Hoff on or before November 20,

1997, n20 this Court need not address whether R&M, in fairness, should disclose documents authored or received by Hoff after such date, unless such bears on his knowledge before November 20, 1997. n21

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n19 See *Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 349, 85 L. Ed. 2d 372, 105 S. Ct. 1986 (1985); Polycast Tech. Corp. v. Uniroyal, Inc., 125 F.R.D. 47, 49 (S.D.N.Y. 1989).*

n20 See R&M's Opposition Brief, at 17 ("R&M has withheld no document that relates to Mr. Hoff's knowledge at or before the time of the Stock Purchase Agreement ***").

n21 Defendants are free to bring to this Court's attention any documents authored or received by Hoff before November 20, 1997 that are being withheld. Cf. *Johnson Matthey, Inc., v. Research Corp., 2002 U.S. Dist. LEXIS 13560, 2002 WL 1728566,* at *2 (S.D.N.Y. 2002) (noting that "even if the privilege holder does not attempt to make use of the privileged communication, he may waive the privilege if he makes factual assertions the truth of which can only be assessed by examination of the privileged communication.") (citation omitted).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*20]

This Court declines to recognize the privilege of self-critical analysis at this time. See *Robinson v. U.S., 205 F.R.D. 104, 108-109 (W.D.N.Y. 2001)* (noting that the self-critical analysis privilege has not been adopted by the Second Circuit Court of Appeals and has been rejected in this district). Accordingly, neither party may rely upon the self-critical analysis privilege as a basis for withholding documents.

A motion to compel must be filed with the court that issued the subpoena in issue. *In re Sealed Case, 329 U.S.*

App. D.C. 374, 141 F.3d 337, 341 (D.C. Cir. 1998) (holding that *Rule 45 of the Federal Rules of Civil Procedure* ("FRCvP") "allows enforcement of a subpoena following objections only 'pursuant to an order of the court by which the subpoena was issued.' *[FRCvP] 45(c)(2)(B)*. *** [The language of FRCvP 45] suggests that only the issuing court has the power to act on its subpoenas. *** Subpoenas are process of the issuing court, and nothing in the Rules even hints that any other court may be given the power to quash or enforce them.") (emphasis added) (citations omitted). Accordingly, any motion to compel directed toward Joseph M. Rigot must[*21] be filed with the District Court for the Southern District of Ohio -- the court from which the Rigot subpoena was issued.

With respect to R&M's refusal to produce documents in response to document requests 2-6, 10-11, and 16-17, R&M's objections are improper. First, this Court finds it dubious for a plaintiff to claim that the phrase "the subject matter of this litigation" is vague and ambiguous; if it were, it would be due to the manner in which the Complaint was drafted. In any event, R&M will not be allowed to continue with this objection. Second, even where a legitimate objection to a discovery request exists, such objection does not permit the objecting party to refuse to produce any documents whatsoever. Rather, the objecting party should produce any documents that are clearly requested or claim such to be privileged while objecting as to the remainder. See *FRCvP 34(b)*. Furthermore, to the extent that plaintiff considers "contracts proposed" or "assurances" to be vague or ambiguous, plaintiff shall meet and confer with defendants to clarify such requests. Accordingly, R&M will be ordered to supplement its responses to document requests 2-6, 10-11 and 16-17 as necessary. [*22] n22

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n22 Although defendants ask this Court to require plaintiff to "supplement its responses to document requests 1, 7-9, 12-15, and 18" in their prayer for relief, no basis therefor is offered. Accordingly, such request has will not be granted.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Defendants' complaints concerning R&M's

interrogatory responses are likewise well-founded. First, as noted above, the phrase "the subject matter of this litigation" is neither vague nor ambiguous. Second, R&M's objection that the information sought may be "elicited through deposition testimony" is improper because a responding party may not dictate which discovery device the requesting party should employ or in what order they should be employed. See *FRCvP 26(d)* ("methods of discovery may be used in any sequence"). n23 Third, R&M must -- when relying upon FRCvP*FRCvP 33(d)* to answer an interrogatory -- specify by category and location the documents from which each interrogatory answer may be derived. See *FRCvP 33(d)*. n24 Defendants shall also so comply with [*23] *FRCvP 33(d)*. Accordingly, R&M will be ordered to supplement interrogatories 1-6, 8-12, and 14-20 and defendants will also be ordered to comply with *FRCvP 33(d)*. n25

