# EXHIBIT A

# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

December 14, 2005

The Honorable Sue L. Robinson
United States District Court
844 North Kind Street,
Wilmington, DE 19801

RE:    *BTG International Inc. v. Amazon.com, Inc.*,
       C.A. No. 04-1264-SLR

Dear Chief Judge Robinson:

Plaintiffs submit this letter in support of their motion for leave to be heard regarding privileged documents stored at Tucows' King of Prussia, Pennsylvania facility. Defendants claim that the attorney-client privileged status of certain documents that Tucows stored there has been waived solely as a result of Tucows' partial sub-lease of the facility to Alacritude. That argument fails on its face—defendants cite no authority for the proposition that merely storing privileged documents on leased property leads to the drastic finding of attorney-client privilege waiver. Even further, defendants provide no evidence that any Alacritude employee actually obtained privileged information from the facility.

Tucows took reasonable measures to preserve the confidentiality of its documents at the King of Prussia facility. It did this by maintaining control over the facility and the documents it kept there. Indeed, as shown by the attached declarations and exhibits:

- Tucows kept documents in a file room with cement block walls, a steel door and no windows.

- This file room was separate from the area leased by Alacritude.

- Tucows limited Alacritude's internal use of the facility to the precise area used for Alacritude's business and did not permit it access to Tucows' area, including the Tucows file room.

- Tucows limited Alacritude's physical access to the facility by approving only certain personnel who could access the building, requiring them to have security passes and requiring them to activate an alarm system.

The Honorable Sue L. Robinson
December 14, 2005
Page 2

These facts—ones that defendants chose not to take discovery into—show that Tucows' documents were kept confidential at all times.

**Documents were kept at the King of Prussia
facility because Tucows' predecessor company was headquartered there**

The patents-in-suit were originally owned by Infonautics which was headquartered in King of Prussia. Infonautics provided an online electronic research program named eLibrary, and operated it from the King of Prussia facility. In August 2001, Infonautics merged with Tucows (the new company retained Tucows' name) and all of the Infonautics employees became Tucows employees. Tucows continued to operate its eLibrary business out of the King of Prussia facility.

In August 2002, Tucows sold its eLibrary business to Alacritude. The patents-in-suit were not part of that sale, nor were they licensed to Alacritude. Lazare Decl. ¶ 5 (attached hereto as Ex. 4). Some Tucows employees involved with eLibrary became Alacritude employees as a result of the sale, including Scott Bernberg and Kevin Gillan. Bernberg Decl. ¶ 4 (attached hereto as Ex. 5). As part of the eLibrary sale, Alacritude was permitted to sub-lease a portion of the King of Prussia facility from Tucows so it could continue to operate the eLibrary business. The terms of that sub-lease are set forth in the parties' "Shared Facilities Agreement." *See* Ex. 1.[1]

The lease lasted until January 25, 2004. During that time, Tucows continued to store some of its Infonautics documents at the facility. It also stored approximately 460 boxes of Infonautics documents at an Iron Mountain facility in Pennsylvania. Raponi Decl. ¶ 3 (attached hereto as Ex. 6). It is unknown which documents identified on BTG's privilege log were stored at the King of Prussia facility and which documents were stored at the Iron Mountain facility.

**Tucows took reasonable measures to maintain its
documents at the King of Prussia facility as confidential**

For the entire duration of the sub-lease to Alacritude, Tucows exercised control over the King of Prussia facility and the documents that it kept there. Indeed, special provisions were set forth in the parties' Shared Facilities Agreement to ensure that Tucows' sub-lessee Alacritude did <u>not</u> take possession of the documents. For example, Article 5 provided:

---

[1] Defendants never requested the Shared Facilities Agreement as part of formal discovery. BTG has nonetheless provided it to defendants as part of its investigation into the present privilege issue.

The Honorable Sue L. Robinson
December 14, 2005
Page 3

## ARTICLE 5
## CONFIDENTIALITY

**5.1 Entry By Others.** <u>Alacritude acknowledges that confidential information of Tucows and other subtenants is maintained and used in the Facilities</u> and therefore Alacritude will not permit any Alacritude employees (except for Authorized Personnel), independent contractors, contractors or visitors to use the Services or enter the Facilities (except for representatives of Landlord) unless accompanied by or under the supervision of Authorized Personnel.

