IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BTG INTERNATIONAL, INC., INFONAUTICS CORPORATION, and TUCOWS INC., | §<br>§<br>§<br>§ | |
| *Plaintiffs,* | §<br>§ | |
| vs. | §<br>§ | C.A. No. 04-1264-SLR |
| AMAZON.COM, INC., AMAZON SERVICES, INC., NETFLIX, INC., BARNESANDNOBLE.COM, INC., BARNESANDNOBLE.COM LLC, and OVERSTOCK.COM, INC. | §<br>§<br>§<br>§<br>§<br>§ | |
| *Defendants.* | §<br>§ | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO BE HEARD AND FOR CLARIFICATION REGARDING THE COURT'S DECEMBER 2, 2005 ORDER

Defendants Amazon.com, Inc., Amazon Services, Inc., and Overstock.com, Inc. submit this response to Plaintiffs' Motion for Leave to Be Heard and for Clarification Regarding the Court's December 2, 2005 Order (D.I. 336). Plaintiffs (collectively, referred to herein as "BTG") misnamed their request, as they do not wish the Court to "clarify" the Order, but, in fact to reconsider the decision. As demonstrated below, BTG has utterly failed to meet its burden under Federal Rule of Civil Procedure 60(b) for relief from paragraph 1 of the Court's December 2, 2005 Order (D.I. 324) (the "Order"), and its request for modification of paragraphs 2 and 3 of the Order is also without merit.

## INTRODUCTION

Since 2003, Plaintiff BTG has known that Alacritude housed and reviewed documents that it now contends are "privileged." Plaintiffs Tucows/Infonautics have known this since 2002. BTG did not disclose this in any privilege log, even though Federal Rule of Civil Procedure

26(b)(5) requires litigants to disclose such facts when relevant documents are withheld from production on grounds of privilege or other immunity from production. Defendants learned of these facts only by chance while exploring other issues during the 30(b)(6) deposition of Plaintiffs Tucows and Infonautics on October 28, 2005.

After Defendants raised this issue with the Court on November 2, 2005, the Court directed the parties to submit letter briefs on November 15, 2005. Specifically, the Court said:

> Well, I am just going to say November 15. If you are prepared to offer your version of the facts to me on those issues, that's fine. If there needs to be a different mechanism than this letter memorandum you're going to send me, then you should contact me and let me know so we can have a telephone conference and determine how we're going to address that issue, all right? [Transcript of November 2, 2005 discovery conference (D.I. 285) at 35:10-16.]

BTG never asked the Court to extend the November 15 deadline for simultaneous submissions. It simply failed to submit a letter brief on that date, and granted itself several extensions of time—first to November 22, and then to "sometime" the following week. (*See* D.I. 299 at note 1, D.I. 314.) At no point did BTG offer any explanation as to why it needed additional time for its "investigation," such as the difficulty of obtaining specific and relevant non-party discovery. Now, six weeks after the November 2 hearing, four weeks after the November 15 deadline and the timely filing of Defendants' letter brief, and two weeks after the Court ruled, BTG asks the Court to hear its argument for the first time.

BTG has presented no credible excuse for its neglect or delay. Its "investigation" consisted of little more than contacting a single non-party witness, "finding" an agreement from BTG's own files (which Defendants specifically requested on October 28) and producing self-serving affidavits from Plaintiffs BTG and Tucows' employees, two of whom had already been deposed on this issue. Thus, the Court should refuse to consider BTG's late-filed argument.

Even if the Court entertains BTG's argument, the Court should not reverse its ruling. BTG's investigation reveals what BTG must have known all along—that at least sixteen employees of Alacritude had access to the documents and at least one Alacritude employee is known to have actually reviewed them. Without question, any existing privilege has been waived when the documents were reviewed by an unrelated third party.

BTG's conduct blocked Defendants and the Court from learning the true facts about these documents until late in the discovery process. This delay could well make a difference in the case, prejudicing Defendants. The Court's December 2, 2005 Order (D.I. 324) should stand, and the documents produced without further delay.

BTG seeks relief from an Order of this Court. Under Federal Rule of Civil Procedure 60(b), such relief is granted only under certain enumerated circumstances, none of which BTG claims in its Motion. As a result, the Court should deny BTG's requested relief.

**ARGUMENT**

**I.    BTG Has Given No Valid Reason for Its Delay**

BTG's explanation for its delay is not credible, and in any event is no excuse. BTG's sole basis for asking to be heard on the Alacritude issue is that BTG was unaware of the issue and needed time conduct a "factual investigation." This investigation should have been conducted prior to setting forth materials on a privilege log. In fact, BTG has been aware of this issue for a long time, at least since it went to the Alacritude site and utilized Alacritude employees to collect the documents. Moreover, the "investigation" essentially consisted of interviewing one non-party individual. That does not justify the month-long delay in BTG's briefing, or BTG's failure to timely move for more time to complete its "investigation" and briefing.