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n23 See also Compagnie Francaise d'*Assurance Pour le Commerce v. Phillips Petroleum Co., 105 F.R.D. 16, 43 (S.D.N.Y. 1984)* (rejecting objection that interrogatory sought information "more appropriately elicited at depositions" because interrogatories may help the requesting party avoid unnecessary -- and costlier -- depositions); *In re Potash Antitrust Litig., 161 F.R.D. 405, 409 (D. Minn. 1995)* (same); cf. *Starlight Intern. Inc. v. Herlihy, 186 F.R.D. 626, 640 (D. Kan. 1999)* ("A party may not properly answer an interrogatory by referring generically to testimony given upon deposition.") (emphasis added).

n24 See also *Natural Resources Defense Council, Inc. v. Fox, 1996 U.S. Dist. LEXIS 12810, 1996 WL 497024*, at *4-5 (S.D.N.Y. 1996) (finding response defective for failing to specify responsive documents as required by *FRCvP 33(c)*, now *FRCvP 33(d)*). *T.N. Taube Corp. v. Marine Midland Mortg. Corp., 136 F.R.D. 449, 455 (W.D.N.C. 1991)*("Directing the opposing party to an undifferentiated mass of records is not a suitable response to a legitimate request for discovery.") (citation omitted).

[*24]

n25 The parties are encouraged to adopt more reasonable discovery positions in the future.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

With respect to the documents situated in Houston, R&M shall segregate for defendants the responsive documents if such documents have already been reviewed for privilege; otherwise R&M is only obligated to make the documents available for defendants' inspection. n26

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n26 See *Bd. of Educ. of Evanston Tp. High Sch. Dist. No. 202 v. Admiral Heating & Ventilating, Inc., 104 F.R.D. 23, 36 n.20 (D.C. Ill. 1984).*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Finally, in a letter dated April 8, 2003, the parties requested that the discovery deadline be extended until six months after this Order issues. This Court's April 15, 2002 Scheduling Order will be vacated and another *FRCvP 16(b)* conference will be scheduled.

Accordingly, it is hereby ORDERED that plaintiff's motion to preclude defendants' assertion of the attorney-client privilege is granted, that[*25] defendants shall make available all communications made on or before November 20, 1997 related to the Disputed Issues, that defendants have waived any privilege associated with any document retained by FCE after November 20, 1997 and that -- within fifteen business-days of the date of the filing of this Order -- defendants shall supplement previous discovery responses as necessary in light of this Memorandum and Order; and it is further ORDERED that defendants' cross-motion to compel discovery is granted in part and denied in part, that plaintiff -- within fifteen business-days of the date of the filing of this Order -- shall (a) produce or make available for inspection all responsive and non-privileged documents requested by document requests 2-6, 10-11, and 16-17, (b) supplement its responses to interrogatories 1-6, and 8-12, and 14-20, (c) specify by category and location the documents from which its interrogatory answers may be derived as required by *FRCvP 33(d)*, (d) supplement all interrogatory answers that object on the purported basis that the information sought may be "elicited through deposition testimony" and (e) segregate and produce all responsive documents located[*26] in Houston if plaintiff has already reviewed such documents for privilege, that defendants' motion is otherwise denied, that defendants shall specify by category and location the documents from which their interrogatory answers may be derived where they relied upon *FRCvP 33(d)* and that this Court's April 15, 2002 Scheduling Order is vacated and that a further *FRCvP 16(b)* conference shall be scheduled.

DATED: May 9, 2003

JOHN T. ELFVIN

S.U.S.D.J.