*See* Ex. 1 (emphasis added). Article 5 of the Shared Facilities Agreement alone illustrates that Tucows has taken all necessary efforts to protect the confidentiality of its documents.

Only 16 Alacritude personnel had access to the facility. All of them were identified in the agreement. Moreover, Tucows took additional measures to limit access to the facility by providing security passes to these authorized personnel and requiring them to activate the alarm system when the building was unoccupied. *See* Ex. 2.

Another provision in the agreement limited the authorized personnel's internal use of the facility to the precise area that was used for Alacritude's eLibrary business — the agreement did not permit them access to Tucows' areas. *See* Ex. 1. Tucows even reserved the right to re-occupy that area at any time after 30 days notice to Alacritude. *See id.*

Tucows took even further measures to maintain documents as confidential by keeping them separated from the eLibrary area leased by Alacritude. Indeed, Tucows documents were stored at the facility in an interior file room with cement block walls and no windows. *See* Ditty Decl. ¶ 3 (attached hereto as Ex. 7); Bernberg Decl. ¶ 5. This room only had one door and it was made out of steel. *See id.* And most of the authorized personnel—identified in the Shared Facilities Agreement—didn't even know the room existed. Bernberg Decl. ¶¶ 5-6. Some documents pertaining to Infonautics' board minutes and former Infonautics employees' personal information, were kept in approximately 7-10 file cabinets located on a wall along side the file room. Raponi Decl. ¶ 4. Inside the file room, documents were kept in file cabinets (some of which were locked) and in boxes on top of the file cabinets. *See* Bernberg Decl. ¶¶ 5-6; Raponi Decl. ¶ 4. As BTG employee Scott Williams testified at his deposition, the file room was separate from where Alacritude personnel were working, it had a door to prohibit people from going in, it contained file cabinets, and it was clearly for document storage only. Exhibit 3, Uncertified Dep. Tr. of Scott Williams at 83-86:10-22.

Moreover, Tucows <u>never</u> allowed Alacritude access to its documents. Defendants incorrectly claim that Alacritude possessed the documents simply because Scott Bernberg—the former Infonautics and Tucows employee who went to Alacritude with the sale of eLibrary—let

The Honorable Sue L. Robinson
December 14, 2005
Page 4

three BTG employees (one of which was BTG's in house counsel Brad Ditty) into the file room.[2] Mr. Bernberg merely escorted the BTG employees to the file room after he received express permission from Tucows' General Counsel, Brenda Lazare to do so—nobody was given access to the room without direct permission from Tucows. Lazare Decl. ¶ 8; Ditty Decl. ¶ 5; Bernberg Decl. ¶ 8. Further, he told Brad Ditty that he didn't know what documents were in the room or the content of the documents. Ditty Decl. ¶ 6.

Former Infonautics and Tucows employee, Kevin Gillan—who, like Scott Bernberg, was listed as an authorized personnel in the Shared Facilities Agreement—helped Tucows' Maria Raponi gather documents from the facility in early November 2003. He merely helped her determine the types of documents in some boxes and then they labeled them so the boxes could be shipped to Tucows' Toronto facility—it is unknown which boxes of documents they labeled. And Mr. Gillan did not substantively review the documents while doing this. Raponi Decl. ¶ 5.

## Defendants provide no evidence that
## <u>Tucows failed to maintain its documents as confidential</u>

Defendants have provided no evidence that any Alacritude employee, or any other third party, obtained privileged information from the facility. Instead, defendants simply assert that Tucows must have waived privilege for all of its King of Prussia documents because it leased a portion of the facility to Alacritude, while storing documents there. In doing so, defendants rely heavily on *Robbins & Myers, Inc. v. J.M. Huber Corp.*, which is easily distinguishable from the facts at hand.

In *Robbins*, a subsidiary in its entirety, including its privileged documents, was sold to a third party. 2003 U.S. Dist. LEXIS 10001 (W.D.N.Y. 2003). Here, on the other hand, only a small portion of Tucows' business—i.e., eLibrary—was sold to Alacritude and privileged documents were <u>not</u> part of that sale. In fact, unlike in *Robbins*, and contrary to defendants' assertions, no privileged documents were given to or possessed by Alacritude. Tucows merely leased the portion of the facility to Alacritude which pertained to the eLibrary work area and at all times stored documents in its secure file room and limited Alacritude's physical access to the facility. None of these measures taken by Tucows were present in *Robbins*.