### A.   BTG Never Explained Why It Needed So Much Additional Time

As the Court requested, Defendants briefed this issue on November 15, 2005.  (D.I. 298.)

BTG did not address this issue at all in its November 15 brief, claiming that it would do so by

November 22.  *See* D.I. 299 (BTG's Nov. 15, 2005 letter brief at n.1).  After missing its self-

imposed November 22 deadline, BTG sent a letter to the Court on November 23 and granted

itself a second extension of time to address the Alacritude issue.  *See* D.I. 314.  Three weeks after

Defendants briefed this issue, and with no word from BTG, the Court issued its Order on

December 2.  Two more weeks passed before BTG finally decided to respond.

At no point during BTG's delay did it ever explain why it could not respond.  BTG never

informed the Court or anyone else what it expected to find or what it was doing that was taking

so long.[1]  Considering that BTG has known the underlying facts for years, it should have been a

very simple task to draft a short brief on the issue – or at least formally request additional time.

### B.   BTG Has Known of This Issue for Some Time

BTG complains that Defendants first mentioned the Alacritude issue by alleging that the

attorney-client privilege was waived at the November 2, 2005 hearing.  Although Defendants

only learned of the issue at the deposition of Tucows' general counsel on October 28, 2005, BTG

now argues that Defendants' act of raising the issue in Court somehow justifies BTG's extensive

delay in briefing the issue following the hearing.  In reality, Plaintiff BTG has known about this

issue since at least November 2003, when BTG went to Alacritude to pick up the documents.

*See* BTG's December 15, 2005 letter brief (Ex. A to D.I. 336) at 4.  Moreover, Plaintiff Tucows

---

[1] On December 1, in the course of discussing the purported need to reschedule the deposition of a
third party, Mr. Winfield Treese, until after the Court's ruling on the pending privilege issues,
Amazon.com counsel inquired if and when BTG intended to submit any additional briefing, per
its letters of November 15 and 22 to the Court.  BTG's counsel stated that they had found facts
and might complete briefing by the end of the week.  Defendants did not hear any more from
BTG on this issue until they received BTG's December 15 filing.

has known about this issue since August 2002, when it sold its eLibrary business to Alacritude while leaving the documents behind.

### C.    BTG's "Investigation" Does Not Justify a Month-Long Delay

The only reason BTG has offered for taking an additional month to brief this issue is that BTG was conducting a factual investigation that is "just now" complete. *See* Pl.'s Motion (D.I. 336) at 1. The disclosed material from BTG's factual investigation consists of:  1) deposition testimony of Plaintiff BTG's Scott Williams; 2) three affidavits of employees of Plaintiffs BTG and Tucows; 3) a single affidavit from an employee of Alacritude, and 4) an agreement between Alacritude and Tucows.

At no time did BTG explain its delay.  As set forth in the chart below, each piece of information on which BTG relies was likely available by the date the Court set for briefs to be submitted, November 15 (and certainly before the Court issued its Order on December 2).

| "Fact" | Information Available to BTG | Information Memorialized |
|---|---|---|
| Williams Deposition Testimony | Mr. Williams is an employee of Plaintiff BTG and presumably had knowledge of the facts in his deposition since 2003. | Testimony completed on 11/10/05 |
| Lazare (Tucows' general counsel) Declaration | Ms. Lazare stated in her affidavit that she had knowledge of her statements as of the day she was deposed: 10/28/05. | Declaration signed on 12/12/05 |
| Ditty (BTG's general counsel) Declaration | Mr. Ditty stated in his affidavit that he had knowledge of these "exact facts" as of the day he was deposed: 11/11/05. | Declaration signed on 11/29/05 |

| Raponi (Tucows' employee) Declaration | Ms. Raponi is an employee of Plaintiff Tucows and presumably had knowledge of the facts in her affidavit since 2003 | Declaration signed on 12/12/05 |
|---|---|---|
| Bernberg Declaration | Mr. Bernberg been known to BTG for several years as he is the Alacritude employee who escorted Plaintiff BTG personnel to the file room to retrieve the documents in 2003. *See* D.I. 336, Ex. A (BTG's 12/15/05 letter brief) at 4. We do not know how long it would have taken to contact Mr. Bernberg, but BTG was able to finalize his affidavit by 11/30. | Declaration signed on 11/30/05 |
| Shared Facilities Agreement | The document, dated August 15, 2002, was in the possession of BTG and requested by Defendants on October 27, 2005, and again on November 2, 2005. | Produced November 22, 2005 |