REDACTED VERSION – PUBLICLY FILED

# EXHIBIT

# J

GERALD J. NAQUIN, SR. VERSUS UNOCAL CORPORATION
CIVIL ACTION NO. 01-3124 SECTION "N"(2)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

2002 U.S. Dist. LEXIS 15722; 53 Fed. R. Serv. 3d (Callaghan)1079

August 12, 2002, Decided
August 12, 2002, Filed; August 12, 2002, Entered

DISPOSITION: [*1] Plaintiff's motion to compel granted in part and denied in part.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff former employee brought suit against defendant former employer, alleging violations Title VII of the Civil Rights Act of 1964 (Title VII), the Employee Retirement Income Security Act (ERISA), and the Americans with Disabilities Act. The employee moved to compel the employer to produce documents that the employer claimed were protected from disclosure by the attorney-client privilege and/or the work product doctrine.

OVERVIEW: The employee alleged that, although his doctors had not discharged him to return to work unless he received a transfer to the eastern Gulf, the employer insisted that he had been fully discharged to return to work at his current job in the western Gulf. When the employee refused to return to work in the western Gulf, the employer terminated his employment. The employer admitted that while the employee's discrimination complaint was pending before the Equal Employment Opportunity Commission (EEOC), it inadvertently produced to the EEOC a document that was subject to the attorney-client privilege. The employee sought to compel production of those documents related to the disclosed subject matter, and the court agreed, finding that the employer had voluntarily produced the e-mail correspondence to the EEOC, and that there was nothing inadvertent about the disclosure. Thus, the employer had waived its attorney-client privilege as to all other communications relating to the same subject matter. In addition, the work product doctrine did not protect the disclosure because the employer failed to establish that the documents at issue had been created to aid in litigation.

OUTCOME: The employee's motion to compel was granted as to certain documents for which the subject matter had already been voluntarily disclosed by the employer.

LexisNexis(R) Headnotes

COUNSEL: For GERALD J NAQUIN, SR, plaintiff: James Louis Arruebarrena, Dwight Loisel McNamara, Arruebarrena & McNamara, Metairie, LA.

For UNION OIL COMPANY OF CALIFORNIA, defendant: Robert B. Worley, Jr., Jennifer A. Faroldi, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA.

JUDGES: JOSEPH C. WILKINSON, JR., UNITED STATES MAGISTRATE JUDGE.

OPINIONBY: JOSEPH C. WILKINSON, JR.

OPINION: ORDER AND REASONS

Plaintiff, Gerald J. Naquin, Sr., moved to compel defendant, Union Oil Company of California ("UNOCAL"), to produce documents that UNOCAL asserts are protected from disclosure by the attorney-client privilege and/or the work product doctrine. Record Doc. No. 16. UNOCAL provided plaintiff with a privilege log, Plaintiff's Exh. C, and delivered the documents to the court for in camera review, as previously ordered. Record Doc. No. 15. UNOCAL filed a timely opposition memorandum to plaintiff's motion to compel. Record Doc. No. 17. Naquin received leave to file a reply memorandum. Record Doc. Nos. 18, 19.

UNOCAL admits that while Naquin's discrimination complaint was pending before the Equal[*2] Employment Opportunity Commission ("EEOC"), it "inadvertently" produced to the EEOC a document that was subject to the attorney-client privilege, as part of its response to Naquin's complaint. The document consists of an e-mail dated November 27, 2000 from UNOCAL's in-house attorney, Veronica Roa, to Union Oil's Manager of Employee Assistance Program, Richard Wall, and

Wall's e-mail response to Roa dated the same day. Plaintiff's Exh. B. Roa also sent a copy of her e-mail to Bill Herrington, UNOCAL's Human Resources Consultant, and Wall sent copies of his response to Herrington and to Eugenia C. George, who is not identified on defendant's privilege log. In its memorandum, UNOCAL does not state whether it concedes that it waived the attorney-client privilege with respect to this document.

However, in the event that the court finds such a waiver, the parties dispute whether UNOCAL's disclosure waived its attorney-client privilege as to all subjects disclosed in that communication, and if so, what subjects are covered by the waiver. In addition, UNOCAL asserts that the attorney-client privilege and/or the work product doctrine protect all documents listed on its privilege log as to[*3] which it has not waived the privilege.

Having reviewed the complaint, the record, the submissions of the parties, the documents submitted for in camera review and the applicable law, and for the following reasons, IT IS ORDERED that plaintiff's motion to compel is GRANTED IN PART AND DENIED IN PART as follows.