Tucows' measures to limit access to its documents prove its continued intent to maintain their confidentiality. *See McCafferty's, Inc. v. The Bank of Glen Burnie*, 179 F.R.D. 163, 169 (D. Md. 1998) (citing Edna S. Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 183-190 (ABA Section of Litigation, 3d ed. 1997)) (segregating documents to their own separate files and establishing policies to limit access to privileged materials are recognized precautions which evidence a continued intent to maintain the confidentiality of privileged documents). As acknowledged in *McCafferty's*, the precautions need not be "perfect" and the

---

[2] This was of course after BTG and Tucows signed the Patent Assignment and Commercialization Agreement so it was entirely proper for BTG to access any Tucows documents at that time.

The Honorable Sue L. Robinson
December 14, 2005
Page 5

issue is not whether every conceivable precaution was taken, but whether reasonable precautions were taken. *Id.* at 169. Reasonable precautions were taken here. Tucows limited Alacritude's actual use of the facility and precluded its access to all Tucows documents kept there to ensure that the documents would be protected.[3]

Defendants could have developed these facts through proper discovery but chose not to. They didn't ask BTG's in house counsel, Brad Ditty, or Tucows' General Counsel, Brenda Lazare, appropriate questions on these issues. Nor did they meet and confer with BTG's counsel or take the depositions of Maria Raponi or Scott Bernberg before they raised their allegations of waiver with the Court. Instead, defendants placed the entire task of discovering this factual information on BTG.

<u>**Conclusion**</u>

Tucows took reasonable measures to maintain its documents as confidential by limiting Alacritude's access to the King of Prussia facility itself and any Tucows documents kept there. Defendants have provided no evidence that these measures were not reasonable or that any third party actually obtained privileged information from the facility. As such, Tucows did not waive privilege by keeping documents at the King of Prussia facility while sub-leasing space to Alacritude. For these reasons, no privilege associated with any document from the King of Prussia facility was waived.

Respectfully,

/s/ *Tiffany Geyer Lydon*

Tiffany Geyer Lydon (I.D. #3950)

TGL: nml
164582.1

cc:     Clerk of the Court (by hand)
        John W. Shaw, Esquire (by hand)
        David J. Margules, Esquire (by hand)
        Niall A. MacLeod, Esquire (via electronic mail)
        Kristin L. Cleveland, Esquire (via electronic mail)
        John F. Luman, III, Jr., Esquire (via electronic mail)

---

[3] For argument sake only, even if there had been an inadvertent disclosure—which in this case there has not been—the scope of the waiver would only cover the specific document in issue. *Hechinger Investment Co. of Delaware v. Fleet Retail Finance Group*, 2003 U.S. Dist. LEXIS 22402, *19 (D. Del. 2003) ("When considering the scope of the waiver of the attorney client privilege…In a proper case of inadvertent disclosure, the waiver should cover only the specific document in issue").

**1**

# REDACTED

**2**

# REDACTED

**3**

# REDACTED

**4**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BTG INTERNATIONAL INC., INFONAUTICS CORPORATION, AND TUCOWS INC., | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 04-1264 SLR |
| v. | ) ) | |
| AMAZON.COM, INC., AMAZON SERVICES, INC., NETFLIX, INC., BARNESANDNOBLE.COM INC., BARNESANDNOBLE.COM LLC, AND OVERSTOCK.COM, INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF BRENDA LAZARE

Brenda Lazare declares as follows:

1.    I submit this declaration in support of Plaintiffs' letter brief submission to the Court regarding the storage of documents in Tucows Inc.'s ("Tucows") King of Prussia facility.

2.    I am currently employed as General Counsel for Tucows and held that same position during the Tucows/Infonautics merger.

3.    After Tucows and Infonautics merged (and the successor company's name was changed to Tucows Inc.), Tucows maintained Infonautics' King of Prussia facility until the lease for that facility expired in January, 2004.

4.    At all times, it was Tucows' intention to maintain the confidentiality of any confidential documents kept at the King of Prussia facility.

5.    In August 2002, Tucows sold the eLibrary business to Alacritude. The patents-in-suit were certainly not part of the sale.