A review of the above chart illustrates that obtaining an affidavit from Alacritude's Scott Bernberg was the only aspect of BTG's investigation that could possibly have taken any amount of time to accomplish. Despite the fact that Mr. Bernberg's affidavit was available November 30, 2005, BTG inexplicably waited an additional two weeks to submit its brief. Further, two of the affidavits obtained as part of the six-week investigation are from individuals who have been deposed on the Alacritude issue—Brenda Lazare and Bradley Ditty (both of whom are general counsel for Plaintiff Tucows and BTG, respectively).[2] At their depositions (which occurred prior to November 15, 2005) both were questioned by Defendants about Alacritude, and BTG could

---

[2] Defendants cited to these witnesses' deposition transcripts and provided a copy of these transcripts with Defendants' November 15, 2005 letter brief. Defendants also cited to BTG's Williams' testimony on his involvement with the Alacritude documents. Thus, the majority of BTG's six-week "investigation" resulted in information already available on November 15.

have easily asked questions on this issue but did not. BTG should now not be rewarded for its

dilatory tactics and wordsmithed declarations of these deponents.

In sum, BTG's request to be heard should be denied. BTG has known about the

Alacritude issue for years now, yet failed to disclose it to Defendants in the privilege log to allow

an earlier inquiry to be made. The issue was discovered by Defendants in an October 28th,

30(b)(6) deposition of Tucows, for which Defendants served a notice in August, and expressly

requested to be completed before the Court's September discovery status conference, but that

BTG would not coordinate prior to late October. When the issue was finally raised in Court,

BTG delayed in briefing the issue and offered no explanation as to why it was unable to do so.

Finally, now that BTG completed its "investigation" that caused the delay, it is apparent that the

investigation does not justify BTG's extreme tardiness in addressing the Alacritude issue. The

Court should not allow BTG to grant itself extensions and address issues when it sees fit.

## II.    BTG's Late Briefing Is Not Persuasive, and the Court Should Not Reconsider Its Ruling

Not only is BTG's briefing late, it is also without merit. If the Court decides to hear

BTG's late-filed arguments, the Court will learn that many employees of the third party,

Alacritude, had access to the documents in question and that at least one such employee is

known to have reviewed the documents. BTG sets forth no facts to sustain the privilege, and the

BTG's late-filed brief is entirely unpersuasive. While Defendants reserve the right to respond

substantively should the Court grant BTG's motion to be heard, the information below sets forth

how even the material presented by BTG supports that the privilege was waived.

### A.    At Least One Alacritude Employee Reviewed the Documents, and Others Had Access

The results of BTG's "investigation" completely undermine its arguments. First, BTG

acknowledges that Alacritude employee Scott Bernberg escorted Plaintiff BTG personnel to the

7

file room to get the documents. *See* BTG's December 15, 2005 letter brief (Ex. A to D.I. 336) at

4. While BTG contends that Tucows controlled all access to the documents, apparently Mr.

Bernberg had easier access to the confidential documents than BTG. Moreover, BTG candidly

admits that at least 16 Alacritude employees had access to the documents. *See id.* at 3. <u>BTG also</u>

<u>admits it is aware that Alacritude employee Kevin Gillan reviewed the documents to "help</u>

<u>determine the types of Infonautics' documents in some boxes</u> and also helped...me label the

boxes...." *See* Raponi Decl., Ex. 6 to BTG's December 15, 2005 letter brief (Ex. A to D.I. 336).[3]

BTG therefore admits that not only did Alacritude have access to the documents for nearly a

year, but also that an Alacritude employee actually reviewed the documents!

Because many employees of third-party Alacritude had access to the supposedly

privileged documents, and at least one Alacritude employee is known to have actually reviewed

them, any privilege that could have existed has been waived.[4] *In re Sealed Case*, 877 F.2d 976,

980 (D.C. Cir. 1989).

---

[3] Raponi, a Tucows' employee, goes on to testify on Kevin Gillan's behalf by swearing that "neither of us substantively reviewed the documents...." *Id.* Despite conducting a month-long investigation, BTG was apparently unable to get Mr. Gillan to make such a statement or to provide an affidavit. Further, whether his review is "substantive" or not, the fact remains that <u>BTG admits a third party reviewed allegedly privileged documents</u>.

[4] In the agreement between Plaintiff Tucows and Alacritude, sixteen employees of Alacritude are listed as having access to the documents. *See* Ex. A to D.I. 336, Ex. 1 at Ex. D. This agreement purportedly existed at the time of the Tucows sale of its eLibrary assets to Alacritude in August 2002. There is no indication that BTG interviewed these sixteen people. While Defendants believe that the record fully supports waiver of the alleged privilege of the Alacritude documents, to the extent the Court is inclined to give credence to BTG's affidavits, Defendants request the opportunity to depose or interview each of the sixteen Alacritude employees listed in the agreement and any others employed by Alacritude during the relevant time period.