## I. FACTUAL BACKGROUND

According to plaintiff's complaint, he worked for defendant on offshore production platforms in the eastern Gulf of Mexico for many years. He asserts that he began suffering from major clinical depression after he was transferred to a platform in the western Gulf of Mexico, which was serviced out of Cameron, Louisiana, about a five-hour drive from his home. Naquin alleges that he took an authorized leave of absence from UNOCAL, during which he was treated for depression; that UNOCAL knew about his continuing treatment; and that both he and his doctors requested that he be transferred to a platform in the eastern Gulf as an accommodation for his illness. According to plaintiff's complaint, he was treated by a psychologist, Clarence M. Bergeron, Ph.D., and a psychiatrist, Dr. Dennis M. Spiers.

However, UNOCAL refused to transfer Naquin. Plaintiff[*4] alleges that, although his doctors had not discharged him to return to work unless he received a transfer to the eastern Gulf, UNOCAL insisted that he had been fully discharged to return to work at his current job. When Naquin refused to return to work in the western Gulf, UNOCAL terminated his employment. Plaintiff asserts that defendant's actions violate Title VII of the Civil Rights Act, the Employment Retirement Income Securities Act ("ERISA"), the Americans with Disabilities Act and Louisiana anti-discrimination law.

## II. ANALYSIS

### A. The Attorney-Client Privilege

Federal law governs the analysis of the attorney-client privilege in this case. Under *Federal Rule of Evidence 501*, privilege questions are generally governed by common law unless otherwise required by federal law. Thus, privilege questions are governed by the federal courts' interpretation of federal common law, except when state law supplies the rule of decision, in which case state law on privilege governs. *Fed. R. Evid. 501*; *United States v. Moore, 970 F.2d 48, 49-50 (5th Cir. 1992); Hancock v. Hobbs, 967 F.2d 462, 466 (11th Cir. 1992); Robertson v. Neuromed. Ctr., 169 F.R.D. 80, 81-82 (M.D. La. 1996);*[*5] *Soriano v. Treasure Chest Casino, Inc., 1996 U.S. Dist. LEXIS 19183, No. 95-3945, 1996 WL 736962, at *2 (E.D. La. Dec. 23, 1996).*

Plaintiff's federal claims are brought under Title VII, ERISA and the Americans with Disabilities Act. He also asserts supplemental jurisdiction over his claims brought under Louisiana law. Federal law provides the rule of decision on his federal claims, while state law provides the rule of decision on his state law claims. "Rule 501 makes it clear that state privilege law will apply in diversity cases, and that federal privilege law will apply in federal question cases. However, in federal question cases where pendent state law claims have been asserted, the rule is equivocal." *In re Combustion, Inc., 161 F.R.D. 51, 53 (W.D. La. 1995)* (Tynes, M.J.), aff'd, *161 F.R.D. 54 (W.D. La. 1995)* (Haik, J.) (citing *Hancock v. Hobbs, 967 F.2d at 466; Hancock v. Dodson, 958 F.2d 1367 (6th Cir. 1992); American Civil Liberties Union of Miss., Inc. v. Finch, 638 F.2d 1336, 1343 (5th Cir. Unit A March 1981)).*

"The weight of authority among courts that have confronted this issue in the context of[*6] discovery is that the federal law of privilege governs even where the evidence sought might be relevant to pendent state law claims." *Robertson, 169 F.R.D. at 82-83* (citing *Hancock, 967 F.2d at 466; von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 141 (2d Cir. 1987); Wm. T. Thompson Co. v. General Nutrition Corp., 671 F.2d 100, 104 (3d Cir. 1982); Memorial Hosp. v. Shadur, 664 F.2d 1058, 1061 n.3 (7th Cir. 1981); In re Combustion, Inc., 161 F.R.D. at 54; Pagano v. Oroville Hosp., 145 F.R.D. 683, 687 (E.D. Cal. 1993)*, overruled in part on other grounds by *Jaffee v. Redmond, 518 U.S. 1, 8, 135 L. Ed. 2d 337, 116 S. Ct. 1923 (1996)).*

For the reasons stated in the cases cited above, I conclude "that the federal law of privilege provides the rule of decision with respect to privilege issues affecting

the discovery of evidence in this federal question case involving pendent state law claims." *In re Combustion, Inc., 161 F.R.D. at 53.*

Federal courts have looked to various sources to define the federal common law of attorney-client privilege. [*7] Some courts rely on the time-honored Wigmore formulation.