MP3 29460742 1

6.    When Tucows' eLibrary business was sold to Alacritude, the parties entered into a "Shared Facilities Agreement," wherein Tucows leased Alacritude the part of the King of Prussia facility associated with eLibrary.   Tucows included a confidentiality clause in that Agreement and included several restrictions to Alacritude's access to the facility.  These provisions limited Alacritude's physical access to the facility by requiring that only authorized personnel identified in the agreement have access to the facility and no other party was to access it without being directly supervised by one of them.  Moreover, Tucows provided the authorized personnel with security passes and required that the facility's alarm be activated when the building was unoccupied.  Even more so, Tucows kept confidential documents in a file room which was separated from the eLibrary area leased by Alacritude.  It was Tucows' intent to establish these limitations and precautions to maintain the confidential nature of documents kept at the facility.  Thus, Tucows believed at all times that it was taking reasonable measures to protect any confidential information located at the King of Prussia facility.

7.    Scott Bernberg and Kevin Gillan were Infonautics employees at the King of Prussia facility, who became Tucows employees after Tucows merged with Infonautics.  Then, they became Alacritude employees after the eLibrary business was sold to Alacritude.

8.    After Tucows and BTG entered into the Patent Assignment and Commercialization Agreement, I approved BTG's access to Tucows' documents located at the King of Prussia facility.  I contacted Scott Bernberg and specifically instructed him to allow BTG access to the file room.  To the best of my knowledge, nobody was given access to those documents without my approval.

9.    If asked the proper questions at my deposition, I would have testified to the above information.

2

I declare under penalty of perjury and to the best of my knowledge that the foregoing is true and correct.

Dated: December 12, 2005

Brenda Lazare
Brenda Lazare

**5**

11/30/2005  13:41    6104306355                    CMR                        PAGE  02

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| BTG INTERNATIONAL INC., INFONAUTICS CORPORATION, AND TUCOWS INC., | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 04-1264 SLR |
| v. | ) ) | |
| AMAZON.COM, INC., AMAZON SERVICES, INC., NETFLIX, INC., BARNESANDNOBLE.COM INC., BARNESANDNOBLE.COM LLC, AND OVERSTOCK.COM, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF SCOTT BERNBERG

Scott Bernberg declares as follows:

1.     I submit this declaration in support of Plaintiffs' letter brief submission to the Court regarding the storage of documents in Tucows Inc.'s ("Tucows") King of Prussia Facility.

2.     I am a former employee of Infonautics and worked for Infonautics at the King of Prussia Facility, where Infonautics was headquartered.  I continued to work for Tucows/Infonautics in the King of Prussia Facility after Tucows and Infonautics merged and the company name was changed to Tucows Inc.

3.     While working for Infonautics and for Tucows, my responsibilities included work for eLibrary.

4.     Following the sale of eLibrary to Alacritude, all of the Tucows employees located at the King of Prussia facility who were associated with eLibrary became employees of Alacritude, including myself.

MP3 20158692.1

PAGE 2/3 * RCVD AT 11/30/2005 12:11:50 PM [Central Standard Time] * SVR:MP-RIGHTFAX/6 * DNIS:612 * CSID:6104306355 * DURATION (mm-ss):02-00

5.      Tucows kept documents at its King of Prussia Facility. Certain documents were kept apart from the eLibrary work area in an interior storage room, having four walls and one entry door.  The documents were kept inside file cabinets, which were lockable and some of the file cabinets were locked.

6.      To the best of my knowledge, no other Alacritude employees ever accessed the documents in the storage room described in Paragraph 5.

7.      Furthermore, to the best of my knowledge, nobody was granted access to the storage room described in Paragraph 5 without direct instruction from Tucows.   In fact, the only persons, other than myself and that I am aware of, that Tucows gave direct instruction to access the storage room were BTG employees.

8.      Brenda Lazare, Esq. of Tucows, Inc. contacted me and instructed me to allow BTG employees into the storage room.  I provided them access to the room but did not assist them in their review and collection of documents from the room.

I declare under penalty of perjury and to the best of my knowledge that the foregoing is true and correct.