**B.    BTG's Arguments That It Maintained the Privilege Are Unpersuasive**

BTG's first argument that the attorney-client privilege was not waived is that the documents were kept in "lockable"[5] file cabinets in a room with "cement block walls, a steel door and no windows." While impressive, such a well-fortified room has no relevance to the issue of privilege, particularly where BTG never states that the file room was actually locked. The fact remains that at least 16 Alacritude employees had access to the room. *See* BTG's December 15, 2005 letter brief (Ex. A to D.I. 336) at 3.

BTG next argues that the file room was separate from the Alacritude space. Again, however, by BTG's own admission at least 16 Alacritude employees had access to the file room and at least one, Kevin Gillan, actually reviewed the documents. *Id.*

BTG's third and fourth arguments are basically the same, alleging that Tucows contractually limited Alacritude's access to the documents. This argument is based on the "Shared Facilities Agreement" attached by BTG as Exhibit 1 to the brief. BTG does not offer any evidence whatsoever that anyone at Alacritude actually abided by the Agreement. BTG also fails to offer any evidence that Tucows enforced the Agreement. Notably absent from BTG's investigation is any statement that Alacritude never had new employees, vendors, customers, service people, directors/officers, etc. in the facility.

Even if every employee of Alacritude knew of the Agreement, and even if BTG took every precaution possible to protect the documents, the fact that BTG admits that an employee of Alacritude, Kevin Gillan, reviewed the documents constitutes waiver of the attorney-client privilege.

---

[5] Note that BTG's Ditty used the word "lockable" instead of "locked." *See* Declaration of Bradley Ditty, attached to BTG's December 15, 2005 letter brief (Ex. A to D.I. 336) as Exhibit 7.

Finally, BTG argues that Defendants have no evidence that Tucows failed to maintain the confidentiality of the documents in question. This is demonstrably false, of course, as Defendants provided evidence that the documents were left in the possession of a third party for over a year. *See* Defendants' November 15, 2005 letter brief (D.I. 298). This evidence alone is enough to show waiver, as the Court acknowledged in its December 2, 2005 Order by stating that the "documents have lost their privileged status by being left in the possession of a third party, Alacritude." *See* D.I. 324. Even if this evidence was somehow insufficient, the evidence discovered in BTG's investigation that at least one Alacritude employee actually reviewed the documents in question provides conclusive evidence of waiver.[6]

**III.     The Court Should Not Modify Its Order**

BTG has also requested that the Court modify its Order to require Amazon.com to produce 36 documents for inspection by the Court, purportedly to ensure a "level playing field." The playing field is already level. It is the Defendants' vigorous actions in moving the ball down the field that has made the difference. While Defendants have repeatedly urged for in camera review of supposedly privileged documents, BTG has never (until now) made a formal request to the Court and, unlike Defendants, has never shown the Court any specific privilege log entry that is being questioned. Thus, the issue is unripe and there is no basis for the Court to modify paragraphs 2 and 3 of its Order.

---

[6] Even if the Court were to reverse its prior decision regarding waiver of the attorney-client privilege based on Alacritude, the documents are still not protected by any privilege. No common interest privilege exists between Tucows and BTG as the shared interest between them is strictly commercial. The Court has not yet addressed this argument, as it has been rendered moot by the Alacritude issue. *See, e.g.*, D.I. 276 at paragraph 1; D.I. 285 at 5:24-6:14.

## CONCLUSION

BTG's brief regarding waiver of attorney-client privilege for documents left in Alacritude's possession comes far too late and is without merit. The Court should not reconsider its ruling, and certainly should not reverse it. After knowing of this issue for years and then stalling for six weeks after Defendants raised it with the Court, BTG's "investigation" resulted in nothing more than an unsigned agreement and an admission that many Alacritude employees had access to the documents and one actually reviewed them. That "investigation" confirms the waiver of privilege and supports this Court's ruling. Finally, BTG's request to modify the Order to require Amazon to produce documents for in camera review is unripe, unsupported, and should also be denied.

In accordance with the Court's December 16, 2005 Order (D.I. 340), BTG should be ordered to pay Defendants' costs in these proceedings.

BOUCHARD MARGULES & FRIEDLANDER, P.A.

/s/ David J. Margules

Dated: December 22, 2005

David J. Margules (#2254) [dmargules@bmf-law.com]
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 573-3500
Attorneys for Defendant Overstock.com, Inc.

OF COUNSEL:

Glenn A. Ballard, Jr.
John F. Luman, III
BRACEWELL & GIULIANI LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002-2781
(713) 223-2300