The elements of the attorney-client privilege are as follows: (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

*Reed v. Baxter, 134 F.3d 351, 355-56 (6th Cir. 1998)* (citations omitted); accord *United States v. Massachusetts Inst. of Tech., 129 F.3d 681, 684 (1st Cir. 1997)* (quoting 8 J. Wigmore, Evidence § 2292, at 554 (McNaughton rev. 1961)). Relying in part on the Wigmore formulation, Judge Alvin B. Rubin stated: "The oldest of the privileges for confidential communications, the attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice. The privilege also protects communications from the lawyer to his client, at least if they would tend to disclose the client's confidential communications." *Hodges, Grant & Kaufmann v. United States, 768 F.2d 719, 720-21 (5th Cir. 1985).*[*8]

In addition, proposed Federal Rule of Evidence 503

provides a useful starting place for our discussion. Although not enacted by Congress, courts have relied upon [proposed Federal Rule of Evidence 503, also known as Supreme Court Standard 503] as an accurate definition of the federal common law of attorney-client privilege. . . . Consequently, despite the failure of Congress to enact a detailed article on privileges, Standard 503 should be referred to by the Courts. The most relevant aspect of Standard 503 is its statement of the general rule:

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative, or (2) between his lawyer and his lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common

interest, or (4) between representatives of the client or between the client and a representative of the client, or (5) between lawyers representing the client.

*In re Bieter Co., 16 F.3d 929, 935 (8th Cir. 1994)*[*9] (quoting Supreme Court Standard 503(b); additional citations and quotations omitted).

The court "may also look to state privilege law . . . if it is enlightening." *Tennenbaum v. Deloitte & Touche, 77 F.3d 337, 340 (9th Cir. 1996)* (citing *Lewis v. United States, 517 F.2d 236, 237 (9th Cir. 1975)* ("In determining the federal law of privilege in a federal question case, absent a controlling statute, a federal court may consider state privilege law. But the rule ultimately adopted, whatever its substance, is not state law but federal common law.")).

B. Waiver by Implication

"'Disclosure of any significant portion of a confidential communication waives the privilege as to the whole.'" *Nguyen v. Excel Corp., 197 F.3d 200, 207 (5th Cir. 1999)* (quoting *Industrial Clearinghouse, Inc. v. Browning Mfg., 953 F.2d 1004, 1007 (5th Cir. 1992));* accord *United States v. Davis, 636 F.2d 1028, 1043 n. 18 (5th Cir. 1981)* (citing *United States v. Cote, 456 F.2d 142, 144-145 (8th Cir. 1972));* 8 J. Wigmore, Evidence § 2327. "Patently, a voluntary disclosure of information which is inconsistent[*10] with the confidential nature of the attorney[-]client relationship waives the privilege." *Alldread v. City of Grenada, 988 F.2d 1425, 1434 (5th Cir. 1993).* "Waiver of the privilege in an attorney-client communication extends to all other communications relating to the same subject matter." *In re Grand Jury Subpoena (Zerendow), 925 F. Supp. 849, 855 (D. Mass. 1995)* (citing *In re Sealed Case, 278 U.S. App. D.C. 188, 877 F.2d 976, 980-81 (D.C. Cir. 1989))* (emphasis added)); accord *In re Papst Licensing, GmbH Patent Litig.,2001 U.S. Dist. LEXIS 15667,* No. MDL-1298, 99-CA-3118, 2001 WL 1135465, at *4 (E.D. La. Sept. 24, 2001) (Sear, J.).