Dated: November 30, 2005

_____
Scott Bernberg

**6**

12-12-05　　03:52PM　　FROM-Tucows　　　　　　　　4165356875　　　　T-680　P.002/003　F-219

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BTG INTERNATIONAL INC.,<br>INFONAUTICS CORPORATION, AND<br>TUCOWS INC., | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 04-1264 SLR |
| v. | ) ) ) | |
| AMAZON.COM, INC., AMAZON<br>SERVICES, INC., NETFLIX, INC.,<br>BARNESANDNOBLE.COM INC.,<br>BARNESANDNOBLE.COM LLC, AND<br>OVERSTOCK.COM, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF MARIA RAPONI

Maria Raponi declares as follows:

　　　1.　　I submit this declaration in support of Plaintiffs' letter brief submission to the Court regarding the storage of documents in Tucows Inc.'s ("Tucows") King of Prussia facility.

　　　2.　　I am currently employed by Tucows as the Facility Coordinator. I held that same position during the Tucows/Infonautics merger.

　　　3.　　On November 6, 2003 I traveled to the Tucows' King of Prussia facility to gather documents and ship them to Tucows' Toronto facility. Documents were stored at this facility and at least 460 boxes of Infonautics documents were stored at an Iron Mountain facility in Pennsylvania.

　　　4.　　Infonautics documents at the King of Prussia facility were stored in an interior file room with cement block walls and no windows. Some documents pertaining to Infonautics' board minutes, WorldCom, and employees' personal information were also kept in a

MP3 20160624.1

12-12-05    03:52PM    FROM-Tucows                    4165356875            T-680    P.003/003    F-219

approximately seven to ten file cabinets located on a wall along side the storage room.  Inside the

storage room, documents were kept in file cabinets and in boxes on top of the file cabinets.

     5.     At the time I went to the King of Prussia facility in November 2003, Kevin

Gillan, a former Infonautics and Tucows employee who became an Alacritude employee after

Tucows sold its eLibrary business to Alacritude, helped me determine the types of Infonautics

documents in some boxes and also helped me label the boxes so I could ship them to Tucows'

Toronto facility.  Neither of us substantively reviewed the documents while we were doing this.

We were simply doing this so we could organize them in some way and ship them off.

     6.     To the best of my knowledge, while I was at the King of Prussia facility, nobody

other than myself and Mr. Gillan, accessed the documents in the facility.

     I declare under penalty of perjury and to the best of my knowledge that the foregoing is

true and correct.

Dated: December 12, 2005

                                           Maria Raponi

MP3 20160624.1                                        2

7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BTG INTERNATIONAL INC.,<br>INFONAUTICS CORPORATION, AND<br>TUCOWS INC., | ) ) ) ) | |
| Plaintiff, | ) | Civil Action No. 04-1264 SLR |
| v. | ) ) | |
| AMAZON.COM, INC., AMAZON<br>SERVICES, INC., NETFLIX, INC.,<br>BARNESANDNOBLE.COM INC.,<br>BARNESANDNOBLE.COM LLC, AND<br>OVERSTOCK.COM, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF BRADLEY DITTY

Bradley Ditty declares as follows:

1.      I submit this declaration in support of Plaintiffs' letter brief submission to the Court regarding the storage of documents in Tucows Inc.'s ("Tucows") King of Prussia Facility. Unless otherwise stated, I am fully familiar with the matters set forth in this declaration.

2.      After BTG and Tucows entered into the Patent Assignment and Commercialization Agreement regarding the patents-in-suit, four BTG employees, including myself, were granted access to Tucows' documents kept in Tucows' King of Prussia Facility.

3.      Tucows' documents were kept apart from the eLibrary work area in an interior, windowless storage room, having four cement block walls and one steel entry door.  Nearly all of the documents were kept inside lockable file cabinets.  The only documents located in the storage room were those belonging to Tucows.

4.      Three BTG employees, acting under my direction, and I were granted access to the storage room described in Paragraph 3 upon direct instruction from Tucows to Scott Bernberg.

5.      Brenda Lazare, Esq., Tucows' General Counsel, contacted Scott Bernberg and instructed him to allow us into the storage room. Mr. Bernberg escorted us to the storage room but did not assist us in our review and collection of documents from the storage room. Nobody else entered the storage room when we were there.

6.      We asked Scott Bernberg whether he could identify where in the storage room certain categories of documents were located and he told us that he had no knowledge of what documents were in the room, the content of the documents within the room or the organization of the documents within the room itself.

7.      If I had been asked at my deposition, I would have testified to these exact facts as set forth herein.

I declare under penalty of perjury and to the best of my knowledge that the foregoing is true and correct.

Dated:  November 29, 2005

_____
Bradley Ditty