In this case, UNOCAL voluntarily produced the e-mail correspondence between Roa and Wall to the EEOC. Although UNOCAL asserts that Herrington attached the document to UNOCAL's position paper without legal advice, there was nothing inadvertent about the disclosure. Thus, UNOCAL has waived its attorney-client privilege as to all other communications relating to the same subject matter. As noted above, the parties dispute the breadth of the subject matter disclosed.

The "waiver by implication" doctrine appears applicable[*11] to these circumstances. That doctrine

provides that the disclosure of otherwise privileged communications can "in some circumstances . . . waive the privilege not only with respect to the disclosed documents but also as to all other communications made about the same subject between the attorney and the client." *Palazzetti Import/Export, Inc. v. Morson,2000 U.S. Dist. LEXIS 10340, No. 98 CIV 0722, 2000 WL 1015921,* at \*4 (S.D.N.Y. July 21, 2000) (quoting *In re Leslie Fay Cos. Secs. Litig., 161 F.R.D. 274, 282 (S.D.N.Y. 1995));* accord *In re Papst Licensing, 2001 U.S. Dist. LEXIS 15667, 2001 WL 1135465,* at \*4.

Waiver by implication is determined by the standard of fairness. If the disclosure of privileged communications "may be misleading because only favorable material has been disclosed, waiver is likely to be found for so much of the withheld information as will make the disclosure complete and not misleadingly one-sided." *Koster v. Chase Manhattan Bank, 1984 U.S. Dist. LEXIS 23531, No. 81 Civ. 5018, 1984 WL 883,* at \*4 (S.D.N.Y. Sept. 18, 1984); accord *In re Papst Licensing, 2001 U.S. Dist. LEXIS 15667, 2001 WL 1135465,* at \*4.

In Palazzetti, the court found that defendants had produced to plaintiff's counsel[\*12] two memoranda from one defendant to his attorney. Defendants claimed that production of the documents was inadvertent, but their attorney allowed a defendant to answer questions concerning the documents at a deposition. The court concluded that defendants had waived their attorney-client privilege as to these memoranda, then turned to the scope of the waiver. The court held that defendants would be required to disclose all documents or portions of documents "necessary to ensure that the disclosure of the Waiver Documents . . . [was] not misleading." *Palazzetti, 2000 U.S. Dist. LEXIS 10340, 2000 WL 1015921,* at \*4.

In *Glenmede Trust Co. v. Thompson, 56 F.3d 476 (3rd Cir. 1995),* Glenmede argued that it had waived its privilege only as to the tax advice and other advice set forth in the opinion letter which it had produced, and objected to production of its attorney's entire file concerning services it received in connection with the transaction at issue. The court ordered production of the file.

There is an inherent risk in permitting the party asserting a defense of its reliance on advice of counsel to define the parameters of the waiver of the attorney-client privilege as[\*13] to that advice. That party should not be permitted to define selectively the subject matter of the advice of counsel on which it relied in order to limit the scope of the waiver of the attorney-client privilege and therefore the scope of discovery. To do so would undermine the very purpose behind the exception to the

attorney-client privilege at issue here--fairness.

*Id. at 486; see also In re Sealed Case, 278 U.S. App. D.C. 188, 877 F.2d 976, 981 (D.C. Cir. 1989)* ("[A] waiver of the privilege in an attorney-client communication extends to 'all other communications relating to the same subject matter.'") (quoting *In re Sealed Case, 219 U.S. App. D.C. 195, 676 F.2d 793, 809 (D.C. Cir. 1982)).*

Naquin contends that the subject matter of the disclosed e-mails consists of the following topics: (1) whether UNOCAL regarded Dr. Spiers' letters as medical evidence that plaintiff could stay away from work; (2) whether and when plaintiff was released to return to work; (3) what was discussed with Naquin about his condition, his transfer requests and if he could return to work; (4) the details of plaintiff's "problem" and whether said[\*14] problems constituted a disability; (5) whether the documentation UNOCAL had from Naquin's physician and psychologist created a "reason" that UNOCAL should not discipline him and (6) whether Naquin was requesting an accommodation for a disability. These suggested subjects are clearly too broad and go beyond the actual subjects discussed in the correspondence.

UNOCAL contends that any waived subject matter is much narrower, consisting of: (1) the specifics of Dr. Spiers' November 6, 2000 letter, (2) Dr. Spiers' opinion regarding plaintiff's ability to return to work, (3) Dr. Bergeron's opinion regarding the lack of psychological restrictions on Naquin's return to work and (4) the requirement that plaintiff return to work. These limited subjects are clearly too narrow and fail to account for the revelation via his own e-mail of the actions and opinions of Wall, the employee assistance program manager.

I find that the November 27, 2000 e-mail correspondence between Roa, defendant's in-house counsel, and Wall relates to the following subjects: (1) the contents of Dr. Spiers' November 6, 2000 letter, (2) UNOCAL's communications with Naquin about the opinions of plaintiff's doctors and [\*15]plaintiff's ability to return to work, (3) Wall's reasons for and the contents of his telephone call with Dr. Spiers, (4) the contents of Wall's conversation with Dr. Bergeron, (5) the contents of Wall's "recent" conversation with Bill Herrington about plaintiff's "apparent malingering" and (6) the contents of and reasons for Wall's opinion that plaintiff was malingering.

UNOCAL was not required to waive the attorney-client privilege, but affirmatively chose to do so by submitting these privileged communications to a third-party, the

EEOC, in opposition to plaintiff's EEOC charge as purported evidence that Naquin's employment was terminated for his failure to comply with defendant's sick leave and reporting procedures and that UNOCAL did not violate any antidiscrimination laws. See Plaintiff's Exh. A, UNOCAL's response to EEOC dated February 23, 2001, at p.4 (reference to e- mail to Wall dated November 27, 2000, Attachment # 9 to response).

Thus, I find that UNOCAL waived its attorney-client privilege as to the following Bates-numbered documents, all of which must be produced: UO-126 through UO-126.1; UO-128; UO-131 through 132 except that the last sentence of the third[*16] paragraph (beginning "I understand") is privileged and may be redacted; UO-140 through UO-142, except that the two sections headlined "Veronica" on UO-141 and UO-142 are privileged and may be redacted; n1 UO-282 through UO-285; UO-314; UO-359; UO-360; UO-379 through UO-382; UO-399 through UO-400 to the same extent as UO-131 through 132; UO-404 through 406; UO-410; UO-452 through 453 to the same extent as UO-131 through 132; UO-454 through 456; UO-520 through 521 to the same extent as UO-131 through 132; UO-525 through 529; UO-533; on UO-540, the e-mail from Bondurant to Ettensohn only (the remainder of UO-540 through 541 is privileged); UO-561; and UO-814.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 Based on the contents of these documents, the court believes that their correct date should be 2000, not 2001, as stated in defendant's privilege log.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

In addition, UNOCAL has exceeded the bounds of the attorney-client privilege in designating many of the documents as privileged. For example, included in the documents for in camera review and listed on[*17] the privilege log are copies of the Roa/Wall e-mail correspondence as to which it has waived the privilege. There is also a settlement demand letter from plaintiff's attorney with its attachments, which are clearly not privileged even if they were contained in defendant's attorney's files. Fax transmittal cover sheets and e-mail transmittal messages are not privileged because they contain no confidential communications, regardless

whether they were sent from, addressed to or copied to an attorney or paralegal.

Thus, I find that the following documents are not protected by the attorney-client privilege and must be produced: UO-123; UO-124; UO-127 except that the second sentence of the third paragraph is privileged and may be redacted; UO-227 through 245 except that the handwritten notes in the margin of UO-232 are privileged and may be redacted; UO-340; UO-363; UO-372; UO-378; UO-383; UO-393; UO-413; UO-420 through UO-422; UO-424 through UO-426; UO-428; UO-430; UO-467; UO-477; UO-497; UO-506; UO-536; UO-546; UO-548; and UO-870.

C. Work Product Doctrine

The Work product protection arises under federal law and is governed by *Fed. R. Civ. P. 26(b)(3)*, which provides that[*18]

a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

*Fed. R. Civ. P. 26(b)(3)* (emphasis added). Federal law governs defendant's assertions that certain information is protected from disclosure by the work product doctrine. *Dunn v. State Farm, 927 F.2d 869, 875 (5th Cir. 1991)*.

UNOCAL, as the party seeking protection, bears the burden to show that the disputed documents are work product, i.e., that they were prepared in anticipation of litigation. *Guzzino v. Felterman, 174 F.R.D. 59, 63 (W.D. La. 1997)* (Tynes, M.J.) (citing *Hodges, Grant & Kaufmann v. United States, 768 F.2d 719, 721 (5th Cir. 1985))*.[*19] "The law is settled that 'excluded from the work product doctrine are materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation.'" Id. at 62 (quoting *United States v. El Paso Co., 682 F.2d 530, 542 (5th Cir. 1982)* (citing Rule 26(b)(3) advisory committee notes)).

The Fifth Circuit has described the standard for determining whether a document has been prepared in anticipation of litigation as follows:

It is admittedly difficult to reduce to a neat general formula the relationship between preparation of a document and possible litigation necessary to trigger the protection of the work product doctrine. We conclude that litigation need not necessarily be imminent, as some courts have suggested, as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation.

*United States v. Davis, 636 F.2d 1028, 1039 (1981)* (citations omitted) (emphasis added); accord   *In re Kaiser Alum. & Chem. Co., 214 F.3d 586, 593 (5th Cir. 2000),* cert. denied, *532 U.S. 919, 121 S. Ct. 1354, 149 L. Ed. 2d 285 (2001).* [*20]

It is not dispositive that some documents were not prepared by attorneys. Rule 26(b)(3) protects from discovery documents prepared by a party's agent, as long as they are prepared in anticipation of litigation. As the Supreme Court explained:

At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*United States v. Nobles, 422 U.S. 225, 238-39, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975)* (emphasis added).

However, UNOCAL has presented no evidence to establish a date when its primary motivating purpose for creating the documents at issue became to aid in possible future litigation, other than the date proposed by plaintiff, [*21] which is February 7, 2001, the date when plaintiff's EEOC charge was mailed to defendant. Although "prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced," C.A. Wright, A.R. Miller & R.L. Marcus, Federal Practice and Procedure § 2024, at 343 (1994), the evidence (or lack thereof) in the instant case does not support a conclusion that anticipation of litigation was the primary motivating purpose for documents created before February 7, 2001. If a party or its attorney

prepares a document in the ordinary course of business, "it will not be protected [from discovery] even if the party is aware that the document may also be useful in the event of litigation." *Occidental Chem. Corp. v. OHM Remediation Servs. Corp., 175 F.R.D. 431, 435 (W.D.N.Y. 1997)* (quotation and citations omitted).

Accordingly, I find that defendant has failed to bear its burden of establishing that any of the documents generated before February 7, 2001 are protected by the work product doctrine. Thus, all of those documents generated before February 7, 2001 as to which defendant claims work product protection, except those that are protected[*22] by the attorney-client privilege which has not been waived as discussed in the preceding section, must be produced. In addition, I find that the following documents generated after February 7, 2001 are not protected work product and must be produced: UO-219; UO-378; UO-383; UO-386; UO-497; UO-506; and UO-548.

Finally, UNOCAL's objections that UO-125 and UO-627 are irrelevant are sustained. I also find that the redacted portion of UO-832 is irrelevant and need not be produced.

CONCLUSION

For the foregoing reasons, plaintiff's motion to compel is GRANTED IN PART as described above in that all documents that I have specifically identified above for production must be produced. In all other respects described above, the motion is denied.

Plaintiff's deposition is scheduled to commence today. By agreement of all counsel and the court as discussed in our telephone conference of August 9, 2002, those documents whose production has been ordered will be produced to plaintiff's counsel immediately, so that they may be reviewed prior to the deposition, unless either party intends to seek review of this order pursuant to *28 U.S.C. § 636*(b)(1)(A) and Fed. R. Civ. [*23] P. 72(a). If review will be sought, counsel must confer with each other and me to determine the mann er and timing of implementation of this order and conduct of the deposition.

New Orleans, Louisiana, this 12th day of August, 2002.

JOSEPH C. WILKINSON, JR.

UNITED STATES MAGISTRATE JUDGE